## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| THE COURTLAND COMPANY, INC., a West Virginia Business Corporation, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. __2:19-cv-00894____ ) |
| UNION CARBIDE CORPORATION, a New York Corporation, | ) ) ) |
| Defendant | ) ) |

**COMPLAINT FOR: (1) RECOVERY OF RESPONSE COSTS AND DECLARATORY RELIEF UNDER CERCLA § 107(a), 42 U.S.C. §§ 9607(a) AND 9613(g); (2) "CITIZEN SUIT" PURSUANT TO RCRA § 7002(a)(1)(A), 42 U.S.C. § 6972(a)(1)(A); (3) "CITIZEN SUIT" PURSUANT TO RCRA § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), FOR ABATEMENT OF AN IMMINENT AND SUBSTANTIAL ENDANGERMENT TO HEALTH OR THE ENVIRONMENT; (4) JUDICIAL ABATEMENT OF A PUBLIC NUISANCE *PER SE*; (5) JUDICIAL ABATEMENT OF A PUBLIC NUISANCE; (6) DAMAGES AND RELIEF FROM PRIVATE NUISANCE; (7) NEGLIGENCE; (8) NEGLIGENCE *PER SE*; (9) GROSS NEGLIGENCE; AND (10) STRICT LIABILITY**

Plaintiff, the Courtland Company, Inc. ("Courtland"), by and through its undersigned counsel, makes the following allegations upon knowledge as to itself and upon information and belief as to all other matters:

### *Nature of this Case*

1. Through its acts, omissions, violations of federal and state environmental and public health protection laws, and breaches of common law duties owed to Plaintiff and the public at large, Defendant, Union Carbide Corporation ("UCC") has caused the release of toxic, noxious, harmful and hazardous contaminants into the environment, and such contaminants have become present and threaten to become further present at, on, and under Plaintiff's property and in soils,

groundwater, and surface waters in the immediate vicinity thereof. Such releases have occurred at and from a parcel of land owned and operated by Defendant beginning no later than the 1950s, which parcel lies both east and north of property owned by the Plaintiff and contains (i) a rail yard, at which hazardous and toxic chemicals have been both stored onsite, released and disposed of to environmental media, and then permitted to leach into the environment, including soils, surface waters -- including Davis Creek and/or the Kanawha River -- and groundwater underlying Plaintiff's property, and (ii) an undisclosed landfill that is entirely noncompliant with applicable state and federal law, at which landfill hazardous wastes and hazardous substances have been disposed of and from which landfill such hazardous wastes and hazardous substances have leached and continue to leach to soils, groundwater, and surface waters—including the Davis Creek and/or the Kanawha River —in further violation of applicable state and federal law. Such unabated contamination of environmental media not only is an invasion of Plaintiff's right to the customary safe and comfortable use and enjoyment its property, it also constitutes a condition that both presents and may present an imminent and substantial endangerment to human health and the environment, has already caused actual damage to the environment, and is a current and continuing hazard to human health and the environment and a serious public nuisance which has been intentionally hidden by Defendant UCC from the Plaintiff, the responsible federal and state governmental agencies with applicable environmental and public health protection regulatory authority, and the public.

2.      Accordingly, Plaintiff brings this action to, *inter alia*: **(a)** recover its costs of responding to releases hazardous substances (*i.e.,* "response costs") incurred and to be incurred under Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA" or "federal Superfund Act"), 42 U.S.C. § 9607(a);

**(b)** to obtain appropriate injunctive relief pursuant to section 7002(a)(1)(A) of the Resource Conservation and Recovery Act of 1976 ("RCRA" or "federal Hazardous Waste Management Act"), 42 U.S.C. § 6972(a)(1)(A) to compel compliance with the requirements of RCRA and to redress the consequences of past and on-going violations of RCRA; **(c)** pursuant to section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), to secure judicial abatement of an imminent and substantial endangerment to health or the environment that may be presented by the solid wastes and hazardous wastes at and emanating from the facility owned and operated by Defendant UCC as a result of its past and on-going acts and omissions, with authorization for Plaintiff to conduct appropriate oversight and monitoring of the defendant UCC's compliance with this court's orders herein; **(d)** to secure abatement of an on-going public nuisance, through an appropriate Judicial Public Nuisance Abatement Order (in the nature of an appropriate mandatory injunction) that is subject to appropriate oversight and monitoring, binding and compelling Defendant UCC timely and competently to undertake all actions necessary to properly abate the continuing public nuisance conditions and endangerments to the public health, safety, welfare and the environment caused and contributed to by the past and on-going acts and omissions of Defendant UCC, which nuisance conditions, as a direct and proximate result of Defendant's acts and omissions, have become present and threaten further to become present at, on, under, and in the vicinity of the real property owned by Plaintiff in South Charleston, West Virginia, with extremely adverse consequences to the environment, including Davis Creek and/or the Kanawha River; **(e)** to recover money damages, including an award of punitive damages, under the laws of private nuisance, negligence, negligence *per se*, gross negligence, and strict liability, for the harms to Plaintiff's property and to Plaintiff's property rights, including loss of reasonable use and enjoyment and loss of value; **(f)** to recover plaintiff's reasonable litigation costs, non-exclusively including plaintiff's

attorney fees and costs, expert witness fees and costs and court costs incurred in obtaining such relief; **(g)** appropriate prejudgment interest; and **(h)** such other relief as this Court may deem necessary and appropriate, including all relief under Rule 54(c), Federal Rules of Civil Procedure.

### *Jurisdiction and Venue*

3.      This Court has exclusive, original jurisdiction over the subject matter of Count I of this Complaint pursuant to CERCLA § 113(b), 42 U.S.C. § 9613(b), and original jurisdiction over the subject matter of Counts II and III of this Complaint pursuant to RCRA § 7002(a), 42 U.S.C. § 6972(a) and 28 U.S.C. § 1331. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's remaining causes of action because those claims are so related to Counts I, II, and III that they form the same case and controversy under Article III of the United States Constitution.

4.      Pursuant to CERCLA § 113(b), 42 U.S.C. § 9613(b), RCRA § 7002(a), 42 U.S.C. § 6972(a) and 28 U.S.C. § 1391(b)(2), venue lies in this Judicial District, since a substantial part of the acts, omissions, and events which are described herein and which give rise to Plaintiff's claims, including the releases of hazardous wastes and hazardous substances referenced herein, occurred in this judicial district, causing harmful impacts and endangerments to human health and the environment within this judicial district.

### *The Parties*

5.      Plaintiff Courtland is a West Virginia Business Corporation with its principal place of business in the City of South Charleston (Kanawha County), West Virginia. Courtland is the owner, in fee simple, of approximately 13.8 acres of land on Davis Creek in the City of South Charleston, Kanawha County, West Virginia, which real property is described as real estate purchased by Courtland by deed from The Charleston National Bank as Trustee under the Will of Lulu B. Dickenson Owens, Deceased, Kanawha County Recorder's Office, Book 1932 Page 440

("the Courtland Property"). Courtland purchased the Courtland Property for investment purposes, particularly for potential future sale to a third party.

6.      Defendant UCC is a New York Corporation with its principal place of business in the State of Connecticut. Since approximately 1946, Defendant UCC has been the owner of Kanawha County Tax Parcel No. 22-14-9, located at approximately 38° 21' 29.018" North latitude and 81° 42' 29.212" West longitude ("UCC Parcel"), which parcel contains a rail yard ("UCC Railyard") and a landfill site ("Filmont Landfill"). Beginning in no later than the 1950s and continuing through the 1980s, UCC accepted for disposal and disposed of solid wastes, hazardous wastes, and hazardous substances (as those terms are defined herein) at the Filmont Landfill in the manner described herein. Inasmuch as such landfill has never been properly closed in accordance with federal and state law, it remains an illegal open dump, as that term is defined and used herein—one owned, operated, and maintained by UCC—in violation of state and federal law. UCC has received an economic benefit by failing to properly and timely report, disclose, identify, list and close the Filmont Landfill, and Plaintiff has been harmed by UCC's knowing, willful, and intentional violations of federal and state law. No later than 1971 and probably several years earlier, UCC commenced operations at the UCC Railyard, including operations involving the handling, storage, and disposal of hazardous wastes and hazardous substances. In or about 2001, UCC became a wholly-owned subsidiary of the Dow Chemical Company, Inc. ("Dow"), which since that date and through its officers and employees, has controlled and continues to control all operations of UCC, inclusive of all decisions concerning hazardous waste and hazardous substance handling, treatment, storage, and disposal and all decisions concerning the environmental remediation of both legacy and current UCC sites, including both the UCC Railyard and Filmont Landfill.

*Facts Common to All Counts*

7.     RCRA is the federal public law that creates the framework for the proper management of both hazardous and non-hazardous solid wastes, so as to assure adequate protection of public health and the environment.   To accomplish these broad goals, Congress included within RCRA both regulatory and remedial provisions.

8.     RCRA § 1004(27) broadly defines "solid waste" as follows:

> The term "solid waste" means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, but does not include solid or dissolved material in domestic sewage, or solid or dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under section 1342 of title 33, or source, special nuclear, or byproduct material as defined by the Atomic Energy Act of 1954, as amended (68 Stat. 923) [42 U.S.C. 2011 *et seq.*].

42 U.S.C. § 6903(27).

9.     RCRA § 1004(5) sets forth the statutory definition of "hazardous waste," which it expressly defines as a subset of "solid waste":

> The term "hazardous waste" means a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—
>
> **(A)**     cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or
>
> **(B)**     pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C. § 6903(5).

