UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

THE COURTLAND COMPANY, INC.,
a West Virginia Business Corporation,

      Plaintiff,

v.                        Civil Action No. 2:19-cv-00894

UNION CARBIDE CORPORATION,
a New York Corporation,

      Defendant.


MEMORANDUM OPINION & ORDER


Pending is the defendant's motion to dismiss, filed on January 28, 2020 (ECF No. 9).


I.   Background


The plaintiff, Courtland Company, Inc. ("Courtland"), initiated this action on December 13, 2019 alleging federal and state-law claims against the defendant, Union Carbide Corporation ("UCC"), for environmental pollution.  See ECF No. 1 ("Compl.").

Courtland and UCC are both corporations that own property in Kanawha County, West Virginia.  See id. ¶¶ 5-6.  UCC owns two parcels of land adjacent to Courtland's property: a

rail yard and a landfill site.[1]  Id. ¶¶ 1, 14.  UCC's rail yard ("UCC Railyard") has allegedly stored onsite hazardous and toxic chemicals beginning "[n]o later than 1971," and such chemicals have allegedly "leach[ed] into the environment, including soils, surface waters – including Davis Creek and/or Kanawha River -- and groundwater underlying Plaintiff's property."  See id. ¶¶ 1, 6.  UCC allegedly accepted solid wastes, hazardous wastes, and other hazardous substances for disposal at the landfill ("Filmont Landfill") from the 1950's through the 1980's, including waste from the UCC South Charleston chemical manufacturing facility, bottom-ash from two UCC South Charleston facility power plants, and wastewater treatment plant grit from the UCC South Charleston Wastewater Treatment Plant.  See id. ¶¶ 6, 17-18, 22.  The Filmont Landfill allegedly fails to comply with applicable state and federal laws, and hazardous wastes and other hazardous substances from the property have allegedly "leached and continue to leach to soils, groundwater, and surface waters – including the [sic] Davis Creek and/or the Kanawha River -- in further violation of applicable state and federal law."  See id. ¶ 1.  Courtland alleges that the Filmont

---

[1] A third adjacent property owned by UCC, the "UCC Tech Center," is the subject of a related lawsuit.  See The Courtland Company, Inc. v. Union Carbide Corporation, 2:18-cv-01230.

Landfill remains an "illegal open dump"[2] owned, operated, and maintained by UCC in violation of federal and state laws because UCC never properly closed the landfill in accordance with applicable laws.  See id.

Courtland alleges that the "release of toxic, noxious, harmful and hazardous contaminants into the environment" from the two UCC properties has caused actual damage to the environment; presents an imminent and substantial endangerment to the environment and human health; is an invasion of Courtland's right to the safe and comfortable use and enjoyment of its property; and is a serious public nuisance.  See id. ¶ 1. Courtland further alleges that UCC has intentionally hidden the pollution from Courtland, federal and state regulatory agencies, and the public at large.  See id.

Courtland alleges ten (10) causes of action.  Count I seeks to recover "response costs" for addressing releases of hazardous substances from the UCC properties, pursuant to Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C.

---

[2] An "open dump" means "any solid waste disposal which does not have a permit under [the West Virginia Solid Waste Management Act, W. Va. Code § 22-15-1 et seq.], or is in violation of state law, or where solid waste is disposed in a manner that does not protect the environment."  W. Va. Code § 22-15-2(23).

§ 9607(a).  See id. ¶¶ 2, 58-66.  Count I is not the subject of the motion to dismiss.

Count II seeks injunctive relief pursuant to Section 7002(a)(1)(A) of the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. § 6972(a)(1)(A), to compel compliance with RCRA and to redress the consequences of alleged past and on-going violations of RCRA, and civil penalties to be paid to the United States to redress the consequences of the alleged past and ongoing violations.  See id. ¶¶ 2, 67-81.  Count III seeks judicial abatement of the imminent and substantial endangerment to public health and the environment caused by the solid wastes and hazardous wastes at and emanating from the UCC properties, pursuant to Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B).  See id. ¶¶ 2, 82-88.

The remaining counts are framed under state law. Count IV seeks judicial abatement of the ongoing public nuisance, see id. ¶¶ 2, 89-97; and Count V seeks judicial abatement of the ongoing public nuisance per se, see id. ¶¶ 2, 98-107.  Counts VI to X seek damages, including an award of punitive damages, under the laws of private nuisance, negligence, negligence per se, gross negligence, and strict liability, for the harms to Courtland's property and property

4

rights, including the loss of reasonable use and enjoyment, and the loss of property value.[3]  See id. ¶¶ 2, 108-34.

The defendant filed its motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) on January 28, 2020.  The motion is fully briefed.[4]

## II.  Legal Standards

### A.  Rule 12(b)(1)

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a defendant to challenge a complaint for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  Federal

---

[3] The plaintiff also seeks to recover reasonable litigation costs, appropriate prejudgment interest, and other relief that the court may deem necessary and appropriate.  See Compl. ¶ 2.

[4] Pursuant to Rule 12(a), a defendant must serve an answer to a complaint "within 21 days after being served with the summons and complaint."  Fed. R. Civ. P. 12(a)(1)(A)(i).  Filing a motion under Rule 12 alters this time period as follows: "if the court denies the motion or postpones its disposition until trial, the responsive pleading must be served within 14 days after notice of the court's action."  See id. 12(a)(4)(A); see also Myrick v. United States, 559 F. App'x 245, 246 (4th Cir. 2014) (per curiam) (finding that the defendant's "timely filing of a motion to dismiss suspended its obligation to file an answer" under Rule 12(a)(4)).  In accordance with Rule 12(a)(4), UCC asserts that it will file an answer to Courtland's complaint, including an answer to claims not challenged in the motion to dismiss, after the court rules on the motion to dismiss.  See ECF No. 9 at 7.  UCC further states that it reserves the right to assert any and all defenses and counterclaims when it files its answer.  See id.  Courtland does not dispute this.

district courts are courts of limited subject matter jurisdiction, possessing "only the jurisdiction authorized them by the United States Constitution and by federal statute." U.S. ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 347 (4th Cir. 2008) (citing Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005)). There is no presumption that a federal district court has jurisdiction." Pinkley, Inc. v. City of Frederick, 191 F.3d 394, 399 (4th Cir. 1999). The facts essential to show jurisdiction must be affirmatively alleged in the complaint. Dracos v. Hellenic Lines, Ltd., 762 F.2d 348, 350 (4th Cir. 1985).

An objection that a federal court lacks subject matter jurisdiction may be raised by a party, or by the court sua sponte, at any stage in the litigation. Arbaugh v. Y&H Corp., 546 U.S. 500, 506 (2006). If subject matter jurisdiction is lacking at any point in litigation, the claim must be dismissed. Id. When a defendant challenges the existence of subject matter jurisdiction under a Rule 12(b)(1) motion, the plaintiff bears the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists. Jadhav, 555 F.3d at 347. When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), "the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside

the pleadings without converting the proceeding to one for summary judgment." Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999) (citing Richmond, Fredericksburg & Potomac R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991)).  The district court should grant the Rule 12(b)(1) motion to dismiss "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Id. (citing Richmond, 945 F.2d at 768).

B.    Rule 12(b)(6)

        Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleader provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Rule 12(b)(6) correspondingly permits a defendant to challenge a complaint when it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  The purpose of a Rule 12(b)(6) motion to dismiss is to test the sufficiency of a complaint.  Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999).

        Specific facts are not necessary in a pleading, "but only enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  The pleading "must give the defendant fair notice of

what the . . . claim is and the grounds upon which it rests."
Id. at 555 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957));
see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (explaining
that the Rule 8 pleading standard "does not require 'detailed
factual allegations,' but it demands more than an unadorned,
the-defendant-unlawfully-harmed-me accusation").

"[W]hen ruling on a defendant's motion to dismiss, a
judge must accept as true all of the factual allegations
contained in the complaint." Erickson v. Pardus, 551 U.S. 89,
94 (2007) (per curiam) (citing Twombly, 550 U.S. at 572).
However, the court is not required to accept as true the legal
conclusions set forth in a complaint. Edwards, 178 F.3d at 244.
The motion should only be granted if, "after accepting all well-
pleaded allegations in the plaintiff's complaint as true and
drawing all reasonable factual inferences from those facts in
the plaintiff's favor, it appears certain that the plaintiff
cannot prove any set of facts in support of his claim entitling
him to relief." Id.