10.     This matter also concerns the presence, within environmental media at and in the vicinity of the Courtland Property of wastes released into the environment at and from, and continuing to migrate from the Filmont Landfill and the UCC Railyard, which wastes meet the

narrower *regulatory* definition of "hazardous waste" under RCRA.  In addition to providing broad

statutory definitions of both solid waste and hazardous waste for all purposes of RCRA, Congress,

in RCRA § 3001(a), directed the Administrator of U.S. EPA:

> to develop and promulgate criteria for identifying the characteristics of hazardous
> waste, and for listing hazardous waste, which should be subject to the provisions of
> this subtitle [*i.e.,* Subtitle C of RCRA, 42 USCS §§ 6921 – 6939a], taking into
> account toxicity, persistence, and degradability in nature, potential for
> accumulation in tissue, and other related factors such as flammability,
> corrosiveness, and other hazardous characteristics.

42 U.S.C. § 6921(a).  Thus, Congress authorized and required the Administrator of U.S. EPA to

select from out of the universe of "hazardous wastes" congressionally-defined in RCRA § 1004(5)

a subset of those wastes that the Administrator determined should be subject to the

Congressionally-created strict, regulatory program of RCRA Subchapter III (sometimes also

known as RCRA Subtitle C--i.e., RCRA §§ 3001-3064, 42 U.S.C. §§ 6901-6964).  *See* 42 U.S.C.

§ 6921.

11.    Those "listed or identified" hazardous wastes to be designated by the US EPA

pursuant to formally promulgated federal regulations issued under 42 U.S.C. § 6921, are a subset

of the "statutory" hazardous wastes defined in 42 U.S.C. § 6903(5), that are subject to the very

strict RCRA Subchapter III regulatory program--a national, comprehensive "cradle to grave"

"hazardous waste management"[1] system regulating, *inter alia*, the manner in which such wastes

can be treated, stored, and disposed of.  *See* 42 U.S.C. §§ 6921-6934. *Chi* v. *EDF*, 511 U.S. 328

(1994) ("RCRA is a comprehensive environmental statute that empowers EPA to regulate

hazardous wastes from cradle to grave, in accordance with the rigorous safeguards and waste

---

[1] RCRA § 1004(7), 42 U.S.C. § 6903(7), defines the term "hazardous waste management":

> The term "hazardous waste management" means the systematic control of the
> collection, source separation, storage, transportation, processing, treatment, recovery,
> and disposal of hazardous wastes.

management procedures of Subtitle C, 42 U.S.C. §§ 6921-6934."). Throughout RCRA, Congress consistently refers to the subset of wastes designated by the Administrator pursuant to his authority under RCRA § 3001(a) that are subject to the stringent regulatory and punitive requirements of RCRA Subtitle C as "hazardous wastes listed or identified by the Administrator."

12.     Moreover, pursuant to RCRA § 3006(b), 42 U.S.C. § 6926(b), a state may develop its own hazardous waste program (*i.e.,* by the enactment of appropriate statutes, creation and funding of necessary governmental infrastructure and promulgation of necessary implementing, enforceable administrative regulations).   Upon approval of such a state hazardous waste management program by U.S. EPA, the state, pursuant to express Congressional authorization, may operate that program "in lieu of the federal program within such state," subject to certain federal requirements, the most notable of which is that the state program must be equivalent to and consistent with the federal RCRA Subtitle C hazardous waste management program.   *See* 42 U.S.C. § 6926(b).   West Virginia's hazardous waste management program, which is substantially similar to the federal program, has been formally approved by the Administrator of U.S. EPA and, accordingly, operates "in lieu of" the federal RCRA program within the State of West Virginia. *See* 51 FR 17739B (May 15, 1986); 65 FR 29973 (May 10, 2000); 78 FR 70225 (November 25, 2013).   The federal regulations pertaining to the listing and identification of hazardous wastes that are subject to the requirements of RCRA Subtitle C, set forth in 40 C.F.R. Part 261, are incorporated by reference into section §33-20-3 of the West Virginia Code of State Rules, with minor modifications that are not relevant herein.

13.     CERCLA Section 102(a), 42 U.S.C. § 9602(a), directs the Administrator of the U.S. Environmental Protection Agency to designate "as hazardous substances . . . such elements, compounds, mixtures, solutions, and substances which, when released into the environment may

present substantial danger to the public health or welfare or the environment." 42 U.S.C. § 9602(a). The Administrator's designations of the "hazardous substances" that are addressed by CERCLA are set forth in duly promulgated federal regulations codified at 40 C.F.R. § 302.4. In furtherance of its goal in enacting CERCLA to provide powerful remedial authority to address the adverse consequences to public health and the environment from "hazardous substances" released into the environment, Congress, in CERCLA § 107(a), 42 U.S.C. § 9607(a), imposes strict liability upon certain defined categories of "persons" for the payment of "response costs" incurred or to be incurred by such "persons" arising from the release or threatened release into the environment of such designated hazardous substances.

14.     Three (3) UCC facilities are adjacent to the Courtland Property, all of which have documented releases of wastes to the environment. These three facilities are the UCC Tech Center (which is the subject of a separate lawsuit), the Rail Yard, and the Filmont Landfill (collectively, "UCC Facilities"), each of which meets the definition of "facility" under CERCLA § 101(9), 42 U.S.C. § 9601(9): ". . .(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel."

15.     The Filmont Landfill is north of the Rail Yard and extends to the west to the banks of Davis Creek. It is also immediately adjacent to the Courtland real property, generally on the north side (See Figure 1) of the Courtland Property. On information and belief, the area used by

the Filmont Landfill also runs under the Rail Yard, a portion of highway 64, and a nearby office complex.

16.     Courtland was unaware of the contents or the very existence of the Filmont Landfill until the very recent Rule 30(b)(6) deposition (10/22/19) testimony by UCC's designee (a Dow employee) in related litigation.  According to this testimony, the landfill's existence has not been disclosed to state or federal authorities as required by federal and state law.



*Figure 1*

17.     According to the testimony of UCC's corporate designee, the Filmont Landfill received wastes during the 1970's and 1980's from the UCC South Charleston chemical manufacturing facility.  According to documents received from the City of South Charleston, the Filmont Landfill received wastes from the 1950s through the 1980s.  UCC's witness claimed that UCC does not know what went into the landfill other than wastes associated with the manufacture of Dynel, a fiber made from vinyl chloride and acrylonitrile.  UCC also does not how the landfill

was constructed but admitted that it was not built to the standards required by either RCRA Subtitle D or Subtitle.

18.     Additional research reveals that in addition to unknown wastes and wastes from Dynel manufacturing, the Filmont Landfill received bottom-ash from two Union Carbide South Charleston facility power plants that burned primarily coal, but also "wastes", and wastewater treatment plant grit from the UCC South Charleston influent to the South Charleston Wastewater Treatment Plant. This grit contained biphenyl, 2,6-di-tert-butyl-p-cresol, isophorone, phenyl ether and various inorganics including arsenic, chromium, lead and mercury.

19.     Historic aerial photography reveals large piles of what is likely bottom ash at the landfill site in 1971, as well as other activities. 1984 aerials also indicate the presence of what is likely large piles of bottom ash as well as other activities at the landfill site. 1996 aerials show the site as somewhat vegetated.

20.     Deposition testimony also revealed that UCC had installed 3 monitoring wells on property owned by the City of South Charleston, across Davis Creek, downgradient of the Filmont Landfill, and in close proximity to a residential area. Contamination was discovered in these wells some time prior to 2012, including 1,4-dioxane and "some ethers". UCC's Rule 30(b)(6) witness admitted in a deposition conducted in related litigation now pending before this Court that the Filmont Landfill was the source of that contamination.

21.     According to the testimony of UCC's designated representative, the presence of these contaminants from the Filmont Landfill was not reported to any governmental regulatory agency.   Freedom of Information Act ("FOIA") requests were made to both the U.S. Environmental Protection Agency (Region III) and the West Virginia Department of Environmental Protection with detailed descriptions of the landfill and its location.   Consistent

with the testimony of UCC's corporate representative, both the U.S. Environmental Protection Agency (Region III) and the West Virginia Department of Environmental Protection have claimed, in response to the FOIA requests, to have no records concerning the Filmont Landfill.

22.    An additional FOIA request was sent to the City of South Charleston concerning the monitoring wells which UCC caused to be installed on municipal property, and responsive documents were received on December 9, 2019.  Although such documents are still under review as of the date of this Complaint, such documents confirm that no later than 2011, UCC was aware that its Filmont Landfill was the source of VOC, SVOC, and toxic metal contamination—including hazardous wastes listed or identified by the U.S. EPA Administrator under 42 U.S.C. § 6921(a)— found in surrounding groundwater monitoring wells, including wells west of the Davis Creek. Such documents also contain admissions by UCC that such contamination "is historical in nature, resulting from waste placed in the [Filmont] landfill from the 1950s through the 1980s."

23.    The depth of the Filmont Landfill is unknown, however it does come to the very bank of Davis Creek and appears to cover part of the Davis Creek floodplain.  At the edge of Davis Creek the landfill appears to be 20-30 feet high.

24.    Documents produced by UCC in related litigation establish that UCC's consultant recommended an investigation of whether contamination at UCC Tech Center was connected to contamination at Filmont Landfill, though it is unknown whether UCC or Dow approved such an investigation or whether it was completed.

25.    UCC's Rail Yard is immediately adjacent to and upgradient of the Courtland Property.  The Rail Yard is currently used to stage/store chemical raw material and product railcars until they are required in the UCC South Charleston Plant or in the case of product shipped to the customer.  To Plaintiff's present knowledge, there is presently no transfer of materials at the Rail

Yard, only storage. The Rail Yard is managed by the UCC South Charleston Plant, but is not contiguous to that plant.

26.     Historic aerial photography shows that the Rail Yard was in service by 1971.

27.     Historic aerial photography also appears to show the land that was eventually used for the Rail Yard was previously used by UCC to dispose of bottom ash from UCC power plants.

28.     Deposition testimony indicates that some investigation of groundwater has occurred at the Rail Yard, but UCC's designated expert environmental scientist was unable to recall the details of that investigation.