To survive a Rule 12(b)(6) motion to dismiss, "a
complaint must contain sufficient factual matter, accepted as
true, to 'state a claim to relief that is plausible on its
face.'" See Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S.
at 570). To contain sufficient factual matter to make a claim

plausible, the factual allegations must "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

### III. Federal Claims

A.    RCRA Provisions

The Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. § 6901 et seq., is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste. Meghrig v. KFC W., Inc., 516 U.S. 479, 483 (1996); City of Chicago v. Envtl. Def. Fund, 511 U.S. 328, 331-32 (1994) ("RCRA is a comprehensive environmental statute that empowers [the Environmental Protection Agency] to regulate hazardous wastes from cradle to grave, in accordance with the rigorous safeguards and waste management procedures of Subtitle C, 42 U.S.C. §§ 6921-6934."). The primary purpose of RCRA is "to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, so as to minimize the present and future threat to human health and the environment." Meghrig, 516 U.S. at 483 (internal quotation marks omitted) (quoting 42 U.S.C. § 6902(b)).

Subchapter III, or Subtitle C, of RCRA specifically concerns the management of hazardous waste, and directs the federal Environmental Protection Agency ("EPA") to promulgate federal standards and permit requirements for its storage, treatment, and disposal.  See 42 U.S.C. §§ 6921-6934. Subchapter III also grants states the authority to establish their own hazardous management waste programs, subject to the review and approval of the EPA.  See 42 U.S.C. § 6926(b); see also 40 CFR §§ 271.1 to 271.27 (detailing requirements for state programs).  Where a state has an approved program, it is authorized to carry out its program in lieu of the federal program.  42 U.S.C. § 6926(b); Safety-Kleen, Inc. (Pinewood) v. Wyche, 274 F.3d 846, 863 (4th Cir. 2001); see also Sierra Club v. Virginia Elec. & Power Co., 903 F.3d 403, 407 (4th Cir. 2018) ("When a State elects to establish its own program, the EPA suspends its federal permit program and defers to the State's, allowing the state discharge permit to authorize effluent discharges under both state and federal law.").

The EPA approved West Virginia's hazardous waste program on May 15, 1986 and granted the State the "primary enforcement responsibility" for permitting treatment, storage, and disposal facilities within its borders and carrying out the other aspects of the RCRA program.  See West Virginia: Final

10

Authorization of State Hazardous Waste Management Program, 51 Fed. Reg. 17739-01 (May 15, 1986); see also West Virginia: Final Authorization of State Hazardous Waste Management Program Revision, 65 Fed. Reg. 29973-01 (May 10, 2000); West Virginia: Final Authorization of State Hazardous Waste Management Program Revisions, 78 Fed. Reg. 70225-01 (Nov. 25, 2013).  West Virginia implemented its hazardous waste program through the West Virginia Hazardous Waste Management Act, W. Va. Code § 22-18-1 et seq.  See W. Va. Code § 22-18-2(b)(4) ("Therefore, it is hereby declared that the purposes of this article are: . . . (4) to assume regulatory primacy through Subtitle C of [RCRA]."); id. § 22-18-4 ("The [Department of Environmental Protection] is hereby designated as the hazardous waste management lead agency for this state for purposes of Subtitle C of [RCRA] . . . .").[5] The federal EPA retains the right to conduct inspections under section 3007 of RCRA and to take enforcement actions under sections 3008, 3013, and 7003 of RCRA.  51 Fed. Reg. 17739.

---

[5] The court notes that references to the "division" or "division of environmental protection" refer to the Department of Environmental Protection ("DEP").  See W. Va. Code § 22-1-2(4).

RCRA and the West Virginia Hazardous Waste Management
Act define "hazardous waste" as:

> [A] solid waste, or combination of solid wastes, which
> because of its quantity, concentration, or physical,
> chemical, or infectious characteristics may -- (A)
> cause, or significantly contribute to an increase in
> mortality or an increase in serious irreversible, or
> incapacitating reversible, illness; or (B) pose a
> substantial present or potential hazard to human
> health or the environment when improperly treated,
> stored, transported, or disposed of, or otherwise
> managed.

42 U.S.C. § 6903(5); W. Va. Code § 22-18-3(6) (using "waste"
instead of "solid waste").  The EPA Administrator and the
Secretary of the West Virginia Department of Environmental
Protection are responsible for developing and promulgating
criteria for identifying the characteristics of hazardous waste,
and for listing such hazardous waste.  See 42 U.S.C. § 6921(a);
W. Va. Code § 22-18-6(a)(2).

Both RCRA and the West Virginia Hazardous Waste
Management Act prohibit the operation or closure of any facility
or site for the treatment, storage, and disposal of hazardous
waste listed or identified in these statutes without a permit
for such activity.  See 42 U.S.C. § 6925; W. Va. Code § 22-18-
8(a); see also Envtl. Def. Fund, Inc. v. Lamphier, 714 F.2d 331,
335 (4th Cir. 1983) ("Under 42 U.S.C. § 6925, anyone 'owning or
operating a facility for the treatment, storage, or disposal of
hazardous waste' as of November 19, 1980, must obtain operating

permits from the EPA."). Within 90 days of the promulgation of regulations identifying or listing substances as hazardous waste, "any person generating or transporting such substance or owning or operating a facility for treatment, storage, or disposal of such substance" must file a notification with the EPA Administrator, or with the authorized state hazardous waste permit program, that details the location and general description of such activity and the hazardous waste involved. See 42 U.S.C. § 6930(a); Lamphier, 714 F.2d at 334 ("After August 19, 1980, no hazardous waste could be stored lawfully unless notification had been given.").

Like other environmental laws, RCRA contains a citizen suit provision, 42 U.S.C. § 6972, that permits private citizens to enforce its provisions in some circumstances. Goldfarb v. Mayor & City Council of Baltimore, 791 F.3d 500, 504 (4th Cir. 2015); Meghrig, 516 U.S. at 484. RCRA authorizes "any person" to commence a civil action on his own behalf against other persons in two discrete types of citizen suits:

> (1)(A) against any person . . . who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to [RCRA]; or

> (B) against any person . . . who has contributed or
> who is contributing to the past or present handling,
> storage, treatment, transportation, or disposal of any
> solid or hazardous waste which may present an imminent
> and substantial endangerment to health or the
> environment . . . .

See 42 U.S.C. §§ 6972(a)(1)(A)-(B).  Each of these citizen suit
subsections "contains different elements and targets somewhat
different conduct."  Goldfarb, 791 F.3d at 504.

Subsection (a)(1)(A) authorizes so-called "permitting
violation claims," loosely termed though they be, which must be
based on an ongoing violation of a state or federal standard
that became effective pursuant to RCRA, regardless of any proof
that the alleged violative conduct has endangered the
environment or human health.  See id. at 504-05 (affirming that
the federal district court has authority to enforce a state
standard).  In contrast, subsection (a)(1)(B) authorizes so-
called "imminent and substantial endangerment" claims against a
defendant whose present or past conduct may pose an "imminent
and substantial endangerment to health or the environment."  See
id.  Claims under subsection (a)(1)(B) "may be brought
regardless of whether the plaintiff can demonstrate that the
defendant's actions violated a specific RCRA-based permit, etc."
Id. at 505.  Federal district courts have the authority to order
a defendant to take necessary action to remedy a violation under

either subsection.  42 U.S.C. § 6972(a); Goldfarb, 791 F.3d at
505.

        Prior to commencing a citizen suit for an alleged
violation of RCRA, a plaintiff must (1) provide notice of the
alleged violation to the EPA Administrator, the State in which
the alleged violation occurred, and the defendant alleged to
have committed the violation; and (2) observe a waiting period
of 60 days for a subsection (a)(1)(A) suit, or 90 days for a
subsection (a)(1)(B) suit.  See 42 U.S.C. §§ 6972(b)(1)-(2).
The notice and the waiting period are "mandatory conditions
precedent to commencing suit under the RCRA citizen suit
provision; a district court may not disregard these requirements
at its discretion."  Hallstrom v. Tillamook Cty., 493 U.S. 20,
31 (1989).  An exception to the waiting period requirement
exists for actions brought under either subsection to allege
violations of Subchapter III of RCRA (i.e., management of
hazardous waste), which may be brought immediately after the
notice to the required parties.  See 42 U.S.C. §§ 6972(b)(1)(A),
(b)(2)(A).