29.     Because of Courtland's concern that contamination from the UCC Facility had migrated or may have migrated onto the Courtland Property, as it had migrated onto neighboring properties, a limited environmental investigation was conducted, at Courtland's expense, in August of 2017.   As described below, this limited environmental investigation revealed the presence of certain contaminants of concern, at elevated levels, in environmental media, at and under the Courtland Property.  These contaminants of concern include 2-Butanone (a.k.a. methyl ethyl ketone), Di-n-butyl phthalate, Arsenic, Barium, Cadmium, Chromium, Lead and Selenium, each identified below as a "solid waste," within the meaning of 40 C.F.R. § 261.2, with respect to its presence in environmental media at and emanating from the UCC Facility.

30.     In this investigation, three direct-push borings were completed into the subsurface at the Courtland Property for the purpose of collecting groundwater samples via temporary piezometers.  The location of the three borings was in the most upgradient, southeast portion of the Courtland property, directly downgradient of the UCC Facility as shown in various UCC groundwater monitoring reports.  The 3 piezometers were screened at three different depths, with the deepest completed to about 50 feet below ground surface to the underlying sandstone bedrock.

31.    Sampling of the three piezometers revealed contamination of the groundwater by both organic chemicals and toxic metals.  The organic contaminants detected included Acetone, 2-Butanone (a.k.a. methyl ethyl ketone) and Di-n-butyl phthalate.  These three contaminants are not present in natural groundwaters.  All three of these contaminants are also present in UCC Facility groundwater.  Acetone and Di-n-butyl phthalate have also been detected in UCC off-site monitoring wells.  Acetone and 2-butanone are also present in UCC landfill leachate.

32.    Plaintiff's environmental consultants have also engaged in additional activities to ascertain the nature of CERCLA hazardous substance contamination released from UCC Facilities neighboring the Courtland Property and affecting the Courtland Property.  Such activities include but are not limited to physical inspection of the area surrounding the UCC Facilities, research concerning the environmental media and geology at and in the vicinity of the UCC Facilities, observations of the UCC Facilities from nearby and adjacent properties, the ordering, inspection, and review of public records concerning the UCC Facilities, and discussions with individuals with knowledge concerning the history of the UCC Facilities and the activities conducted thereon.

33.    With respect to their presence at the Filmont Landfill and their migration, through environmental media, at and from such landfill to become present or to threaten to become present in environmental media (soils, groundwater, and surface waters) at and in the vicinity of the Courtland Property, the substances 1,4-dioxane, biphenyl, 2,6-di-tert-butyl-p-cresol, isophorone, phenyl ether, arsenic, chromium, lead, and mercury, which have been disposed of at an illegal landfill (*i.e.,* the Filmont Landfill) and released to environmental media at and from such landfill, are each a "solid waste" within the meaning of 42 U.S.C. § 6903(27), in that each is a discarded material—discarded by UCC—resulting from industrial or commercial operations of UCC.  The

following is known concerning the substances 1,4-dioxane, biphenyl, 2,6-di-tert-butyl-p-cresol, isophorone, arsenic, chromium, lead, and mercury:

(a) Arsenic is a federal Clean Water Act ("CWA") Priority Pollutant and Toxic Pollutant, and a RCRA Subtitle C hazardous waste because it is a toxicity characteristic contaminant (D004) under 40 C.F.R. § 261.24. Arsenic concentrations in groundwater at the UCC Technology Park exceed the Safe Drinking Water Act ("SDWA") Maximum Contaminant Level ("MCL"). Inorganic arsenic has been recognized as a human poison since ancient times and is a carcinogen. Arsenic exerts its toxicity by inactivating up to 200 enzymes, especially those involved in cellular energy pathways and DNA synthesis and repair. Acute arsenic poisoning is associated initially with nausea, vomiting, abdominal pain, and severe diarrhea. Encephalopathy and peripheral neuropathy are reported as effects of arsenic poisoning. Arsenic is a well-documented human carcinogen affecting numerous organs. Arsenic compounds cause short-term and long-term adverse effects in individual plants and animals and in populations and communities of organisms.

(b) Chromium is a federal Clean Water Act ("CWA") Priority Pollutant and Toxic Pollutant, and a RCRA Subtitle C hazardous waste because it is a toxicity characteristic contaminant (D007) under 40 C.F.R. § 261.24. Chromium concentrations in groundwater at the UCC Facility exceed the SDWA Maximum Contaminant Limit ("MCL"). Chromium presents a substantial threat to aquatic life. It destabilizes the ecosystem due to toxic impacts on biota and bioaccumulation in certain organisms. It also produces cytotoxicity and has a detrimental impact on the behavior of fish, such as hypertrophy and paraplegia at gill epithelium, uneven swimming and suspended feeding. Various research studies indicate adverse effects of chromium in fish at hematological level similar to anemia,

thrombocytopenia, decrease in hemoglobin and total erythrocytes count.  At bio-chemical level, a decline in glycogen, lipids and proteins was observed.

(c) Lead is a CWA Priority Pollutant and Toxic Pollutant, and a RCRA Subtitle C Hazardous waste because it is a toxicity characteristic contaminant (D008) under 40 C.F.R. § 261.24. Lead concentrations in groundwater at the UCC Facility exceed the SDWA Action Level. Lead adversely affects algae, invertebrates, and fish.  There are also limited adverse effects in amphibians, including loss of sodium, reduced learning capability, and developmental problems.  Fish exposed to high levels of lead exhibit a wide-range of adverse effects including muscular and neurological degeneration and destruction, growth inhibition, mortality, reproductive problems, and paralysis.

(d) Mercury exposure can harm the brain, heart, kidneys, lungs, and immune system of people of all ages.  Some forms of mercury in the bloodstream of babies developing in the womb and young children may harm their developing nervous systems, affecting their ability to think and learn.  Mercury's harmful effects on these animals include death, reduced reproduction, slower growth and development, and abnormal behavior. It is a "Subtitle C hazardous waste " under 40 C.F.R. § 261.3, because it is:  (a) with respect to its presence in environmental media at and emanating from the UCC Filmont Landfill, a discarded material and "solid waste" under within the meaning of 40 C.F.R. § 261.2; (b) not excluded from regulation as a hazardous waste under 40 C.F.R. § 261.4(b); and (c) listed as a hazardous waste under Subpart D of 40 C.F.R. Part 261 (in particular, under 40 C.F.R. § 261.33, with waste code U151 when it has been, as it has been at the Filmont Landfill, discarded or intended to be discarded).

(e) 1,4-Dioxane is a synthetic industrial chemical that is completely miscible in water and is used as a stabilizer in certain chlorinated solvents, paint strippers, greases and waxes. It may leach readily from soil to groundwater, migrates rapidly in groundwater and is relatively resistant to biodegradation in the subsurface. It is classified by EPA as "likely to be carcinogenic to humans" by all routes of exposure. Short-term exposure may cause eye, nose and throat irritation; long-term exposure may cause kidney and liver damage. It is a "RCRA Subtitle C hazardous waste" under 40 C.F.R. § 261.3, because it is:  (a) with respect to its presence in environmental media at and emanating from the UCC Facilities, a discarded material and "solid waste" under within the meaning of 40 C.F.R. § 261.2, (b) not excluded from regulation as a hazardous waste under 40 C.F.R. § 261.4(b), and (c) listed as a hazardous waste under Subpart D of 40 C.F.R. Part 261 (in particular, under 40 C.F.R. § 261.33, with waste code U108 when it has been, as it has been at the Filmont Landfill, discarded into the environment).

(f) Biphenyl is used in organic syntheses, heat transfer fluids, dye carriers, food preservatives, and as an intermediate for polychlorinated biphenyls.  In workers, acute (short-term) exposure to high levels of biphenyl has been observed to cause eye and skin irritation and toxic effects on the liver, kidneys, and central and peripheral nervous systems.  Kidney effects have been observed in chronically (long-term) exposed animals.  The main threat to the aquatic environment is likely to be from by biphenyl being leached from landfills, as it is toxic to fish and aquatic invertebrates.

(g) 2,6-di-tert-butyl-p-cresol is used as an antioxidant and as a stabilizer in petroleum, rubber and plastic.  It causes irritation in eyes and skin; in animals it decreases growth rate and increases liver weight.  There is limited evidence that 2,6-Di-tert-Butyl-p-Cresol causes

cancer in animals.  It may cause lung, brain and liver cancer.  It may damage a developing human fetus.

**(h)** Isophorone is a widely used solvent and chemical intermediate.  Short-term exposure of animals to high levels of isophorone has caused inactivity and coma.  Some animal studies suggest that isophorone may cause birth defects and slower growth in the offspring of rats and mice that breathed the vapors during pregnancy.  These studies found some harmful health effects in adult female animals.  When rats and mice were given high doses of isophorone in food or water for a long time, the male rats developed kidney disease.  The EPA has determined that isophorone is a possible human carcinogen.

34.     With respect to their presence at the Filmont Landfill and their migration, through environmental media, at and from the Filmont Landfill to become present or to threaten to become present in environmental media (soils, groundwater, and surface waters) at and in the vicinity of the Courtland Property, the substances 1,4-dioxane, biphenyl, 2,6-di-tert-butyl-p-cresol, isophorone, phenyl ether, arsenic, chromium, lead and mercury, which have been released to the environment at and from the Filmont Landfill and which have become present or which threaten to become present in environmental media (soils, groundwater, and surface waters) at and in the vicinity of the Courtland Property are each a "hazardous waste," as defined by Congress in RCRA § 1004(5), 42 U.S.C. § 6903(5), since each is a "solid waste," within the meaning of 42 U.S.C. § 6903(27), which has been shown to cause or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness, and each poses a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

35.    With respect to their presence at the Filmont Landfill and their migration, through environmental media, at and from the Filmont Landfill to become present or to threaten to become present in environmental media (soils, groundwater, and surface waters) at and in the vicinity of the Courtland Property, the substances 1,4-dioxane, biphenyl, 2,6-di-tert-butyl-p-cresol, isophorone, phenyl ether, arsenic, chromium, lead and mercury, which have been released to the environment at and from the Filmont Landfill and which have become present or which threaten to become present in environmental media (soils, groundwater, and surface waters) at and in the vicinity of the Courtland Property are each a "solid waste," within the meaning of 40 C.F.R. § 261.2, in that each is a "discarded material"—discarded by UCC—within the meaning of 40 C.F.R. § 261.1(a) that is not subject to any of the exclusions set forth in that same paragraph 261.1(a).    Accordingly, each such substance is a "solid waste," within the meaning of 40 C.F.R. § 261.2.