B.    Rule 12(b)(1) Motion to Dismiss

        In both its complaint and responsive pleading,
Courtland alleges that it provided the necessary notice before

15

commencing this action as an RCRA citizen suit but that it was not bound by, and therefore did not observe, the 60-day waiting period for Count II or the 90-day waiting period for Count III because it alleges multiple specific violations of Subchapter III of RCRA regarding management of hazardous waste.  See ECF No. 16-1 ("Resp.") at 17-18; see also Compl. ¶¶ 80-81, 87-88.

UCC argues that Count II and Count III should be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction because Courtland's claims are not exempt from the mandatory waiting period under 42 U.S.C. §§ 6972(b)(1) and 6972(b)(2).  See ECF No. 10 ("Mem.") at 16, 18.  In a supplemental briefing, UCC further argues that the waiting periods cannot be waived and, further, are not rendered moot by the passage of time because of the "premature" filing of the complaint.  See ECF No. 24 at 1-2.  UCC argues that Courtland must identify a violation of Subchapter III, or a violation of the West Virginia equivalent, in order to forego the mandatory waiting period, but that Courtland has failed to identify a credible violation to fall within the statutory exception.  See Mem. at 11-12, 16, 18.

Courtland, however, does allege multiple violations of Subchapter III of RCRA in its complaint, including 42 U.S.C. § 6924 (addressing performance standards for owners and

operators of hazardous waste treatment, storage, and disposal facilities); 42 U.S.C. § 6925 (requiring permits for owners and operators of hazardous waste treatment, storage, and disposal facilities); 42 U.S.C. § 6930(a) (requiring notification of hazardous waste to the EPA or state agency); and 40 C.F.R. §§ 264.143 to 264.145 (requiring financial assurance instruments for the closure and post-closure care of a hazardous waste management facility).  See, e.g., Compl. ¶¶ 48-49, 55-56, 72, 75.  Courtland also alleges violations of the West Virginia equivalent to Subchapter III, including W. Va. Code § 22-18-8(a) (requiring permits to construct, modify, operate, or close a hazardous waste treatment, storage or disposal facility), and W. Va. Code St. R. 33-20-7.5 (requiring financial assurance instruments for the closure and post-closure care of a hazardous waste management facility).  See, e.g., id. ¶¶ 72-73, 75.

While Courtland, in Count II of the complaint, alleges that UCC is not compliant with a Subchapter IV provision against open dumps, 42 U.S.C. §§ 6944-6945, see id. ¶ 76, Courtland does not allege a violation of Subchapter IV as a cause of action in either Count II or Count III.  Courtland only alleges a violation of Subchapter IV in its claim for negligence per se (Count VIII) with regard to the prohibition against "open dumps."  See id. ¶ 100 (citing 42 U.S.C. §§ 6944-6945).

Negligence __per se__ is a state-law claim that does not arise under the RCRA citizen suit provisions, so it is not subject to the mandatory notice and waiting periods.

Accordingly, the motion to dismiss Count II and Count III under Rule 12(b)(1) is denied.

C.     __Rule 12(b)(6) Motion to Dismiss__

(1)    __Count II: RCRA Subsection (a)(1)(A) Citizen Suit –__
       __Injunctive Relief__

Courtland asserts a subsection (a)(1)(A) citizen suit claim in Count II for various violations of Subchapter III of RCRA and the West Virginia Hazardous Waste Management Act. Courtland alleges that UCC handled and disposed of multiple RCRA Subchapter III hazardous wastes, including 1,4 dioxane and mercury.[6]  __See__ Compl. ¶¶ 37-38, 68.  Courtland alleges that UCC never provided to either the EPA or the West Virginia Department of Environmental Protection the required notification of

---

[6] **Mercury and 1,4-dioxane are both categorized as hazardous wastes when, as is alleged here, they are discarded, intended to be discarded, and/or "applied to the land."  See 40 C.F.R. § 261.33(f) (identifying both mercury and 1,4-dioxane as "toxic waste" with "Hazardous Waste Number" U151 for mercury and U108 for 1,4-dioxane); see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 176 (2000) (describing mercury as "an extremely toxic pollutant").  The EPA labeled mercury and 1,4-dioxane as hazardous as early as 1981.  See Hazardous Waste Management System; Corrections, 46 Fed. Reg. 27473-02 (May 20, 1981).**

activity involving such hazardous waste and a list of such waste in accordance with 42 U.S.C. § 6930(a).  See id. ¶¶ 48-49, 74. Courtland also alleges that UCC does not have, and never had, a permit to dispose of hazardous waste into environmental media at and under UCC's property, or into environmental media on or in the vicinity of Courtland's property, in violation of 42 U.S.C. § 6924 and W. Va. Code § 22-18-8(a).[7]  See id. ¶ 72.

Courtland alleges that UCC's operation or closure of a facility for the treatment, storage, or disposal of hazardous wastes without a permit violates federal and state laws, including 42 U.S.C. § 6928 and W. Va. Code § 22-18-8(a).  See id. ¶ 73.  Courtland further alleges that these permit violations began on or about the effective date of RCRA on November 19, 1979, and continue to the date of the filing of the complaint.  See id. ¶¶ 72-73.  In addition, Courtland alleges that UCC has failed to put into place the financial assurance instruments for the closure and post-closure care of a hazardous waste disposal facility as required by 40 C.F.R. §§ 264.143 to 264.145 and W. Va. Code St. R. 33-20-7.5.  See id. ¶ 75.

---

[7] The court notes that the permit requirement is provided in 42 U.S.C. § 6925.  Section 6924 addresses performance standards for owners and operators of hazardous waste treatment, storage, and disposal facilities, which includes compliance with permits issued under § 6925, see, e.g., 42 U.S.C. § 6924(a)(7), and prohibitions on certain activities without such permits, see, e.g., 42 U.S.C. § 6924(b)(1)(C).

UCC asserts that Count II should be dismissed under Rule 12(b)(6) for three reasons.  First, UCC argues that the complaint does not plausibly allege any current or ongoing violations of RCRA.  <u>See</u> Mem. at 12-15.  Specifically, UCC alleges that Courtland failed to allege that any "new" disposal occurred at either the Filmont Landfill or the UCC Railyard on or after the date on which the EPA approved the West Virginia hazardous waste management program in May 1986.  <u>See</u> <u>id.</u> at 14-15.  Second, UCC argues that subsection (a)(1)(A) does not impose retroactive liability on a property owner for alleged past violations.  <u>See</u> <u>id.</u> at 13-14.  Third, UCC argues that it does not need a hazardous waste disposal permit for either the Filmont Landfill or the UCC Railyard because neither property is a "disposal facility" as a matter of law under 40 C.F.R. § 270.2 since UCC did not intentionally place hazardous waste into or onto that land.  <u>See</u> <u>id.</u> at 15.  UCC contends that dismissal is proper because the complaint lacks any allegations of "'new' intentional disposals."  <u>See</u> <u>id.</u>

Courtland plausibly alleges current and ongoing violations of RCRA and the West Virginia Hazardous Waste Management Act, namely, 42 U.S.C. § 6925 and W. Va. Code § 22-18-8(a), which both require permits for the operation of a hazardous waste facility and impose closure requirements for

such facilities; and 40 C.F.R. §§ 264.143 to 264.145 and W. Va.
Code St. R. 33-20-7.5, which require financial assurance
instruments for the closure and post-closure care of a hazardous
waste facility.  Federal courts have held that citizen suits
under subsection (a)(1)(A) do not impose retroactive liability
for past violations.  See e.g., Ascon Properties, Inc. v. Mobil
Oil Co., 866 F.2d 1149, 1159 (9th Cir. 1989) (finding that the
plaintiff failed to state a claim under 42 U.S.C.
§ 6972(a)(1)(A) because the alleged activity occurred before the
RCRA was enacted and subsection (a)(1)(A) does not impose
retroactive liability); Petropoulos v. Columbia Gas of Ohio,
Inc., 840 F. Supp. 511, 515 (S.D. Ohio 1993) ("Section
6972(a)(1)(A) authorizes only prospective relief while the
language of Section 6972(a)(1)(B) provides for retroactive
liability").  The alleged violations relating to permits and the
closure of UCC's property as a disposal facility are ongoing
violations because UCC has allegedly operated without a permit,
has not closed pursuant to a permit, and has not put in place
financial assurance instruments for post-closure care.  These
allegations therefore constitute present and ongoing violations
for a subsection (a)(1)(A) citizen suit.