36.    UCC's corporate designee has specifically admitted that 1.4 dioxane found in environmental media surrounding the Filmont Landfill has leached from the landfill itself.

37.    With respect to its presence at the Filmont Landfill and its migration, through environmental media, at and from such landfill to become present or to threaten to become present in environmental media (soils, groundwater, and surface waters) at and in the vicinity of the Courtland Property, the substance 1,4-dioxane is a "hazardous wastes listed or identified by the Administrator" under Subchapter III of RCRA and, thus, a "hazardous waste" for RCRA Subtitle C purposes as defined by 40 C.F.R. § 261.3(a) and under Title 33, Series 20, of the West Virginia Code of State Rules  because it is:  (a) with respect to its presence in environmental media at and emanating from the Filmont Landfill, a discarded material and "solid waste" under within the meaning of 40 C.F.R. § 261.2, (b) not excluded from regulation as a hazardous waste under 40

-19-

C.F.R. § 261.4(b), and **(c)** listed as a hazardous waste under Subpart D of 40 C.F.R. Part 261 (in particular, under 40 C.F.R. § 261.33, with waste code U108 when it has been, as it has been at the Filmont Landfill, discarded into the environment).

38.     With respect to its presence at the Filmont Landfill and its migration, through environmental media, at and from such landfill to become present or to threaten to become present in environmental media (soils, groundwater, and surface waters) at and in the vicinity of the Courtland Property, the substance mercury is a "hazardous wastes listed or identified by the Administrator" under Subchapter III of RCRA and, thus, a "hazardous waste" for RCRA Subtitle C purposes as defined by 40 C.F.R. § 261.3(a) and under Title 33, Series 20, of the West Virginia Code of State Rules because it is: **(a)** with respect to its presence in environmental media at and emanating from the Filmont Landfill, a discarded material and "solid waste" under within the meaning of 40 C.F.R. § 261.2, **(b)** not excluded from regulation as a hazardous waste under 40 C.F.R. § 261.4(b), and **(c)** listed as a hazardous waste under Subpart D of 40 C.F.R. Part 261 (in particular, under 40 C.F.R. § 261.33, with waste code U151 when it has been, as it has been at the Filmont Landfill, discarded into the environment).

39.     As noted above, the Administrator of the U.S. Environmental Protection Agency has listed his designations of CERCLA hazardous substances at 40 C.F.R. § 302.4. The substances biphenyl, isophorone, arsenic, chromium, lead and mercury, which have been released to the environment at and from the Filmont Landfill and which have become present or threaten to become present in environmental media (soils, groundwater, and surface waters) at and in the vicinity of the Courtland Property, are each listed therein. Accordingly, such substances are, for the purposes of CERCLA and its statutory scheme of liability, "hazardous substances."

40.     In interpreting the provisions of CERCLA § 102(a) and 40 C.F.R. § 302.4, Federal Courts have consistently held that where a waste material contains a designated hazardous substance, like those referenced in the immediately preceding paragraph, then the entirety of that waste material is itself a hazardous substance for the purposes of CERCLA. *See, e.g., State of Arizona and the City of Phoenix v. Motorola, Inc.,* 774 F. Supp. 566 (D. Ariz, 1991) *United States v. Carolawn,* 21 Env't Rep. Cases 2124, 2126 (D.S.C. 1984). Accordingly, if and to the extent that any of the hazardous substances referenced in the immediately preceding paragraph were, prior to release, mixed with another substance, such mixture was undeniably itself a "Hazardous Substance" within the meaning of CERCLA § 101(14), 42 U.S.C. § 9601(14).

41.     Since no operation historically conducted at the Courtland property could have contributed the presence of these contaminants to the environment, the sole plausible source of these contaminants on the Courtland Property, within environmental media underlying that property, and in the vicinity thereof is the migration of such contaminants from one or more of the UCC Facilities. No other source of the contaminants found at, under, and in the vicinity of the Courtland Property reasonably exists.

42.     The past and ongoing disposal, discarding, and release of 1,4-dioxane, biphenyl, 2,6-di-tert-butyl-p-cresol, isophorone, phenyl ether, arsenic, chromium, lead and mercury at and from the Filmont Landfill and the UCC Railyard and into the environment has caused and is continuing to cause the contamination of environmental media at and on both the UCC Facilities and on nearby properties, including (without limitation) the Courtland Property, resulting in a single, indivisible harm to human health and the environment, for which harm no reasonable basis of apportionment between the individual acts of disposal, individual wastes disposed of, or the parties responsible for the acts of disposal exists.

43.     UCC are well aware of the endangerments associated with the UCC Facilities, inclusive of Filmont Landfill, and the leakage of harmful and toxic chemicals therefrom, having installed monitoring wells on the perimeter of the Filmont Landfill and across the Davis Creek from it and having taken samples of environmental media at the UCC Railyard. Groundwater samples taken by UCC have revealed contamination in the form of 1,4-dioxane and "some ethers" emanating from the Fillmont Landfill. Neither UCC nor Dow have advised state or federal governmental agencies with applicable environmental and public health protection authority of this contamination.

44.     Groundwater from the Filmont Landfill and the UCC Railyard is hydrologically connected to the Davis Creek watershed, a tributary of the Kanawha River. The endangerments that may be presented from these environmental contaminants include loss and degradation of biodiversity in the receiving streams, bioaccumulation of contaminations in the wildlife within the watershed, and contamination of sediments, soil, groundwater and surface water by contaminants released or discharged by these activities which generated, used, handled, transported, stored, discharged or released the waste, solid waste, toxic substances, hazardous substances, or hazardous materials which have already harmed and will continue to harm the environment, create and continue to create a threat to human health and the environment, and unabated will continue to migrate within the environment, resulting in further harms. As noted above, many of these contaminants in the groundwater--which is connected to surface water--are easily absorbed by fish and other aquatic organisms. Small concentrations can be toxic because some contaminants bioconcentrate. Toxicity also produces adverse biological effects on an organism's survival, activity, growth, metabolism, or reproduction. Toxic contaminants can be lethal or harm the organism without killing it directly. Adverse effects on an organism's activity, growth,

metabolism, and reproduction are examples of these sublethal effects.  Some of the contaminates of concern may also bio-accumulated within the plants and animals which are in direct or indirect contact with the food chain and adversely impact the health of these organisms and organisms which feed upon those organisms, including pathways of human exposure to these contaminates.

45.     Since no institutional restrictions exist on groundwater use at the Courtland Property, it is both necessary and appropriate to consider the completed groundwater pathway to a human receptor, including the drinking and showering pathway.  Indeed, no restrictive covenants would prevent the development of the Courtland Property for residential use or the beneficial extraction of groundwater from below such property for human use.  Additionally, completed pathways exist for utility workers and on-site workers, including human receptors exposed to volatile organic contaminants—such as those found on the Courtland Property and in the vicinity thereof—migrating through the subsurface.   As noted above, these currently identified contaminants of concern pose a significant threat to human health and the environment.

46.     While contaminants from UCC have been identified on the Courtland Property, the full nature and extent, either vertically or horizontally, of this contamination and the endangerments to health and the environment that are or may be presented by it has **not** been determined, nor has a complete Human Health and Ecological Risk Assessment for impacts to the Courtland Property been performed

47.     The contaminants which have been released at and from the UCC Facility and which have migrated or which threaten to continue to migrate onto and under the Courtland Property have contaminated and threaten to contaminate the groundwater at and under the Courtland Property and impair Courtland's right of reasonable use of such groundwater through beneficial extraction for all purposes, including (without limitation) irrigation, human and animal

consumption, recreation, and aesthetics. Such impairment of the beneficial uses of groundwater by toxic contamination is but one manner in which Defendant's impairment of environmental media has adversely impacted the market value of the Courtland Property and Plaintiff's investment in that property.

48.    At no time has either UCC or Dow provided to either the United States Environmental Protection Agency or the West Virginia Department of Environmental Protection the notification required by the first sentence of RCRA § 3010(a), 42 U.S.C. § 6930(a), to be submitted "Not later than ninety days after promulgation of regulations under section 3001" (which final and effective promulgation occurred on November 19, 1979) with respect to the Filmont Landfill.

49.    At no time has either UCC or Dow provided to either the United States Environmental Protection Agency or the West Virginia Department of Environmental Protection the notification with respect to the UCC Railyard required by the first sentence of RCRA § 3010(a), 42 U.S.C. § 6930(a), to be submitted "[n]ot later than ninety days after promulgation of regulations under section 3001" (which final and effective promulgation occurred on November 19, 1979).

50.    At no time has either UCC or Dow provided to the United States Environmental Protection Agency the formal notification with respect to the Filmont Landfill required by the first sentence of CERCLA § 103(c), 42 U.S.C. § 9603(c), to be filed with USEPA "[w]ithin one hundred and eighty days after the enactment of this Act" [which was enacted on Dec. 11, 1980].