        UCC attaches an exhibit, Exhibit A, to its motion to
dismiss to show that it submitted a "Notification of Hazardous

Waste Site" to the EPA in June 1981 to notify the EPA of the
existence of the Filmont Landfill that handled waste from
approximately the early 1950s until about 1970.  See Mem. at 5-
6; ECF No. 9-1.  In resolving a Rule 12(b)(6) motion, the court
"cannot consider matters outside the pleadings without
converting the motion into one for summary judgment." Occupy
Columbia v. Haley, 738 F.3d 107, 116 (4th Cir. 2013) (citing
Fed. R. Civ. P. 12(d)).  The court may consider documents
attached or incorporated into the complaint.  E.I. du Pont de
Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir.
2011); see also Phillips v. LCI Int'l, Inc., 190 F.3d 609, 618
(4th Cir. 1999) (holding that the court may consider a document
that was not attached to the complaint in determining whether to
dismiss the complaint because the document was integral to and
explicitly relied on in the complaint and because the plaintiffs
do not challenge its authenticity).

        Exhibit A was not attached to the complaint,
incorporated into the complaint, integral to the complaint, or
relied on in the complaint.  The document is only relevant with
respect to the use of the Filmont Landfill up to and including
June 1981.  The exhibit does not provide any further information
beyond that date, does not affirm whether or not UCC had permits
to operate or close the Filmont Landfill as a disposal facility,

22

and does not clarify whether or not UCC put in place financial
assurance instruments for the closure and post-closure care of
the Filmont Landfill.  Inasmuch as UCC's exhibit does not relate
to any specific document offered by Courtland in the complaint,
it is better considered at the summary judgment stage.

Despite UCC's argument to the contrary, Courtland has
plausibly alleged that UCC has operated a disposal facility on
its property.  A "disposal facility" is "a facility or part of a
facility at which hazardous waste is intentionally placed into
or on any land or water, and at which waste will remain after
closure."  40 C.F.R. § 260.10; see also 40 C.F.R. § 270.2; W.
Va. Code St. R. 33-20-2.  UCC allegedly accepted waste from the
1950's through the 1980's to be placed into or onto its
property.  See Mem. at 5-6; ECF No. 9-1.  UCC even concedes that
it is a past and present owner and operator that "has
contributed . . . to the past . . . handling, storage,
treatment, transportation, or disposal of any solid or hazardous
waste."  See Mem. at 17.  Based on this information, it can be
inferred that UCC intentionally placed hazardous waste into or
onto its property, even if the alleged discharge of this waste
from the property was not intentional.  Furthermore, the waste
appears to remain on the property and it is unclear whether UCC
has in fact closed its property as a disposal facility, either

properly or improperly.  These actions fit the definition of a
"disposal facility," for which Courtland alleges that UCC does
not have, and never had, a permit.  Accordingly, the motion to
dismiss Count II under Rule 12(b)(6) is denied.

### (2)  *Count III: RCRA Subsection (a)(1)(B) Citizen Suit – Judicial Abatement*

Courtland asserts a subsection (a)(1)(B) citizen suit
claim in Count III related to the presence and threatened
continued release of hazardous waste, specifically 1,4-dioxane,
biphenyl, 2,6-di-tert-butyl-p-cresol, isophorone, phenyl ether,
arsenic, chromium, lead, and mercury, into environmental media
at and in the vicinity of the Courtland property that has caused
actual harm to the environment and presents, or may present, an
imminent and substantial endangerment to the environment and
public health.  See Compl. ¶ 83.  Courtland seeks an appropriate
investigation and abatement of all the environmental harms
resulting from the presence and/or threatened presence of these
substances.  See id. ¶¶ 85-86.

UCC argues that Count III should be dismissed because
the complaint does not plausibly allege that UCC has contributed
to an "imminent and substantial endangerment to health or the
environment."  See Mem. at 16-18.  UCC asserts that the
complaint only contains conclusory statements and threadbare

recitals of the elements of a subsection (a)(1)(B) cause of
action.  See id. at 17.  UCC concedes that Courtland has
adequately plead that UCC is a past and present owner and
operator that "has contributed . . . to the past . . . handling,
storage, treatment, transportation, or disposal of any solid or
hazardous waste," but UCC contends that Courtland has not plead
any facts to support the plausible conclusion that these wastes
"may present an imminent and substantial endangerment to health
or the environment."  See id. (quoting 42 U.S.C.
§ 6972(a)(1)(B)).  UCC also argues that Courtland only alleges
the presence of "certain contaminants of concern, at elevated
levels, in environmental media, at and under the Courtland
Property" but does not identify the levels of these contaminants
or how those levels compare with federal and state standards to
determine whether and to what degree a threat exists to the
environment or to human health.  See id. (quoting Compl. ¶ 29).

        The citizen suit provision of § 6972(a)(1)(B) "was
designed to provide a remedy that ameliorates present or
obviates the risk of future 'imminent' harms."  See Meghrig, 516
U.S. at 486.  An endangerment can only be "imminent" if it
"threaten[s] to occur immediately," which excludes "waste that
no longer presents such a danger."  See id. at 485-86 (citing
Webster's New International Dictionary of English Language 1245

25

(2d ed. 1934)).  **This provision** "implies that there must be a
threat which is present now, although the impact of the threat
may not be felt until later."  **Id.** at 486 (quoting Price v. U.S.
Navy, 39 F.3d 1011, 1019 (9th Cir. 1994)).  **An endangerment is
"substantial" if it is "serious."**  Leister v. Black & Decker
(U.S.), Inc., 117 F.3d 1414 (4th Cir. 1997).

Courtland plausibly alleges that the presence,
release, and threatened continued release of 1,4-dioxane,
biphenyl, 2,6-di-tert-butyl-p-cresol, isophorone, phenyl ether,
arsenic, chromium, lead, and mercury from UCC's property "may
present an imminent and substantial endangerment to health or
the environment."  These substances are hazardous wastes, which
by definition "may . . . cause, or significantly contribute to
an increase in mortality or an increase in serious irreversible,
or incapacitating reversible, illness," or may . . . pose a
substantial present or potential hazard to human health or the
environment when improperly treated, stored, transported, or
disposed of, or otherwise managed."  See 42 U.S.C. § 6903(5).
There is no question that the endangerment posed by these
substances is substantial.  The endangerment is present now,
even if the impact may not be realized until later, based on
alleged reports of the presence of these substances in soil and
groundwater in neighboring properties.  The presence of these

substances in groundwater also poses a substantial threat to surface waters since the groundwater is hydrologically connected to Davis Creek and the Kanawha River.  See Compl. ¶ 44.

UCC's argument that Courtland fails to allege the levels of contaminants in the soil and groundwater, or how those levels compare with federal and state standards, is better addressed at the summary judgment stage after the benefit of discovery.  The law does not require that a plaintiff quantify the endangerment to health or the environment in order to bring suit.  The court cannot expect a plaintiff alleging a subsection (a)(1)(B) citizen suit to have alleged detailed quantitative facts about hazardous wastes in order to survive a motion to dismiss because that would set too high a bar and require extensive effort to obtain pre-filing discovery that may be unavailable absent suit.  The applicable standard is that the complaint provides "fair notice of what the . . . claim is and the grounds upon which it rests," Twombly, 550 U.S. at 555, and contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" see Iqbal, 556 U.S. at 678.  Courtland has provided such notice and alleged sufficient facts for plausible relief.  Accordingly, the motion to dismiss Count III under Rule 12(b)(6) is denied.