51.    At no time has either UCC or Dow provided to the United States Environmental Protection Agency the notification with respect to the UCC Railyard required by the first sentence of CERCLA § 103(c), 42 U.S.C. § 9603(c), to be filed with USEPA "[w]ithin one hundred and eighty days after the enactment of this Act" [which was enacted on Dec. 11, 1980].

52.     At no time has either UCC or Dow provided to Courtland the notice with respect to hazardous substance releases from the Filmont Landfill required by CERCLA § 111(g), 42 U.S.C. § 9611(g).

53.     At no time has either UCC or Dow provided to Courtland the notice with respect to hazardous substance releases from the Filmont Landfill required by CERCLA § 111(g), 42 U.S.C. § 9611(g) with respect to hazardous substance releases from the Filmont Landfill.

54.     At no time has either UCC or Dow provided to Courtland the notice with respect to hazardous substance releases from the UCC Railyard required by CERCLA § 111(g), 42 U.S.C. § 9611(g) with respect to hazardous substance releases from the UCC Railyard.

55.     Neither UCC nor Dow ever obtained the required permit or any form of interim status under RCRA subtitle C (42 U.S.C. §§ 6921 – 6939g) or the West Virginia Hazardous Waste Management Act (W.Va. Code § 22-18-1 - 25) to operate the Filmont Landfill as a hazardous waste treatment, storage, or disposal facility after the effective date of RCRA (*i.e.*, November 19, 1979) or to close that facility in accordance with either statutory scheme.

56.     Neither UCC nor Dow ever obtained the required permit or any form of interim status under RCRA subtitle C (42 U.S.C. § 6921, *et seq.*) or the West Virginia Hazardous Waste Management Act (W.Va. Code  § 22-18-1, *et seq.*) to operate the UCC Railyard as a hazardous waste treatment, storage, or disposal facility after the effective date of RCRA (*i.e.*, November 19, 1979) or to close that facility in accordance with either statutory scheme.

57.     On information and belief, neither UCC nor Dow has retained the records referenced in CERCLA § 103(d)(1), 42 U.S.C. § 9603(d)(1), with respect to either the Filmont Landfill or the UCC Railyard.

## COUNT I
## RECOVERY OF RESPONSE COSTS AND
## DECLARATORY RELIEF UNDER CERCLA
### (42 U.S.C. §§ 9607(a) and 9613(g))

58.    Plaintiff incorporates and realleges the foregoing paragraphs, above, as if fully set forth herein.

59.    The Filmont Landfill and the UCC Railyard are each an installation, site, or area at which one or more CERCLA hazardous substances, including biphenyl, isophorone, arsenic, chromium, lead and mercury, have been deposited, stored, disposed of, placed, or otherwise came to be located.  Accordingly, the Filmont Landfill and the UCC Railyard are each a "facility," within the meaning of CERCLA § 101(9), 42 U.S.C. § 9601(9).

60.    UCC still owns and operates the Filmont Landfill and the UCC Railyard, including portions at which CERCLA hazardous substances have been disposed, are currently located, and from which such hazardous substances have migrated.

61.    During the time of UCC's ownership of the UCC Facility, CERCLA hazardous substances, including 1,4 dioxane, biphenyl, isophorone, arsenic, chromium, lead and mercury, were disposed of at those locations.

62.    UCC has, by contract, agreement, or otherwise, arranged for the disposal or treatment of CERCLA hazardous substances owned or possessed by UCC at the Filmont Landfill and the UCC Railyard.

63.    CERCLA hazardous substances which were disposed of at the Filmont Landfill and the UCC Railyard have migrated, and continue to migrate, into and through environmental media and have become located at and within the Courtland Property or threaten to become located at and within the Courtland Property and/or the environment.

64.     As a consequence of the foregoing disposal of hazardous substances and the release of such substances into the environment, Courtland incurred necessary costs of response, in a manner consistent with the National Oil and Hazardous Substance Contingency Plan ("National Contingency Plan" or "NCP"), 40 C.F.R. Part 300.

65.     Pursuant to 42 U.S.C. § 9607(a), Defendant UCC, as past and present owner of the Filmont Landfill and the UCC Railyard, and Defendant UCC, a past and present operator of the Filmont Landfill and the UCC Railyard, has caused or contributed to a single, indivisible harm to health, the environment and to Courtland's reasonable, comfortable use and enjoyment of the Courtland Property for which no reasonable basis for apportioning such harm among responsible parties exists. Accordingly, Defendant UCC is liable to Courtland for all costs of response to the released hazardous substances and resulting endangerments incurred and to be incurred by Courtland consistent with the National Contingency Plan.

66.     Pursuant to 42 U.S.C. § 9613(g), Plaintiff is entitled to a declaratory judgment that UCC is liable for response costs to be incurred plus interest consistent with the National Contingency Plan, which judgment will be binding in any subsequent action or actions to recover further response costs.

### COUNT II
### CITIZEN SUIT RELIEF FOR VIOLATION OF RCRA SUBCHAPTER III AND THE WEST VIRGINIA HAZARDOUS WASTE MANAGEMENT ACT
### (RCRA § 7002(a)(1)(A), 42 U.S.C. § 6972(a)(1)(A))

67.     Plaintiff incorporates and realleges the foregoing paragraphs as if fully set forth herein.

68.     As alleged above, both mercury and 1,4 dioxane are each a "hazardous waste identified or listed by the Administrator" under Subchapter III of RCRA and a "hazardous waste" under 40 C.F.R. Part 261 and Title 33, Series 20, of the West Virginia Code of State Rules.

69.    Both RCRA and the West Virginia Hazardous Waste Management Act prohibit the treatment, storage, and disposal of any hazardous waste listed or identified under RCRA Subtitle C at any facility which does not have a permit for such treatment, storage, or disposal. 42 U.S.C. § 6928 and W.V. Code § 22-18-8(a).

70.    Both RCRA and the West Virginia Hazardous Waste Management Act also prohibit the operation or closure of any facility or site for the treatment, storage, or disposal of a hazardous waste listed or identified under RCRA Subtitle C without obtaining a permit for such activity.

71.    RCRA § 1004(3), 42 U.S.C. § 6903(3), defines the term "disposal" as follows:

Disposal means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

40 C.F.R. § 260.10. Such definition is incorporated into the West Virginia Hazardous Waste Management system by W.V. CSR § 33-20-2.

72.    Accordingly, UCC's discharge, deposit, dumping, spilling, or leaking of such hazardous wastes to environmental media at and under the Filmont Landfill and the UCC Railyard and into environmental media on and in the vicinity of the Courtland Property on and after the effective date of RCRA (i.e., November 19, 1979) was, in fact and at law, the "disposal" of such hazardous wastes. In view of the fact that UCC did not then have, does not now have, and never has had, a permit for such activities, such disposal was and is a violation of RCRA Subchapter III, including 42 U.S.C. §§ 6924 and 6928 and W.V. Code § 22-18-8(a). Such violations began in or about November 19, 1979 and continue to the date of filing of this complaint.

73.    Moreover, UCC's operation or closure of a facility for the treatment, storage or disposal of such hazardous wastes listed or identified under RCRA Subtitle C on and after the effective date of RCRA (i.e., sixty (60) days after November 19, 1979) without first obtaining a

permit for such activity was also a violation of RCRA Subtitle C, including RCRA § 3008, 42 U.S.C. § 6928, and W.V. Code § 22-18-8(a).  Such violations began in or about sixty (60) days after November 19, 1979 and continue to the date of filing this complaint.

74.    As noted above, neither UCC nor Dow provided to either the United States Environmental Protection Agency or the West Virginia Department of Environmental Protection the notification required by the first sentence of 42 U.S.C. § 6930(a) with respect to either the Filmont Landfill or the UCC Railyard.   Indeed, UCC has withheld from relevant state and federal authorities all information concerning the Filmont Landfill, its history and the disposal activities thereon, the releases therefrom (including, without limitation, releases of 1,4 dioxane, ethers, and mercury), the results of its sampling and monitoring program at or associated with the Filmont Landfill (on both sides of Davis Creek), and its very existence.

75.    UCC has failed to put into place the financial assurance instruments required for the closure and post-closure care of a hazardous waste disposal facility.  Such requirements are set forth at 40 C.F.R. §§ 264.14 - 264.151 and are incorporated (with minor exception) into the West Virginia Hazardous Waste Management System by W.V. CSR § 33-20-7.5.

76.    As noted above, UCC has operated an "Open Dump" with respect to both the Filmont Landfill and the fill materials at and underlying the UCC Rail Yard, in violation of state and federal law.  Specifically with respect to the Filmont Landfill, UCC has admitted that such dump is compliant with **neither** the requirements of RCRA Subtitle C **nor** the requirements of RCRA Subtitle D.

77.    As a consequence of UCC's violation of the foregoing statutory provisions, hazardous and toxic wastes have become present and  threaten further to become present in environmental media at and in the vicinity of the Courtland Property and the surrounding

environment (including Davis Creek), causing and contributing to actual environmental harm as well as a substantial and unacceptable risk to human health and the environment. These harms and risks have been exacerbated by UCC's knowing and intentional failure to comply with applicable regulatory and statutory obligations, which designed to minimize risk to human health and the environment though disclosure, identification of potential contaminant sources, monitoring, and abatement. Such reckless or knowing failure to comply with such laws and regulations has unnecessarily magnified environmental damage, increased the risk of human exposure, and exacerbated resultant endangerments to human health and the environment.