IV.   State-Law Claims

A.   Count IV: Judicial Abatement of Public Nuisance

"A public nuisance is an act or condition that unlawfully operates to hurt or inconvenience an indefinite number of persons." Hark v. Mountain Fork Lumber Co., 34 S.E.2d 348, 354 (W. Va. 1945). A public nuisance differs from a private nuisance in that the former affects the general public, while the latter only injures one person or a limited number of persons. Id. "A public nuisance action usually seeks to have some harm which affects the public health and safety abated." State ex rel. Smith v. Kermit Lumber & Pressure Treating Co., 488 S.E.2d 901, 925 (W. Va. 1997). Ordinarily, it is the duty of the proper public officials to vindicate the rights of the public. Hark, 34 S.E.2d at 354. A private individual cannot maintain a suit to abate a public nuisance unless such individual suffers a "special injury" that differs "not only in degree, but in character" from the injury inflicted upon the general public. See id.; Int'l Shoe Co. v. Heatwole, 30 S.E.2d 537, 540 (W. Va. 1944); Curry v. Boone Timber Co., 105 S.E. 263, 264 (W. Va. 1920). The injury must be "serious and permanent" and affect "the substance and value of their property." Curry, 105 S.E. at 264; see also Hark, 34 S.E.2d at 354 (requiring

"substantial permanent damages [that] cannot be fully compensated in an action at law").

Courtland alleges, in its complaint, that the acts and omissions of UCC have caused or contributed to the presence of, and the threatened continued release of, 1,4-dioxane, biphenyl, 2,6-di-tert-butyl-p-cresol, isophorone, phenyl ether, arsenic, chromium, lead, and mercury in soil, groundwater, and surface waters at and in the vicinity of the Courtland property.  See Compl. ¶¶ 33-34, 92.  The presence of these substances in the groundwater also allegedly threatens all local surface waters and groundwater downgradient from UCC's property.  See id. ¶¶ 44, 95.  Courtland alleges that UCC's acts and omissions constitute an unreasonable interference with the free use and enjoyment of Courtland's property, and are harmful to human health and offensive to the senses, such that an ordinary person would reasonably be annoyed or disturbed.  See id. at 92. Courtland further alleges that it suffers different harm from the general public because the contaminants are currently present in the groundwater in the immediate vicinity of Courtland's property, which restricts Courtland's right to use that groundwater.  See id. ¶ 95.

UCC presents two arguments for dismissing the claim of public nuisance.  UCC's first argument is that Courtland lacks

29

standing to bring any claim based on alleged contamination of groundwater under its property because (1) Courtland does not own the groundwater at issue, and (2) Courtland does not and cannot use the groundwater. See Mem. at 26-29; see also id. at 19 (arguing that Courtland has not suffered an injury — special or otherwise — because a city ordinance prohibits local property owners from using the groundwater at or beneath its property for human consumption purposes).

In West Virginia, water, including groundwater, is held by the State of West Virginia for the use and benefit of its citizens. See W. Va. Code § 22-26-3(a) ("The waters of the State of West Virginia are claimed as valuable public natural resources held by the state for the use and benefit of its citizens."); see also id. § 22-12-2(b) (describing "the public policy of the state of West Virginia to maintain and protect the state's groundwater so as to support the present and future beneficial uses"). The State manages and protects its waters "for present and future use and enjoyment and for the protection of the environment." Id. § 22-26-3(a). The State oversees the maintenance and protection of all groundwater pursuant to the Groundwater Protection Act. Id. § 22-12-1 et seq.

Under West Virginia law, property owners are limited to a "reasonable and beneficial use" of groundwater within the

boundary of their land.  See Pence v. Carney, 52 S.E. 702, 705-06 (W. Va. 1905); see also Drummond v. White Oak Fuel Co., 140 S.E. 57, 59-61 (W. Va. 1927) ("Subsurface waters . . . are not governed by the rules of law applied to water courses.").  The property owner's interest includes a usufructuary interest to use groundwater, even though the property owner does not own the groundwater.  See Harvey Coal & Coke Co. v. Dillon, 53 S.E. 928, 933 (W. Va. 1905) ("The terms 'property in lands' is not confined to title in fee, but is sufficiently comprehensive to include any usufructuary interest, whether it be a leasehold or mere right of possession."); cf. Sturgeon v. Frost, 139 S. Ct. 1066, 1079 (2019) (describing reserved water rights as "usufructuary" in that they are rights for one to use certain waters, by withdrawing or maintaining, that one does not own).

Article 1353(a) of the City Ordinances of South Charleston prohibits drilling on any property located in the "Restricted Use District" "for the purposes of gaining access to groundwater at or beneath such property for potable use or other purposes."  S. Charleston City Ord. Art. 1353.01(a) (Ord. 2055).  The "Restricted Use District" is defined as the area "bounded by the Kanawha River on the north; corporate limits of the City of South Charleston on the east; southerly right-of-way line of Kanawha Turnpike on the south; and westerly right-of-way of

Chestnut Street on the west." Id. 1353.01(c). Courtland's
property is within the "Restricted Use District." However,
"[n]othing in [Article 1353.01] prohibits use of groundwater in
the designated area if the groundwater has been treated to meet
state standards appropriate for its intended use prior to use."
Id. 1353.01(d).

Courtland has a usufructuary right, as a real property
owner, for the "reasonable and beneficial use" of groundwater
within the boundary of its land. See Pence, 52 S.E. 705-06.
Article 1353.01 of the City Ordinances of South Charleston
limits drilling to access such groundwater, but the ordinance
does not abrogate the property interest in such groundwater
altogether. The drilling restriction does not apply "if the
groundwater has been treated to meet state standards appropriate
for its intended use prior to use." See S. Charleston City Ord.
Art. 1353.01(d). The alleged contamination of the groundwater
interferes with the use of the groundwater since the groundwater
likely does not meet state standards as a consequence of the
alleged contamination. Nevertheless, Courtland still maintains
a usufructuary right for potential future use if the groundwater
were treated to meet state standards. Courtland has plausibly
alleged harm that is different in type and degree from the
general public (i.e., a "special injury") because UCC has

unreasonably interfered with Courtland's present and future usufructuary right to use or access the groundwater.  Moreover, the extent of UCC's interference with Courtland's right to use the groundwater, or its actual use of the groundwater, is more appropriately assessed as a component of damages, rather than as a condition for bringing suit.

Notwithstanding the special injury alleged in relation to the groundwater, Courtland has also described a special injury related to its use and enjoyment of the soil and land within the boundaries of its property.  Courtland's property lies adjacent to the Filmont Landfill and the UCC Railyard. Courtland alleges that hazardous waste emanating from UCC's property is present in excessive levels within the soil on Courtland's property, which constitutes an unreasonable interference with the free use and enjoyment of the soil and land.  See Compl. ¶ 92.  The presence of hazardous waste in high levels on and within Courtland's property thus creates a special injury.

UCC's second argument for dismissal is that the complaint does not plead, identify, or define any harm to or interference with the general public.  See Mem. at 19-20. Despite Courtland's assertion that certain contaminants emanating from the UCC properties are "harmful to human health

33

and offensive to the senses," UCC asserts that the complaint
does not identify the levels of these contaminants, nor how
those levels compare with federal and state standards for
protection of the environment or human health.  See id.

As previously discussed with Count III, the court
rejects UCC's claim that Courtland must quantify the level of
environmental harm in order to bring suit or to survive a motion
to dismiss.  Courtland has plausibly alleged a general injury to
the public due to the presence and continued release of
hazardous waste from UCC's property into the environment.  The
groundwater at and under Courtland's property, whether potable
or not, is unquestionably part of the environment, and is
intended for the present and future use and benefit of the West
Virginia public.  Other environmental media, such as soil and
surface waters, are also allegedly harmed by the presence of
hazardous waste from UCC's property.  See id. ¶¶ 1, 6, 95.  The
alleged contamination of this groundwater, soil, and surface
waters poses a threat to human health and the environment.

Courtland having alleged both general injury to the
public and its own special injury to its property that is
adjacent to UCC's property from which the contaminants are
allegedly emanating, the motion to dismiss Count IV under Rule
12(b)(6) is denied.  Whether Courtland has in fact sustained a

special injury is reserved for the summary judgment stage of this case.  See *Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 97-98 (4th Cir. 2011).

B.    Count V: Judicial Abatement of Public Nuisance *Per Se*

Nuisances may be characterized as either a nuisance per se or a nuisance per accidens.  A nuisance per se, or a nuisance at law, is "an act, occupation, or structure which is a nuisance at all times and and [sic] under any circumstances, regardless of location or surroundings."  *Harless v. Workman*, 114 S.E.2d 548, 552 (W. Va. 1960).  A nuisance per accidens, or a nuisance in fact, becomes a nuisance "by reason of circumstances and surroundings," including "where the natural tendency of the act is to create danger and inflict injury on person or property."  Id.; see also *Burch v. Nedpower Mount Storm, LLC*, 647 S.E.2d 879, 893 (W. Va. 2007) ("It is also true that a business that is not a nuisance per se may still constitute a nuisance in light of the surrounding circumstances.").  Neither a lawful business nor a business authorized to be conducted by the government can constitute a nuisance per se.  *Burch*, 647 S.E.2d at 892.