78.     As a consequence of their violations of the foregoing statutory provisions, UCC is liable for the harms and risks resulting from the presence or threatened presence of such hazardous and toxic wastes at and in the vicinity of the Courtland Property and the resultant risks to human health and the environment UCC is obligated and should be ordered promptly to commence a Remedial Investigation and Feasibility Study ("RI/FS") subject to appropriate oversight and monitoring by Plaintiff to assure compliance with this Court's Orders, and to implement at their sole cost and subject to appropriate oversight and monitoring by Plaintiff to assure compliance with this Court's Orders an appropriate remedy in order to effect an appropriate and complete abatement of the harms and endangerments to health and the environment posed by their illegal and non-compliant facilities, all in a manner protective of human health and the environment and consistent with the National Oil and Hazardous Substances Contingency Plan, 40 C.F.R. Part 300, which provides carefully considered and detailed requirements, methods, and procedures for responding to and abating releases of hazardous substances and hazardous wastes (including hazardous wastes "listed and identified by the Administrator" pursuant to RCRA § 3001(a)) that have been released into the environment and which continue to migrate within the environment.

Such an NCP-compliant response to the harms, and risks of harms, caused by hazardous wastes which have become present or threaten to become present on the Courtland Property and the environment should begin with the a full Remedial Investigation, pursuant to 40 C.F.R. § 300.430, under the supervision of a Special Master appointed by this Court to oversee implementation of, and adjudicate in the first instance any disputes arising under, the required injunctive relief, and with Plaintiff authorized to perform appropriate oversight and monitoring of the Defendant's remedial activities required by this Court's Orders.

79.     Pursuant to 42 U.S.C. § 6972(a)(2) and 42 U.S.C. § 6928(a) and (g), Plaintiff seeks the award of civil penalties, to be paid to the United States of America, in the amount of $25,000 per day of violation for each violation committed by UCC relative to the Filmont Landfill and the UCC Railyard of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to RCRA, including (without limitation) those violations specifically identified herein.

80.     Consistent with 42 U.S.C. § 6972(b)(1) and in the manner specified in 40 C.F.R. § 254.2, prior to filing this action, Plaintiff provided notice, by registered mail (return receipt requested) of the violations set forth herein to Defendant UCC, the Administrator of the U.S. Environmental Protection Agency, and the Cabinet Secretary for the West Virginia Department of Environmental Protection. Copies of that Notice were also provided to the Attorney General of the United States, the Attorney General of the State of West Virginia, the Regional Administrator of the U.S. Environmental Protection Agency (Region III), and the Director for Waste Management of the West Virginia Department of Environmental Protection. (Exhibit 1 and Exhibit 2)

81.     Also consistent with 42 U.S.C. § 6972(b)(1), because this action is one respecting a violation of RCRA subchapter III, this action was properly commenced prior to the expiration of 60 days after Plaintiff provided the notice described in the immediately preceding paragraph.

**COUNT III**
**CITIZEN SUIT RELIEF FOR JUDICIAL ABATEMENT OF**
**AN IMMINENT AND SUBSTANTIAL ENDANGERMENT**
**(RCRA § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B))**

82.     Plaintiff incorporates and realleges the foregoing paragraphs as if fully set forth herein.

83.     The presence of, and the threatened continued release into environmental media at and in the vicinity of the Courtland Property of 1,4-dioxane, biphenyl, 2,6-di-tert-butyl-p-cresol, isophorone, phenyl ether, arsenic, chromium, lead, and mercury, each of which is both a "solid waste," within the meaning of 42 U.S.C. § 6903(27), and a "hazardous waste," within the meaning of 42 U.S.C. § 6903(5), has caused actual harm to the environment and presents or may present an imminent and substantial endangerment to health and the environment.

84.     UCC is a "persons," as that term is defined in RCRA § 1004(15), 42 U.S.C. 6903, "who has contributed or who is contributing to the to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment".

85.     Accordingly, UCC is liable for the endangerments, harms, and risks resulting from the presence or threatened presence of such hazardous and toxic wastes at the Courtland Property and the resultant risks and endangerment to human health and the environment.  Such liability extends to the appropriate and complete investigation and abatement of such endangerments, harms and risks, all in a manner protective of human health and the environment and consistent with the NCP, which, as the Congressionally-required national plan for responding to releases of

hazardous substances into and migrating within the environment, provides scientifically validated, carefully considered and detailed requirements, methods, and procedures for responding to and abating releases of hazardous substances and hazardous wastes (including hazardous wastes "listed and identified by the Administrator" pursuant to RCRA § 3001) that have been released into the environment. Such an NCP-compliant response to the endangerments, harms, and risks caused by solid wastes and hazardous wastes which have become present or threaten to become present in environmental media at and in the vicinity of the Courtland Property should begin with a full Remedial Investigation of all endangerments, harms, and risks which have resulted or may result from such contamination at or from the UCC Facilities, pursuant to 40 C.F.R. § 300.430, under the supervision of a Special Master appointed by this Court to oversee implementation of, and to adjudicate in the first instance any disputes arising under, the required injunctive relief, and with Plaintiff authorized to perform oversight and monitoring of the Defendant's remedial activities required pursuant to this Court's Orders herein.

86.     Accordingly, UCC  is jointly and severally liable for the full and appropriate investigation and abatement of all environmental harms and endangerments resulting from the presence and/or threatened presence of 1,4-dioxane, biphenyl, 2,6-di-tert-butyl-p-cresol, isophorone, phenyl ether, arsenic, chromium, lead, and mercury, in full compliance with the NCP.

87.     Consistent with 42 U.S.C. § 6972(b)(2), prior to filing this action, Plaintiff provided notice, by registered mail (return receipt requested) of the endangerments described herein to the Defendant, to the Administrator of the U.S. Environmental Protection Agency, the State of West Virginia (Director of the Department of Environmental Protection).  Notice was also provided to the Attorney General of the United States, the Attorney General of the State of West Virginia, the Regional Administrator of the U.S. Environmental Protection Agency (Region III), and Deputy

Cabinet Secretary for Waste Management of the West Virginia Department of Environmental Protection. (Exhibit 1 and Exhibit 2)

88.     Also consistent with 42 U.S.C. § 6972(b)(2), because this action is one respecting a violation of RCRA subchapter III, this action was commenced prior to the expiration of 90 days after Plaintiff provided the notice described in the immediately preceding paragraph.

## COUNT IV
## JUDICIAL ABATEMENT OF A PUBLIC NUISANCE

89.     Plaintiff incorporates and realleges the foregoing paragraphs as if fully set forth herein.

90.     Under West Virginia law, a public nuisance is "an act or condition that unlawfully operates to hurt or inconvenience an indefinite number of persons." *Hark v. Mountain Fork Lumber Co.*, 127 W.Va. 586, 595-96, 34 S.E.2d 348, 354 (1945). The Restatement (Second) of Torts § 821B defines a public nuisance as "an unreasonable interference with a right common to the general public."

91.     Where a condition "is shown by facts and circumstances to constitute a nuisance affecting public health 'no measure of necessity, usefulness or public benefit will protect it from the unflinching condemnation of the law.'" *Board of Com'rs of Ohio County v. Elm Grove Mining Co.*, 122 W.Va. 442, 9 S.E.2d 813, 817 (W.Va. 1940) (quoting 1 Wood on Nuisances, 3d Ed., § 19); *Respublica v. Caldwell*, 1 U.S. 150 (1785).

92.     The aforementioned acts and omissions of UCC have caused or contributed to conditions now present in environmental media at, under, and in the vicinity of the Courtland Property—*i.e.*, the presence and threatened presence of 1,4-dioxane, biphenyl, 2,6-di-tert-butyl-p-cresol, isophorone, phenyl ether, arsenic, chromium, lead, and mercury in soils and groundwater at levels far exceeding any "background" levels—which conditions are harmful to human health

and offensive to the senses, such that an ordinary person would reasonably be annoyed or disturbed, and which constituted an unreasonable interference with the free use and enjoyment of such environmental media. Such conditions commenced at some point after UCC began its operations at the Filmont Landfill and the UCC Railyard and continue to this day.

93.     The seriousness of the harm caused by such noxious and offensive conditions outweigh any social utility of the Defendant's conduct.

94.     Neither Courtland nor any of its predecessors in title to the Courtland Property has, in any way or in any manner, consented to the acts and omissions of Defendant which caused such conditions.

95.     Although the harm caused by the contamination of groundwater threatens all local surface waters and groundwater downgradient from the Filmont Landfill and the UCC Railyard, specifically including the Davis Creek, its tributaries, and ultimately the Kanawha River, the harm suffered by Courtland is different from the type of harm suffered by the general public in that the contaminants released and disposed of by Defendant are currently present in the groundwater in the immediate vicinity of Courtland's Property and are currently restricting Plaintiff Courtland's right to use that groundwater, as certain contaminants from the Filmont Landfill, the Railyard, and other UCC facilities (like the Tech Center), including Arsenic and Chromium, have been found in the groundwater underlying the Courtland Property at levels exceeding SDWA MCLs, rendering such groundwater currently unusable for human consumption. Moreover, Courtland is uniquely surrounded, on three sides, by contaminated UCC properties, and UCC's own consultants have recognized the potential that groundwater contamination at the UCC Tech Center (to the south of Courtland) may be related to groundwater contamination at the Filmont Landfill (to the north of

Courtland), which would necessarily mean that such contamination is traveling beneath Courtland's Property.

96.     The aforementioned conduct, acts, and omissions of UCC have been and continue to be a substantial factor in causing the above-described public nuisance conditions and the particular harm to Courtland, also described above.

97.     Accordingly, UCC is liable for the serious public nuisance conditions resulting from the presence or threatened presence of such hazardous and toxic wastes at the Courtland Property and the resultant risks and endangerment to human health and the environment.  Such liability extends to the appropriate and complete investigation and abatement of such nuisance conditions, all in a manner protective of human health and the environment and consistent with the NCP, which, as the Congressionally-required national plan for responding to releases of hazardous substances into and migrating within the environment, provides scientifically validated, carefully considered and detailed requirements, methods, and procedures for responding to and abating releases of hazardous substances and hazardous wastes (including hazardous wastes "listed and identified by the Administrator" pursuant to RCRA § 3001) that have been released into the environment.  Such an NCP-compliant response to the endangerments, harms, and risks caused by solid wastes and hazardous wastes which have become present or threaten to become present in environmental media at and in the vicinity of the Courtland Property should begin with a full Remedial Investigation of all endangerments, harms, and risks which have resulted or may result from such contamination at or from the UCC Facilities, pursuant to 40 C.F.R. § 300.430, under the supervision of a Special Master appointed by this Court to oversee implementation of the required injunctive relief, and with Plaintiff authorized to perform oversight and monitoring of the

Defendant's remedial activities as they relate to endangerments at and to the Courtland Property and the surrounding public resources.