Federal law and West Virginia state law generally prohibit the establishment and operation of "open dumps."  See

42 U.S.C. §§ 6944-6945; W. Va. Code § 22-15-10(a).  An "open

dump" is any solid waste disposal that does not have a permit,

or is otherwise in violation of state law, or where solid waste

is disposed in a manner that does not protect the environment.

W. Va. Code § 22-15-2(23); see also 42 U.S.C. § 6944 ("[A]

facility may be classified as a sanitary landfill and not an

open dump only if there is no reasonable probability of adverse

effects on health or the environment from disposal of solid

waste at such facility.").  Under West Virginia law:

> Open dumps are prohibited and it is unlawful for any
> person to create, contribute to, or operate an open
> dump or for any landowner to allow an open dump to
> exist on the landowner's property unless that open
> dump is under a compliance schedule approved by the
> [Secretary of the West Virginia Department of
> Environmental Protection]. . . . Open dumps operated
> prior to April 1, 1988, by a landowner or tenant for
> the disposal of solid waste generated by the landowner
> or tenant at his or her residence or farm, are not a
> violation of this section, if the open dump was not a
> violation of law on January 1, 1988, and unauthorized
> dumps which were created by unknown persons are not a
> violation of this section: Provided, That a person may
> not contribute additional solid waste to any such dump
> after April 1, 1988, except that the landowners on
> which unauthorized dumps have been or are being made
> are not liable for the unauthorized dumping unless the
> landowners refuse to cooperate with the division in
> stopping the unauthorized dumping.

W. Va. Code § 22-15-10(a).

Courtland alleges, in its complaint, that UCC has

operated the Filmont Landfill and the UCC Railyard as "open

dumps," by collecting, processing, and disposing of both solid

waste and hazardous waste without the required permit and without complying with applicable waste disposal standards, which makes both properties public nuisances <u>per se</u> under federal and state laws.  <u>See</u> Compl. ¶¶ 100-01.  UCC argues that the complaint fails to make any assertion that open dumping occurred at either the Filmont Landfill or the UCC Railyard on or after April 1, 1988.  <u>See</u> Mem. at 21.  UCC also argues that the West Virginia's open dump provisions do not retroactively apply.  <u>See</u> <u>id.</u>

As previously discussed, Courtland has plausibly alleged that UCC's acts and omissions regarding the operation of its property as a waste disposal facility, and the subsequent discharge of hazardous waste into nearby properties and environmental media, present a public nuisance.  Courtland has likewise plausibly alleged that such acts and omissions constitute a public nuisance <u>per se</u> for violating federal and state laws against open dumps.  UCC's argument that Courtland failed to allege dumping at UCC's property on or after April 1, 1988 is inapposite.  That time period only applies to waste "generated by the landowner or tenant at his or her residence or farm" as an exception to prohibition against open dumps.  <u>See</u> W. Va. Code § 22-15-10(a).  Neither Courtland nor UCC claim that the waste on UCC's property was generated from a residence or

farm.  Courtland specifically alleges that UCC accepted waste from the UCC South Charleston chemical manufacturing facility, bottom-ash from two UCC South Charleston facility power plants, and wastewater treatment plant grit from the UCC South Charleston Wastewater Treatment Plant.  See Compl. ¶¶ 6, 17-18, 22.  Regardless of when alleged past dumping occurred, Courtland alleges that UCC allows an open dump to exist on its property, that UCC lacks a permit for such an open dump, and that UCC has not complied with state standards, including a schedule approved by the Secretary of the West Virginia Department of Environmental Protection.  Such allegations support the inference that UCC continues to be in violation of the laws against open dumps.  Accordingly, the motion to dismiss Count V under Rule 12(b)(6) is denied.

C.   Count VI: Private Nuisance

        "A private nuisance is a substantial and unreasonable interference with the private use and enjoyment of another's land."  Syl. Pt. 1, Hendricks v. Stalnaker, 380 S.E.2d 198, 199 (W. Va. 1989).  In order for an interference to be "substantial," the interference must "involv[e] more than slight inconvenience or petty annoyance[,] . . . there must be a real and appreciable invasion of the plaintiff's interests."  Carter v. Monsanto Co., 575 S.E.2d 342, 347 (W. Va. 2002) (quoting

Restatement (Second) of Torts § 821F(c) (1979)).  An
interference is "unreasonable" "when the gravity of the harm
outweighs the social value of the activity alleged to cause the
harm."  Syl. Pt. 2, <u>Hendricks</u>, 380 S.E.2d at 199.

 "Recovery for a private nuisance is limited to
plaintiffs who have suffered a significant harm to their
property rights or privileges caused by the interference."
<u>Hendricks</u>, 380 S.E.2d at 201 (citing Restatement (Second) of
Torts §§ 821E, 821F (1979)); <u>see also</u> <u>Bansbach v. Harbin</u>, 728
S.E.2d 533, 538 (W. Va. 2012) (discussing the need to show
significant harm to prevail in a private nuisance action).  An
alleged diminution of property value, without more, is
insufficient to allow a plaintiff to recover under a theory of
private nuisance.  <u>See, e.g.</u>, <u>Burch</u>, 647 S.E.2d at 892
(reviewing diminution of value, as well as noise and
unsightliness); <u>Martin v. Williams</u>, 93 S.E.2d 835, 843-44 (W.
Va. 1956) (reviewing diminution of value, as well as light,
noise, and aesthetic impacts).

 Courtland alleges, in its complaint, that UCC's acts
and omissions created "harmful and noxious conditions" that
constitute an unreasonable interference with Courtland's rights
to operate, use, and enjoy its property.  <u>See</u> Compl. ¶ 110.
Courtland also alleges that, due to the continuation of these

conditions for an unreasonable period of time, it has suffered diminution in market value of its property and the lost use and enjoyment of its property.  See id. ¶¶ 111-12.

UCC argues that Courtland only asserts threadbare recitals of the elements of a claim for private nuisance and fails to plead facts that give rise to a finding of substantial and unreasonable interference with the use and enjoyment of Courtland's property.  See Mem. at 21-22.  UCC alleges that the alleged contamination of Courtland's property cannot interfere with Courtland's use of the property because Courtland only purchased the property for "investment purposes" and does not currently use it.  See Mem. at 22; see also Compl. ¶ 5 (alleging that Courtland purchased its property "for investment purposes, particularly for potential sale to a third party").

Courtland has plausibly alleged a private nuisance. As previously discussed, UCC's alleged acts and omissions unreasonably interfere with Courtland's usufructuary right for the "reasonable and beneficial use" of groundwater at or underneath Courtland's property.  Courtland has also alleged that UCC's acts and omissions have created "harmful and noxious conditions" on Courtland's property, and pose an endangerment to human health and the environment.  The alleged contamination of soil and groundwater on Courtland's property constitutes a

substantial and unreasonable interference with Courtland's private use and enjoyment of its property.  Allegations regarding the actual use and enjoyment of the property, such as its use for investment purposes, are better evaluated at the summary judgment stage.  Accordingly, the motion to dismiss Count VI under Rule 12(b)(6) is denied.

D.   Count VII: Negligence

       To prevail in a negligence claim in West Virginia, the plaintiff must establish three elements by a preponderance of the evidence: (1) a duty that the defendant owes to the plaintiff, (2) a breach of that duty by an act or omission, and (3) injuries proximately caused by that breach of duty. Wheeling Park Comm'n v. Dattoli, 787 S.E.2d 546, 551 (W. Va. 2016).  "Under West Virginia law, a plaintiff alleging negligence or gross negligence is required to prove that he or she sustained an injury caused by the defendant's allegedly negligent conduct."  Rhodes, 636 F.3d at 94.  "Generally, such injury must already have occurred, although a plaintiff sometimes may recover for future effects of a present injury that are reasonably certain to occur."  Id.