## COUNT V
## JUDICIAL ABATEMENT OF A PUBLIC NUISANCE *PER SE*

98.     Plaintiff incorporates and realleges the foregoing paragraphs as if fully set forth herein.

99.     A condition which is either defined by law to be a nuisance at all times and under any circumstances or which is expressly prohibited by law is known as a nuisance *per se*. *Duff v. Morgantown Energy Assoc.*, 187 W.Va. 712, 716, 421 S.E.2d 253, 257 n. 8 (1992); *Harless v. Workman*, 145 W.Va. 266, 274, 114 S.E.2d 548, 552 (1960)

100.     As described above, both the Filmont Landfill and the UCC Rail Yard are each a prohibited  "open dump," within the meaning of applicable state and federal law and prohibited thereunder.  *See, e.g.,* 42 U.S.C. §§ 6944 and 6945 ("Upon promulgation of criteria under section 1008(a)(3) [42 USCS § 6907(a)(3), which criteria were duly promulgated by USEPA, effective October 15, 1979 and are codified at 40 C.F.R, Part 257], any solid waste management practice or disposal of solid waste or hazardous waste which constitutes the open dumping of solid waste or hazardous waste is prohibited. . . . .  The prohibition contained in the preceding sentence shall be enforceable under section 7002 [42 USCS § 6972] against persons engaged in the act of open Dumping.") and W.Va. Code § 22-15-10 ("Open dumps are prohibited and it is unlawful for any person to create, contribute to, or operate an open dump or for any landowner to allow an open dump to exist on the landowner's property unless that open dump is under a compliance schedule approved by the director.").  Inasmuch as UCC has engaged in the practice open dumping, has maintained, operated, created, and contributed to open dumps, and has allowed open dumps to exist on its property, it is in direct violation of such laws.

101.    In exercise of its sovereign authority and responsibility under the WV Constitution to secure adequate protection of the Public Health, Safety, Welfare and the Environment, the WV Legislature has declared by Public Law:

> **The Legislature** further finds that solid waste disposal has inherent risks and negative impact on local communities and **specifically finds the following: (1) Uncontrolled, inadequately controlled and improper collection, transportation, processing and disposal of solid waste is a public nuisance and a clear and present danger to people;** (2) provides harborages and breeding places for disease-carrying, injurious insects, rodents and other pests harmful to the public health, safety and welfare; (3) constitutes a danger to livestock and domestic animals; (4) decreases the value of private and public property, causes pollution, blight and deterioration of the natural beauty and resources of the State and has adverse economic and social effects on the State and its citizens; (5) results in the squandering of valuable nonrenewable and non-replenishable resources contained in solid waste; (6) that resource recovery and recycling reduces the need for landfills and extends their life; and that (7) proper disposal, resource recovery or recycling of solid waste is for the general welfare of the citizens of this State.

W. Va. Code § 25-15-10(c) [Bolding emphasis added].

101.    UCC's collection, processing and disposal of Solid Wastes and Hazardous Wastes at both the Filmont Landfill and the Rail Yard was conducted without obtaining the required permits and without complying with applicable waste disposal standards and, was and is, therefore, the "uncontrolled and improper collection, transportation, processing and disposal of solid waste." Accordingly, both the Fillmont Landfill and the Rail Yard are each a **public nuisance** *per se* under both state and federal law.

102.    The aforementioned acts and omissions of UCC are both prohibited by law and have caused or contributed to conditions now present in environmental media at, under, and in the vicinity of the Courtland Property—*i.e.*, the presence and threatened presence of 1,4-dioxane, biphenyl, 2,6-di-tert-butyl-p-cresol, isophorone, phenyl ether, arsenic, chromium, lead, and mercury in soils and groundwater at levels far exceeding any "background" levels—which conditions are harmful to human health and offensive to the senses, such that an ordinary person

would reasonably be annoyed or disturbed, and which constituted an unreasonable interference with the free use and enjoyment of such environmental media. Such conditions commenced at some point after UCC began its operations at the Filmont Landfill and the UCC Railyard and continue to this day.

103.    The seriousness of the harm caused by such noxious and offensive conditions outweigh any social utility of the Defendant's conduct.

104.    Neither Courtland nor any of its predecessors in title to the Courtland Property has, in any way or in any manner, consented to the acts and omissions of Defendant which caused such conditions.

105.    Although the harm caused by the contamination of groundwater threatens all local groundwater downgradient from the Filmont Landfill and the UCC Railyard, the Davis Creek, its tributaries, and ultimately the Kanawha River, the harm suffered by Courtland is different from the type of harm suffered by the general public in that the contaminants released and disposed of by Defendant are currently present in the groundwater in the immediate vicinity of Courtland's property and are currently restricting Plaintiff Courtland's right to use that groundwater, as certain contaminants from the Landfill, the Railyard, and other UCC facilities (like the Tech Center), including Arsenic and Chromium, have been found in the groundwater underlying the Courtland Property at levels exceeding SDWA MCLs, rendering such groundwater currently unusable for human consumption. Moreover, Courtland is uniquely surrounded, on three sides, by contaminated UCC properties, and UCC's own consultants have recognized the potential that groundwater contamination at the UCC Tech Center (to the south of Courtland) may be related to groundwater contamination at the Filmont Landfill (to the north of Courtland), which would necessarily mean that such contamination is traveling beneath Courtland's Property.

106.   The aforementioned conduct, acts, and omissions of UCC has been and continue to be a substantial factor in causing the above-described public nuisance conditions and the particular harm to Courtland, also described above.

107.   Accordingly, UCC is  liable for the serious public nuisance conditions resulting from the presence or threatened presence of such hazardous and toxic wastes at the Courtland Property and the resultant risks and endangerment to human health and the environment.   Such liability extends to the appropriate and complete investigation and abatement of such nuisance conditions, all in a manner protective of human health and the environment and consistent with the NCP, which, as the Congressionally-required national plan for responding to releases of hazardous substances into and migrating within the environment, provides scientifically validated, carefully considered and detailed requirements, methods, and procedures for responding to and abating releases of hazardous substances and hazardous wastes (including hazardous wastes "listed and identified by the Administrator" pursuant to RCRA § 3001) that have been released into the environment.   Such an NCP-compliant response to the endangerments, harms, and risks caused by solid wastes and hazardous wastes which have become present or threaten to become present in environmental media at and in the vicinity of the Courtland Property should begin with a full Remedial Investigation of all endangerments, harms, and risks which have resulted or may result from such contamination at or from the UCC Facilities, pursuant to 40 C.F.R. § 300.430, under the supervision of a Special Master appointed by this Court to oversee implementation of the required injunctive relief, and with Plaintiff authorized to perform oversight and monitoring of the Defendant's remedial activities as they relate to endangerments at and to the Courtland Property and the surrounding public resources.

## COUNT VI
## PRIVATE NUISANCE

108.    Plaintiff incorporates and realleges the foregoing paragraphs, above, as if fully set forth herein.

109.    Courtland has a right fully and reasonably to use and fully, reasonably and comfortably to enjoy its own property without interference by Defendant with such rights of use and enjoyment.

110.    Through the aforementioned acts, UCC caused or contributed to the harmful and noxious conditions described above, which conditions constituted an unreasonable interference with Courtland's rights to operate, use, and enjoy its property.

111.    The harmful and noxious conditions caused by Defendant have continued for an unreasonable period of time, causing loss of property use and loss of property value to Courtland.

112.    As a proximate result of Defendant's acts and omissions and of the conditions which the Defendant caused or contributed to, Courtland suffered property damage, including diminution in the market value of the property, and the lost use and enjoyment of Courtland's now contaminated property.

## COUNT VII
## NEGLIGENCE

113.    Plaintiff incorporates and realleges the foregoing paragraphs, above, as if fully set forth herein.

114.    Defendant UCC owes a duty of reasonable care to Courtland, including a duty to handle, treat, store, and dispose of various substances, including 1,4-dioxane, biphenyl, 2,6-di-tert-butyl-p-cresol, isophorone, phenyl ether, arsenic, chromium, lead, and mercury in a manner which would not cause or result in the release of such substances to environmental media, which would

not result in the offsite migration of such contaminants, and which would not result in the contamination of environmental media at, underlying, and in the vicinity of the Courtland Property.

115.    UCC breached its duties of reasonable care by and through a variety of acts and omissions including, but not limited to their failure to handle, treat, store, and dispose of various substances, including 1,4-dioxane, biphenyl, 2,6-di-tert-butyl-p-cresol, isophorone, phenyl ether, arsenic, chromium, lead, and mercury in a manner which would not result in the release of such substances to environmental media, which would not result in the offsite migration of such contaminants, and which would not result in the contamination of environmental media at, underlying, and in the vicinity of the Courtland Property.

116.    UCC's breaches of such duties proximately caused the damages complained of herein.

117.    UCC was negligent in at least the following respects:

(a) Failing to address the foreseeable risk that such contaminants could be spilled or released into the environment;

(b) Failing appropriately to prevent, address or mitigate the presence of contaminants in environmental media on and within the Filmont Landfill and the UCC Railyard, before such contaminants could leach onto adjoining properties;

(c) Failing to prevent the migration of such contaminants from the Filmont Landfill and the UCC Railyard and onto adjoining properties;

(d) Failing to ascertain the nature and extent of potential threats to human health and the environment following the release of such contaminants at and from the Filmont Landfill and the UCC Railyard;

(e) Failing adequately to monitor and detect the offsite migration of such contaminants;

(f) Failing timely to advise adjacent landowners of such migration; and

(g) Failing timely to take appropriate steps after learning of such offsite migration.