       Whether the defendant owed the plaintiff a duty of care is a legal question for the court.  See Syl. Pt. 5, Aikens

41

v. Debow, 541 S.E.2d 576, 578 (W. Va. 2000). "Negligence is the violation of the duty of taking care under the given circumstances. It is not absolute, but is always relative to some circumstance of time, place, manner, or person." Syl. Pt. 7, Strahin v. Cleavenger, 603 S.E.2d 197, 201 (W. Va. 2004) (quoting Syl. Pt. 1, Dicken v. Liverpool Salt & Coal Co., 23 S.E. 582 (W. Va. 1895)). The Supreme Court of Appeals of West Virginia has articulated the following test for whether a duty of care exists in a particular case:

> The ultimate test of the existence of a duty to use care is found in the foreseeability that harm may result if it is not exercised. The test is, would the ordinary man in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result?

Syl. P. 3, Sewell v. Gregory, 371 S.E.2d 82, 83 (W. Va. 1988). The court has also announced that:

> Beyond the question of foreseeability, the existence of duty also involves policy considerations underlying the core issue of the scope of the legal system's protection. Such considerations include the likelihood of injury, the magnitude of the burden of guarding against it, and the consequences of placing that burden on the defendant.

Robertson v. LeMaster, 301 S.E.2d 563, 568 (W. Va. 1983) (internal citations omitted); see also Aikens, 541 S.E.2d at 581.

Courtland alleges, in its complaint, that UCC owes it a duty of reasonable care to handle, treat, store, and dispose

of substances, including 1,4-dioxane, biphenyl, 2,6-di-tert-butyl-p-cresol, isophorone, phenyl ether, arsenic, chromium, lead, and mercury, in a manner that would not cause or result in the release of these substances into environmental media, including soil, groundwater, and surface waters, at or in the vicinity of the Courtland property.  See Compl. ¶¶ 33-34, 114. Courtland alleges that UCC breached this duty through its acts and omissions, including the failure to handle, treat, store, and dispose of the listed substances in a way that would not result in their release or migration into the Courtland property.  See id. ¶ 115.  Courtland specifically alleges that UCC was negligent by (1) failing to address the foreseeable risk that the listed substances could be released into the environment; (2) failing to prevent, address, or mitigate appropriately the presence of these substances on the UCC properties before they leached into adjoining properties; (3) failing to prevent migration of these substances from the UCC properties onto adjoining properties; (4) failing to ascertain the nature and extent of potential threats to human health and the environment following the release of these substances; (5) failing to monitor and detect the offsite migration of these substances; (6) failing to advise adjacent landowners of such migration timely; and (7) failing to take appropriate steps in the appropriate time after learning of the offsite migration.

See id. ¶ 117.  Finally, Courtland alleges that UCC's acts and omissions were the proximate cause of environmental harm, the loss of Courtland's property value, and the loss of Courtland's use and enjoyment of its property.  See id. ¶ 118.

UCC alleges that the claim of negligence is insufficient and contains "only bare bones assertions and legal conclusions that courts have repeatedly rejected as insufficient."  See Mem. at 23.  UCC alleges that Courtland failed to plead any facts that it is currently suffering from any injury, or that an injury is "reasonably certain to occur."  See id. at 23-24.  UCC also alleges that, despite Courtland's "blanket assertion" that it has suffered loss of use and enjoyment of its property and loss of value of such property, Courtland does not allege that it currently uses the property or that the alleged contamination of the property has interfered with the use of the property in anyway.  See id. at 24.  Furthermore, UCC alleges that Courtland does not allege that it has any current or future intention to use the Courtland property, in part, because Courtland stated that it purchased the property for "investment purposes" and intends to benefit from this investment through a "potential future sale to a third party."  See id. (citing Compl. ¶ 5).

Under the circumstances of this case, the court finds
that UCC owed a duty of care to Courtland to prevent harm
resulting from the hazardous waste stored on UCC's property. It
was highly foreseeable that general harm to neighboring
properties, including the exact harm alleged, may result from
the discharge or migration of hazardous waste from UCC's
property if it did not exercise reasonable care to prevent such
harm. The policy considerations of imposing a duty of care onto
UCC also supports this conclusion. Federal and state laws
already impose a burden on UCC to guard against the type of harm
alleged, and the consequences of placing the burden on UCC to
guard against such harm is in line with the purposes of these
federal and state laws. Courtland has plausibly alleged a duty
of care and a breach of that duty, which was the proximate cause
of the harm alleged to its property, as well as the environment
more broadly. Accordingly, the motion to dismiss Count VII
under Rule 12(b)(6) is denied.

E.    Count VIII: Negligence *Per Se*

In West Virginia, it is well-settled that a "violation
of a statute is prima facie negligence and not negligence per
se." Spurlin v. Nardo, 114 S.E.2d 913, 918 (W. Va. 1960); see
also Gillingham v. Stephenson, 551 S.E.2d 663, 670 (W. Va. 2001)
(per curiam); Waugh v. Traxler, 412 S.E.2d 756, 759 (W. Va.

1991); <u>Vandergrift v. Johnson</u>, 206 S.E.2d 515, 517 (W. Va. 1974). "Only a rebuttable prima facie presumption of negligence arises on a showing that the statute was violated." <u>Flanagan v. Mott</u>, 114 S.E.2d 331, 335 (W. Va. 1960). "In order to be actionable, such violation must be the proximate cause of the plaintiff's injury." Syl. Pt. 1, in part, <u>Anderson v. Moulder</u>, 394 S.E.2d 61, 63 (W. Va. 1990).

Courtland alleges, in its complaint, that UCC violated federal and state laws, including 42 U.S.C. § 6925 (permits), 42 U.S.C. §§ 6944-6945 (open dumps), W. Va. Code § 22-15-10 (open dumps), and W. Va. Code § 22-18-8(a) (permits). Inasmuch as these alleged violations create only a <u>prima facie</u> presumption of negligence that may be embraced within the count VII negligence claim, the claim of negligence <u>per se</u> fails as a matter of law. Accordingly, the motion to dismiss Count VIII under Rule 12(b)(6) is granted.

F.   <u>Count IX: Gross Negligence</u>

Gross negligence is the same as ordinary negligence, except in degree. Gross negligence involves a breach in a duty of care with "aggravating circumstances indicating rashness or a conscious indifference to the probable dangerous consequences." <u>See</u> <u>State v. Richeson</u>, 370 S.E.2d 728, 730 (W. Va. 1988) (per

curiam) (discussing motor vehicles).  Gross negligence is synonymous with "reckless conduct" and "reckless disregard for the safety of others."  See Peak v. Ratliff, 408 S.E.2d 300, 304 n.4, 308 (W. Va. 1991) (discussing motor vehicles).

Courtland alleges that UCC is liable for gross negligence because UCC's "wanton and reckless" conduct threatened human health and the environment despite known risks and in knowing disregard of statutory obligations with respect to the UCC properties.  See Compl. ¶¶127-28.  Courtland further alleges that UCC acted with "conscious, reckless and outrageous indifference" to the health, safety, and welfare of others, which was the proximate cause of substantial harm to Courtland's property, the loss of use and enjoyment of that property, the loss of value of that property, harm to wildlife, and the loss of use and enjoyment of surrounding environmental media and resources.  See id. ¶¶ 128-29.

UCC asserts the same argument against gross negligence as it does against standard negligence in Count VII, namely, that Courtland's claim of gross negligence is clearly insufficient and contains "only bare bones assertions and legal conclusions that courts have repeatedly rejected as insufficient."  See Mem. at 23-24.

47

Gross negligence requires an additional showing of conscious indifference or reckless disregard to the safety of others.  Allowing the conditions alleged in the complaint to exist over three decades may support a gross negligence claim against UCC.  Accordingly, the motion to dismiss Count IX under Rule 12(b)(6) is denied.

G.   Count X: Strict Liability

Under West Virginia law, a person is strictly liable "for harm to the person, land or chattels of another resulting from [an abnormally dangerous activity], although he has exercised the utmost care to prevent the harm." Crum v. Equity Inns, Inc., 685 S.E.2d 219, 230 (W. Va. 2009) (per curiam) (citing Restatement (Second) of Torts § 519 (1976)).  Strict liability applies to abnormally dangerous activities and instrumentalities.  See Peneschi v. Nat'l Steel Corp., 295 S.E.2d 1, 5 (W. Va. 1982) ("[W]here a person chooses to use an abnormally dangerous instrumentality[,] he is strictly liable without a showing of negligence for any injury proximately caused by that instrumentality.").  Strict liability is limited "to the kind of harm, the possibility of which makes the activity [or instrumentality] abnormally dangerous." Crum, 685 S.E.2d at 230 (citing Restatement (Second) of Torts § 519 (1976)); see also Peneschi, 295 S.E.2d at 6 ("That is, the rule

48

of strict liability applies only to that harm which is within the scope of the abnormal risk upon which liability is based.").