118.    The Defendant's negligence was the proximate cause of the above-described environmental harms, the loss of use and enjoyment of Courtland's real property, and the loss of value in such property.

119.    By and through its negligent act and omissions, Defendant UCC has caused and contributed to a single, indivisible harm to the use and value of Plaintiff's property, for which no reasonable basis exists for apportioning that harm between Defendant and any other responsible party, UCC is liable, jointly and severally, for such harms and for money damages, in an amount to be proven at trial.

## COUNT VIII
## NEGLIGENCE *PER SE*

120.    Plaintiff incorporates and realleges the foregoing paragraphs, above, as if fully set forth herein.

121.    Both 42 U.S.C. § 6928 and W.V. Code § 22-18-8(a) prohibit the treatment, storage, and disposal of any hazardous waste listed or identified under RCRA Subtitle C at any facility which does not have a permit for such treatment, storage, or disposal.  Such statutes also prohibit the operation or closure of any facility or site for the treatment, storage, or disposal of a hazardous waste listed or identified under RCRA Subtitle C without obtaining a permit for such activity.

122.    As noted above, 1,4-dioxane and mercury are each a hazardous waste listed or identified by the Administrator under RCRA Subtitle C.  Neither the Filmont Landfill nor the UCC Railyard is or was, at any time such substances were disposed of or released to the environment, a facility which had a permit for the treatment, storage, or disposal of such substances.  Moreover,

neither the Filmont Landfill nor the UCC Railyard is or was, at any time it was operated or closed as a treatment, storage or disposal facility of listed or identified hazardous wastes (including 1,4-dioxane and mercury), a facility which had a permit for such operation or closure.  Accordingly, UCC has violated both 42 U.S.C. § 6928 and W.V. Code § 22-18-8(a).

123.    The conduct, acts and omissions of UCC constitute tortious violations of the foregoing statutory provisions, including (without limitation) both 42 U.S.C. § 6928 and W.V. Code § 22-18-8(a), all of which are laws which were and are intended to protect Plaintiff from the harm complained of herein.  Such conduct also constitutes tortious violations of the open dumping prohibitions of 42 U.S.C. §§ 6944 and 6945 and W.Va. Code § 22-15-10, laws which also were and are intended to protect Plaintiff from the harm complained of herein.

124.    As a direct and proximate result of such conduct, acts, and omissions, Plaintiff suffered the harms described above, including damage to its real property, the impairment of such property and its market value, the loss of use and enjoyment of such property.

125.    Accordingly, UCC has committed negligence *per se* and is liable to Plaintiff, jointly and severally, for monetary damages in an amount to be proven at trial.

### COUNT IX
### GROSS NEGLIGENCE

126.    Plaintiff incorporates and realleges the foregoing paragraphs, above, as if fully set forth herein.

127.    The conduct of Defendant as set forth herein was reckless and wanton, constituting the tort of gross negligence, which resulted in damages to Plaintiff.

128.    Defendant UCC is liable for its gross negligence because of the reckless manner in which it has ignored threats to human health and the environment, in spite of known risks, in the conduct of its operations, including: its failure to address the foreseeable risk that such

contaminants could be spilled or released into the environment; its failure appropriately to investigate, address or mitigate the presence of contaminants in environmental media on and within the Filmont Landfill and the UCC Railyard, before such contaminants could leach onto adjoining properties and into the environment; its failure to prevent the migration of such contaminants from the Filmont Landfill and the UCC Railyard and onto adjoining properties and into the the environment; its failure to ascertain the nature and extent of potential threats to human health and the environment following the release of such contaminants (with full knowledge of the migration of those contaminates in the environment), at and from the Filmont Landfill and the UCC Railyard; its failure to monitor and detect and report the offsite migration of such contaminants; its failure to take appropriate steps after learning of such offsite migration; and its failure to advise adjacent landowners and appropriate governmental entities of such release, discharge, and migration and of the very existence of the Filmont Landfill.  Accordingly, Defendant acted with conscious, reckless and outrageous indifference to the health, safety and welfare of others and in knowing disregard for its statutory obligations regarding the UCC Facilities.

129.    Such gross negligence was the proximate cause of the harms described above, including the invasion of toxic and harmful contaminants onto Courtland's property, causing substantial harm to such property, the loss of use and enjoyment of that property, the loss of value of such property, harm to wildlife, and the loss of the use and enjoyment of environmental media and resources.

130.    As a consequence of the aforementioned harms, which have proximately resulted from such conduct, Defendant UCC is jointly and severally liable for monetary damages, including punitive damages, in an amount to be proven at trial.

## COUNT X
## STRICT LIABILITY

131.    Plaintiff incorporates and realleges the foregoing paragraphs, above, as if fully set forth herein.

132.    From the date on which UCC commenced operations at the Filmont Landfill and the UCC Railyard to date, UCC have been engaged in the storage, control, use, transport, and/or disposal of bulk chemicals, including 1,4-dioxane, biphenyl, 2,6-di-tert-butyl-p-cresol, isophorone, phenyl ether, arsenic, chromium, lead and mercury and other materials known to be hazardous to human health and the environment, in close proximity to Plaintiff's property and the Davis Creek.  Such activities were and are ultra-hazardous and unreasonably dangerous activities in that the release or escape of such materials will, inevitably, endanger and/or result in damage to human health and/or the environment.

133.    Defendant UCC is strictly liable for all damages caused by such ultra-hazardous and unreasonably dangerous activities, including the damage to the property owned by Plaintiff, the loss of use and enjoyment of such property, and the loss of value to such property.

134.    Accordingly, Defendant is jointly and severally liable for monetary damages, in an amount to be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court award the following relief:

A.    As to Defendant UCC, jointly and severally:  **(1)** a award, pursuant to 42 U.S.C. §9607(a) and in an amount to be proven at trial, of all costs incurred by Plaintiff consistent with the National Contingency Plan in responding to the release and migration of Hazardous Substance to and through environmental media, to the Courtland Property, as described

herein; and **(2)** declaratory relief, pursuant to 42 U.S.C. §9613(g)(2)(B), 28 U.S.C. § 2201, and applicable state law, that will be binding in any subsequent action or proceeding to recover response costs or abatement costs with regard to the release and migration of Hazardous Substance to and through environmental media, to the Courtland Property, as described herein, and declaring each Defendant jointly and severally liable to Plaintiff for all necessary costs of response incurred by Plaintiff in a manner consistent with the NCP;

B.     As     to     Defendant     UCC,     pursuant     to     RCRA     § 7002(a)(1)(A), 42 U.S.C. § 6972(a)(1)(A), RCRA § 7002(a)(1)(B) (42 U.S.C. § 6972(a)(1)(B)), and the law of public nuisance, mandatory injunctive relief binding and compelling Defendant UCC, under the supervision of a Court-appointed Special Master and with appropriate oversight and monitoring by Plaintiff, timely and competently to undertake all actions, jointly and severally, necessary to abate appropriately the continuing harms caused by their violations of RCRA Subtitle C and by the harms, risks, nuisance conditions, and endangerments to human health and the environment caused by the presence and threatened presence of both solid wastes and hazardous wastes (including hazardous wastes listed or identified by the Administrator pursuant to RCRA Subtitle C) at, on, and under the Courtland Property, including (without limitation): **(1)** a full Remedial Investigation of all harms which have resulted or may have resulted from such contamination, pursuant to 40 C.F.R. § 300.430; and **(2)** such further actions deemed necessary to select and implement a permanent remedy for such harms; and **(3)** such further relief as may thereafter be determined necessary and appropriate, all in full compliance and accordance with the requirements of the NCP;

C.     As to Defendant UCC, a joint and several award of money damages, in an amount sufficient to compensate Plaintiff for Defendant's interference and intrusion upon Plaintiff's

reasonable use and enjoyment of Plaintiff's real property, the damage to such real property resulting from Defendant's acts and omissions, the lost value in such real property resulting from Defendant's acts and omissions, and such other amounts deemed appropriate by this Court;

D.    As to Defendant UCC, an award of civil penalties, to be paid to the United States of America pursuant to 42 U.S.C. § 6972(a)(2) and 42 U.S.C. § 6928(a) and (g), in the amount of $25,000 per day of violation for each violation committed relative to the Filmont Landfill and the UCC Railyard of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to RCRA, including (without limitation) those violations specifically identified herein

E.    As to Defendant UCC, punitive damages, as an exemplary measure, intended to punish Defendant for its grossly negligent and tortuous conduct and its careless and gross disregard for the rights and well-being of Courtland and the general public and to deter others from showing similar disregard;

F.    As to Defendant UCC, an award of prejudgment interest, pursuant to applicable federal or state law;

G.    As to Defendant UCC, an award of reasonable attorney fees and costs incurred in obtaining relief on behalf of Plaintiff;

H.    Such other and further relief as this Court deems necessary and appropriate.


JURY TRIAL REQUESTED:  Plaintiff further prays for trial by jury, as to all matters so triable, and respectfully requests that this Court retain continuing jurisdiction of this action to the extent necessary and for as long as necessary to enforce and interpret, and to review the Defendant's compliance with, this Court's orders entered herein.

Respectfully submitted:

**Neely & Callaghan**
**Lead Trial Counsel for Plaintiff, The Courtland Company, Inc.**

BY: _____
Michael O. Callaghan, Esq. WV Bar No. 5509
NEELY & CALLAGHAN
159 Summers Street
Charleston, WV 25301-2134
Telephone:  (304) 343-6500
Facsimile:  (304) 343-6528
E-Mail:  mcallaghan@neelycallaghan.com