        Whether an activity or instrumentality qualifies as "abnormally dangerous" is a question of law for the court.  See, e.g., Crum, 685 S.E.2d at 231 (holding that the operation of a hotel would not constitute an abnormally dangerous activity for strict liability); Bowers v. Wurzburg, 528 S.E.2d 475, 484 (W. Va. 1999) (holding that the "storage, sale, or distribution of gasoline" could be an abnormally dangerous activity and is subject to the strict liability analysis applicable to "any other activity involving similar or greater danger to the public"); Peneschi, 295 S.E.2d at 5 (holding that the "accumulation and use of combustible gas for a private purpose" is an "abnormally dangerous undertaking"); Whitney v. Ralph Myers Contracting Corp., 118 S.E.2d 622, 626-27 (W. Va. 1961) (holding that the use of explosives in blasting operations subjects the defendant to "absolute liability" for property damage resulting from such operations).  In determining whether an activity is abnormally dangerous, courts must balance six factors: (1) the existence of a high degree of risk of some harm to the person, land, or chattels of others; (2) the likelihood that the harm will be great; (3) the inability to eliminate the risk by the exercise of reasonable care; (4) the extent to which

the activity is not a matter of common usage; (5) the inappropriateness of the activity to the place where it is occurs; and (6) the extent to which the value of the activity to the community is outweighed by its dangerous attributes. Crum, 685 S.E.2d at 230 (citing Restatement (Second) of Torts § 520 (1976)).[8]

Courtland alleges that UCC's storage, control, use, transport, and/or disposal of bulk chemicals — including 1,4-dioxane, biphenyl, 2,6-di-tert-butyl-p-cresol, isophorone, phenyl ether, arsenic, chromium, lead, and mercury — and other materials known to be hazardous to human health and the environment at the Filmont Landfill and the UCC Railyard, were "ultra-hazardous and unreasonably dangerous activities" because the release or escape of these materials inevitably endangers human health and the environment. See Compl. ¶ 132. Courtland thus alleges that UCC is strictly liable for all damages caused by such activities, including the damage to Courtland's property, the loss of use and enjoyment of that property, and the loss of value to that property. See id. ¶ 133. UCC argues

---

[8] The six factors "are all to be considered, and are all of importance. Any one of them is not necessarily sufficient of itself in a particular case, and ordinarily several of them will be required for strict liability. On the other hand, it is not necessary that each of them be present, especially if others weigh heavily." Restatement (Second) of Torts § 520 (1977).

that Courtland's claim for strict liability fails because UCC
was not engaged in an "abnormally dangerous activity."  See Mem.
at 25.  UCC asserts that allegations of abnormally dangerous
materials (i.e., "bulk chemicals") are insufficient for a strict
liability claim since Courtland must allege abnormally dangerous
"activities."  See id.

        Despite UCC's argument that strict liability in West
Virginia only applies to abnormally dangerous "activities," the
Supreme Court of Appeals of West Virginia has held that strict
liability also applies to abnormally dangerous
"instrumentalities."  See Peneschi, 295 S.E.2d at 5.  Even if
strict liability only applied to "activities," UCC's acceptance
and storage of hazardous waste on its property qualifies as an
"activity" that may be abnormally dangerous.  Cf. Bowers, 528
S.E.2d at 484 (W. Va. 1999) (holding that the storage of
gasoline could be an abnormally dangerous activity).

        Neither party discusses how the six-factor balancing
test applies in this action, but the court must review this test
to determine whether the storage of hazardous waste on UCC's
property is abnormally dangerous.  The court finds that the
storage of hazardous waste presents a high risk of great harm to
persons and land as a consequence of the potential release of
hazardous waste.  However, UCC has the ability to eliminate this

risk through the exercise of reasonable care.  This would include, but is not limited to, building a storage facility according to the required federal and state standards, and complying with other federal and state requirements for operation, closure, and post-closure care.  The court lacks sufficient information to evaluate the remaining three factors: the extent to which the storage of hazardous waste is a matter of common usage, the inappropriateness of such storage on UCC's property, or the extent to which the value of the activity to the community may be outweighed by its dangerous attributes. Due to this lack of information, the court is unable to determine whether the storage of hazardous waste, specifically the substances listed by Courtland, qualifies as abnormally dangerous.

Accepting Courtland's allegation and drawing all reasonable inferences in Courtland's favor, the court finds that Courtland may be able to prove a set of facts in support of its claim for relief under a claim of strict liability. Accordingly, the court denies the motion to dismiss Count X under Rule 12(b)(6).  The court may re-evaluate the question of whether UCC's storage of hazardous waste on its property is abnormally dangerous at the summary judgment stage with the benefit of a complete factual record.  The parties are expected

to brief fully this question within the scope of the six-factor balancing test at that time.

H.    Additional Claim: Double Recovery

        In addition to the arguments presented for the aforementioned RCRA claims and the state-law claims, UCC also argues that Courtland's state-law claims should be dismissed because they are duplicative of the claims asserted by Courtland in the related case of The Courtland Company, Inc. v. Union Carbide Corporation, 2:18-cv-01230, and that the inclusion of those claims in this case impermissibly seeks double recovery. See Mem. at 3.

        Double recovery is not permitted under West Virginia law:

> It is generally recognized that there can be only one recovery of damages for one wrong or injury. Double recovery of damages is not permitted; the law does not permit a double satisfaction for a single injury. A plaintiff may not recover damages twice for the same injury simply because he has two legal theories.

Syl. Pt. 7, Harless v. First Nat. Bank in Fairmont, 289 S.E.2d 692, 694 (W. Va. 1982); see also Manor Care, Inc. v. Douglas, 763 S.E.2d 73, 112 (W. Va. 2014) (Workman, J., concurring) ("[T]he common law is clear that duplicative damages are not permitted irrespective of the number of theories or claims advanced.").

UCC argues that Courtland's state-law claims in this case must be dismissed pursuant to Rule 12(b)(6) as an impermissible attempt to recover double damages because Courtland already asserts such state-law claims in the related case of The Courtland Company, Inc. v. Union Carbide Corporation, 2:18-cv-01230.  See Mem. at 29-30.  UCC asserts that Courtland cannot recover twice in two different cases for the same injury.  See id.  Courtland asserts that it is not seeking double recovery because it seeks relief in the separate case, Case No. 2:18-cv-01230, in connection with separate harms caused from the release of separate contaminants from a separate property.  See Resp. at 47.

This action concerns harms stemming from contaminants released from the Filmont Landfill and the UCC Railyard, which lie immediately north and immediately east, respectively, of Courtland's property.  See Compl. ¶¶ 14-15, 25.  The separate action, Case No. 2:18-cv-01230, concerns harms related to the UCC Tech Center, which lies to the south of Courtland's property.  See id. ¶ 14; Resp. at 47.  The two cases in fact allege separate harms stemming from separate properties.  The extent to which the alleged harms from these three properties are the same or similar is not yet known.  That determination is better addressed by the finder of fact with the benefit of a

complete factual record.  The finder of fact will be better positioned to determine the extent to which Courtland may recover for each alleged harm based on the proportion that each UCC property may have contributed to such harm.  Furthermore, the court notes that the finder of fact must be made aware of distinctions between the harms and the properties to ensure that Courtland may not recover twice for the same harm, especially if the actions proceed as separate trials.

The court observes that consolidation of the two cases for trial — as they have been for discovery — may simplify the task of guarding against double recovery.

V.    Conclusion

For the foregoing reasons, it is ORDERED that the defendant's motion to dismiss is granted as to Count VIII for negligence <u>per se</u>, and denied as to all other counts.

The Clerk is directed to transmit copies of this memorandum opinion and order to all counsel of record and any unrepresented parties.

ENTER: August 26, 2020

John T. Copenhaver, Jr.
Senior United States District Judge