**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| **THE COURTLAND COMPANY, INC, a** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Civil Action Number:** |
| **v.** ) | **2:19-cv-00894** |
| ) | |
| **UNION CARBIDE CORPORATION,** ) | **Hon. John T. Copenhaver, Jr.** |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

## DEFENDANT UNION CARBIDE CORPORATION'S MEMORANDUM IN OPPOSITION TO PLAINTIFF THE COURTLAND COMPANY'S MOTION FOR SUMMARY JUDGMENT ON UNION CARBIDE CORPORATION'S COUNTERCLAIMS

Defendant Union Carbide Corporation ("UCC") provides this Memorandum in Opposition to Plaintiff The Courtland Company's ("Courtland") Motion for Summary Judgment on Union Carbide Corporation's Counterclaims ("Counterclaims Motion Case No. 2:19-cv-00894 ("2019 Case") Dkt. 359 & 360.[1]

Strangely after three years of decrying alleged contamination of soil, sediment, groundwater, and surface water by UCC, Courtland now seems to limit the world of possible contamination to just groundwater and surface water. To be clear, CERCLA's provisions apply to any contamination in any medium in the environment though most commonly only **soil** and groundwater.[2] Moreover, it is contaminated soil which is considered the most critical medium under CERCLA because it is a continuous source of contamination to groundwater. Thus, Courtland's narrow focus only on ground and surface water is sophistry

---

[1] Unless otherwise stated herein, all docket citations are to the docket in the 2019 case, Civil Action No. 2:19-cv-00894.

[2] Indeed, surface water is more commonly the purview of the Clean Water Act, under which Courtland has filed two more lawsuits here.

mischaracterizing CERCLA's provisions,  CERCLA precedent, as well as forty-one years of CERCLA based clean-ups of thousands of contaminated sites, all of which deal with **SOIL** and groundwater. *See e.g. United States v. Bestfoods,* 524 U.S. 51 (1998) (CERCLA case brought in response to soil and groundwater contamination); *see also United States v. Atl. Research Corp.,* 551 U.S. 128 (2007)(Same).

Courtland's Counterclaims Motion should be denied for numerous reasons. First, and perhaps most egregiously, Plaintiff badly mischaracterizes CERCLA to falsely assert it only applies to groundwater and surface water. Second, Courtland baldly misstates UCC's counterclaim to say UCC is seeking attorney's fees when instead UCC is only seeking contribution for response costs. Indeed, UCC has not sought any attorney's fees. Quite simply, Courtland utterly and completely misunderstands the point of UCC's CERCLA § 113(f) claim, which covers response costs, not attorney's fees. In the process, Courtland repeatedly conflates the requirements under CERCLA § 107(a) and CERCLA § 113(f), advocating for this Court to apply the wrong legal standard to each.[3] Plaintiff further mischaracterizes the case law it cites in arguing UCC cannot recover CERCLA-based response costs incurred prior to and throughout this litigation. Finally, attempting to assert that there are no material facts in dispute, Courtland completely ignores the significant and extensive evidence supporting UCC's counterclaims. In fact, with respect to UCC's Negligence, Declaratory Judgement, and Equitable Relief counterclaims, Courtland relies solely on the incorrect assertion that UCC's CERCLA 113(f) claim fails for lack of evidence. Therefore, Courtland's Motion for Summary Judgement on UCC's counterclaims should be denied in its entirety.

---

[3] Courts, caselaw, and the Parties to this case refer to CERCLA Section 107(a) and 42 U.S.C. Section 9607(a) interchangeably. For the sake of consistency, UCC will refer to CERCLA Section 107(a)  herein. Similarly, UCC will cite to CERCLA Section 113(f) throughout.

I.      **STATEMENT OF FACTS**

For purposes of brevity, UCC adopts and incorporates the statement of facts found in the Factual Background section in its Memorandum in Support of its affirmative Motion for Summary Judgment.  *See* Dkt. 297 at 1–11.  This Memorandum will focus on the facts as proffered by Courtland in its Counterclaims Motion.

A.  **The Former Filmont Landfill and Massey Railyard**

Filmont and Massey are two separate sites but exist on the same parcel of land.  2019 Case, Dkt. 1, Compl. ¶ 6.  Filmont began operations in or around 1950.  Dkt 290-32, 103(c) CERCLA Superfund Notification (June 9, 1981).  From the mid-1970s until approximately 1987, Filmont was operated as an inert waste landfill, with hazardous chemical waste sent to separate landfill.  *See* Dkt 292-6, Deposition Transcript of Jack Worstell (Oct. 21, 2020) ("Worstell Dep.") at 25:14–22; *see also* Dkt 292-7, SUI Division EP Audit, Plant 514 (May 17, 1984) ("SUI Division EP Audit") at 13.  In 1987, prior to expiration of a then-active state or county health department permit, Filmont underwent final closure under the supervision of the West Virginia Department of Natural Resources ("WVDNR"). *See* Dkt 292-8, Hanshew Dep. at 19:3–12; 24:6–9.

Massey began railyard operations no later than 1971 and is designated as a Very Small Quantity Generator ("VSQG").  *Id.* ¶ 26; *see also* Dkt 292-9, Massey RCRA Info Source Record.  Massey is currently used for the staging and storing of railcars. 2019 Case, Dkt. 1, Compl. ¶ 25.  There is no evidence that any portion of the Massey Property was ever used as a landfill.  *See* Dkt 292-1, Cibrik Dep. at 63:24–64:5.

Filmont has been regulated under CERCLA since the inception of CERCLA. Dkt. 290-28, Feb. 2021 MacPherson Report at 18–1; Dkt 290-32, 1981 103(c) CERCLA Superfund

Notification. Even Courtland's own expert witness admits that EPA had knowledge of Filmont as early as 1978. *See*, Dkt. 111, Amended Decl. of D. Scott Simonton (May 5, 2020) at 6. Moreover, its operation as a landfill was common knowledge historically. Ex. A- Dec. 29, 1953, Kanawha County Deed Book 1075, Page 347, p.3.   Evidence shows that UCC operated Filmont prior to the creation of RCRA under a West Virginia or Kanawha County Health Department Permit and used the landfill for inert waste. *See*, Dkt. 290-28, Expert Report of Charles MacPherson (Feb. 3, 2021) ("February 2021 MacPherson Report") at 22; Dkt. 292-8, Hanshew Dep. at 29:20–33:24; Dkt 292-6, Deposition Transcript of Jack Worstell (Oct. 21, 2020) ("Worstell Dep.") at 25:14–22; *see also* Dkt 292-7, SUI Division EP Audit, Plant 514 (May 17, 1984) ("SUI Division EP Audit") at 13.   UCC followed the requirements in place at that time with regard to the regulation of the landfill. *See*, Dkt. 290-28, Feb. 2021 MacPherson Report at 22; *see also* Case 2019, Dkt. 292-8, Hanshew Dep. at 19:3–33:24. Sworn testimony further confirms that final closure of Filmont occurred in 1987 under the supervision of the West Virginia Department of Natural Resources ("WVDNR").   *See*, Dkt. 292-8, Hanshew Dep. at 19:3–33:24.

After the June 1981 notice, and through continued discussion and correspondence with the EPA and West Virginia Department of Environmental Protection ("WVDEP"), environmental work has continued on Filmont under CERCLA.   Dkt 290-28, Feb. 2021 MacPherson Report at 18 (referencing Ex. 12 to the Worstell Deposition on October 21, 2020, as an example of the continued discussions with regulatory officials).   UCC has monitored groundwater, soil, and surface water at Filmont from 2005 to the present, undertaking among other things samples at various times, a Human Health Risk Assessment ("HHRA") and an Ecological Risk Evaluation ("ERA").   *See* Dkt 292-1, Cibrik Dep. at 18:11–20:15. The HHRA

and ERA found no risk of harm to humans or the environment. *See* Dkts 292-11 & 292-12, UCC Ecological Risk Evaluation for UCC Filmont Landfill- January 2015.  In 2009, 2010, and 2012, UCC also held meetings with WVDEP during which UCC advised WVDEP of the work being done on site, including the results of its ongoing sampling efforts.  *See* Dkt 290-31, Feb. 2021 MacPherson Report at Attachment C (UCC Correspondence with WVDEP). Likewise, neither EPA nor WVDEP required UCC to deviate from its current CERCLA approach.  *Id.*  On February 1, 2021, UCC applied for Filmont and Massey to be accepted under the West Virginia Voluntary Remediation Program ("VRP"). *See* Dkt 292-42, VRP Application.  Final acceptance of Filmont and Massey into the VRP occurred on September 23, 2021. *See* Dkt 292-32, VRP Acceptance. The investigation and remediation required under the VRP will satisfy UCC's requirements under CERCLA as it relates to those sites. *See* Dkt 292-3, Simonton Dep.  at 115:24–116:7 (May 6, 2021); Dkt 292-13, Simonton Dep. at 502:17–24 (May 7, 2021).

## B.  The Courtland Property

### 1.    Historical Investigation and Use of The Courtland Property

Plaintiff purchased the Courtland Property in January of 1980 for "investment purposes." 2018 Case, Dkt. 1, Compl. ¶ 5.  Beginning in 2008, Plaintiff entered into a lease agreement with Raynes & Sons ("Raynes").  *See* Dkt 292-15, Deposition Transcript of Clyde Raynes ("Raynes Dep.") (Oct. 11, 2019) at 29:3–17; Dkt 292-14, Deposition of Andrew Truslow ("Truslow Dep.")  at 179:1–180:23 (Sep. 13, 2019).

Additionally, undisputed aerial photographs of the Courtland property show that for decades it was covered with coal and unknown other materials, including fly ash.  2018 Case, Dkt. 194-1, Cibrik Decl. ¶ 21, Exs. A-5–A-8.  Likewise, since 2008, Courtland's lessee,

Raynes, has used the Courtland property for the storage of, among other materials, dirt, millings (ground up asphalt), concrete, asphalt chunks, barriers and rebar or steel materials. *See* Dkt. 290-19 at 2,5; *see* Dkt 292-15, Raynes Dep. at 36:21–38:1, 52:1–55:23, 56:23–57:4 (Oct. 11, 2019); *see also* Dkt 292-18, Ex. 4 to C. of Raynes Dep. (map depicting location of materials on property). A 1,000-gallon diesel tank is also located on the property and hydraulic oil and motor oil are stored in 5-gallon buckets throughout the site, and heavy equipment is stored on the site including, a screener, crusher, bulldozer, and excavators. *See* Dkt. 290-19 at 2,5; Dkt 292-15, Raynes Dep. at 59:13–21, 67:12–70:3 (Oct. 11, 2019).

### 2.     Environmental Testing on the Courtland Property

In August of 2017, Courtland took three groundwater samples from the Southeast portion of the Courtland property. Dkt. 1, Civil Action No. 2:18-cv-01230, Compl. ¶ 30. However, Courtland's expert, Dr. Scott Simonton, concedes that neither Filmont nor Massey could impact the groundwater at this location. *See* Dkt 292-19, Expert Report of Dr. D. Scott Simonton (Feb. 19, 2021) ("Simonton Feb. 2021 Report") ¶ 44; *see also* Dkt 292-3, Simonton Dep. at 223:7–24 (May 6, 2021); Dkt 292-13, Simonton Dep. at 492:12–18 (May 7, 2021).

Courtland filed a claim for recovery of costs against UCC under CERCLA 42 U.S.C. § 9607(a), alleging UCC is a Potentially Responsible Party (PRP) for environmental impacts allegedly detected on the Courtland property in groundwater. Dkt. 1, Civil Action No. 2:19-cv-00894. Courtland alleges that UCC's historical activities on the former Filmont Landfill and the Massey Railyard led to impacts to groundwater on the Courtland property from various metals and organic compounds and seeks a declaration that UCC would be liable for any response costs incurred by Courtland. Although some similar metals and chemicals have been detected on the UCC property historically, UCC denies that it is responsible for the

impacts to the Courtland property, and, that the historical use of the Courtland property is responsible for some or all of the environmental impacts to the Courtland property. *See generally,* Dkt. 304, Amended Answer "Am. Ans."

Cognizant of Courtland's lawsuit demanding that UCC perform response actions on the Courtland Property, UCC investigated whether Courtland is a source of contamination through soil sampling to determine what impacts exist on the Courtland property. The purpose was to determine if the Courtland property could be a source of the alleged impacts to groundwater on the Courtland property. Ex. B- May 5, 2021 Deposition of Charles McPherson at 89:5-92:15.

On December 16 and 17, 2020, UCC conducted a limited soil investigation on the Courtland Property.  UCC's soil investigation included both soil borings in periphery areas mostly on the side that abuts the UCC property and test pit borings in the interior of the operations area where borings would be dangerous.  The boings found evidence of coal material and the test pits encountered buried metal and debris. Dkt. 290-20 Triad December 2020 Boring Logs *and* Dkt. 290-21 Triad Boring/Test Pit Photos; Dkt. 290-3 DeHaven Analysis at 3-4.

Soil samples taken from both the soil borings and from the soil test pits detected the following metals and organic chemicals in the soil on the Courtland property:   1,2 Dichloroethane, 1,2 Dibromoethane, 1,1,2 Trichloroethane, Acetone, Benzene, Carbon Tetrachloride, Cyclohexane, Ethylbenzene, Methyl Ethyl Ketone (2-Butanone), Trichloroethene, Toluene, o Xylene, m,p Xylene, total Xylene, Aluminum, Antimony, Arsenic, Barium, Beryllium, Cadmium, Chromium, Cobalt, Copper, Lead, Manganese, Mercury, Nickel, Selenium, Sodium, Thallium, Vanadium, Zinc, 1,1 Biphenyl,

Acenaphthylene, Anthracene, Benzo(a)anthracene, Benzo(a)pyrene, Benzo(b)fluoranthene, Benzo(g,h,i)perylene, Benzo(k)fluoranthene, Chrysene, Dibenzo(a,h)anthracene, Dibenzofuran, Fluoranthene, Fluorene, Indeno(1,2,3-cd)pyrene, Naphthalene, Phenanthrene and Pyrene. *See* Dkt. 290-28, Feb. 2021 MacPherson Report at 25-28.

The laboratory results from the December 2020 soil sampling event identified sixteen (16) VOCs, eighteen (18) metals, and seventeen (17) SVOCs. *See* Dkt 290-15, January 2021 MacPherson Report at 14. In all, over forty-five (45) CERCLA Hazardous Substances were detected in one or more of the soil samples. *Id.* The presence of the constituents found in the soil samples taken by UCC in December 2020 suggests that Courtland is likely the source of its alleged contamination. *See id.* at Opinion 1; *see also* Dkt 292-3, Simonton Dep. at 273:24–276:9 (May 6, 2021).

The presence of these contaminates in soils shows that Courtland is at least partially responsible for environmental impacts on the Courtland property and potentially the UCC property. A number of the substances detected in the Courtland soils exceed applicable regulatory limits set for the protection of human health and the environment. Their presence in the soil medium confirms that Courtland is a source of impacts to groundwater. UCC incurred costs of $169,391.58 for the investigation and analysis of soils and source materials on the Courtland property. See Dkts. 292-41 and 290-43. This amount has since increased to $200,917.50 including additional related work. *See* 292-42, MacPherson Second Supplemental Report, 9/3/21 at page 16

Finally, in early June 2021, Dr. Simonton installed four temporary monitoring wells at the Courtland Property. *See* Dkt 292-20, Ashby-Tucker Environmental, LLC, Limited Groundwater Study, Sampling and Analysis Report, Courtland Property Adjacent to UCC

Filmont Dump ("July 2021 Report"). Throughout the months of June and July 2021, several groundwater samples were taken from three of the temporary monitoring wells, and no sampling was recorded from the fourth well. *Id.* at 6. A comparison of the chemicals detected in this 2021 groundwater sampling event to the substances detected in UCC's December 2020 soil samples, eleven (11) of the substances found in the 2021 groundwater sampling event were also found in UCC's December 2020 surface and subsurface investigation. *See* Dkt 290-42, Expert Report of Charles MacPherson (Sept. 2, 2021) ("September 2021 MacPherson Report") at 15. Likewise, thirteen (13) compounds detected in the June/July 2021 sampling event appear to be an artifact of sampling/analysis from Dr. Simonton's groundwater sampling effort and one (1) compound appears to be a possible artifact of sampling/analysis from the UCC conducted soil sample/analysis. *See id. at* 12–13. In essence, the constituents detected are a result of (1) Courtland's own operations on the property; and (2) the improper sampling protocols of Courtland's expert, Dr. Simonton. *Id.* at 13–14.

## II.     Legal Standard

Summary judgment shall ***only*** be granted when a moving party has shown "[that] the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party makes this showing, the opposing party must set forth specific facts showing there is a genuine issue for trial. *Id.* A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. *Id.*

III.    **Argument**

"CERCLA provide[s] for a right to cost recovery in certain circumstances, § 107(a), and separate rights to contribution in other circumstances, §§ 113(f)(1), 113(f)(3)(B)." *Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 163 (2004). Under either CERCLA §107 cost recovery or CERCLA §113 contribution actions, the basic elements are the same. The claimant must show: (i) that the site is a CERCLA "facility"; (ii) that there was a release or threatened release of a hazardous substance; (iii) the release caused the claimant to incur response costs consistent with the National Contingency Plan; and (iv) the counterclaim defendant is a statutorily liable person, i.e., a responsible party. *Blasland, Bouck & Lee, Inc. v. City of N. Miami*, 283 F.3d 1286, 1302 (11th Cir. 2002).

CERCLA § 113(f) gives PRPs the right to contribution against other liable parties under § 107(a), provided the PRP seeking contribution has been sued under 42 U.S.C. § 9606 or 9607(a). 42 U.S.C. § 9613(f)(1). A private party against whom such an action has not been commenced may not obtain contribution under this section. *Cooper Industries*, 543 U.S. at 158. Contribution is defined as the "tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her proportionate share, the shares being determined as a percentage of fault." Black's Law Dictionary 353 (8th ed.2004). Nothing in CERCLA § 113(f) suggests that Congress used the term "contribution" in anything other than this traditional sense....In either case, a PRP's right to contribution under § 113(f)(1) is contingent upon an inequitable distribution of common liability among liable parties. *Atl. Research Corp.*, 551 U.S. at 138–39. Thus, § 113 contribution suits are between jointly liable parties to discern an equitable division of liability. UCC may pursue a § 113(f) claim based on Plaintiff's § 107(a) action against it. Whether Plaintiff is willing to admit it or

not, at issue is the question of whether Plaintiff is responsible for some or all of the contamination it claims is on its property, which gives rise to UCC's CERCLA counterclaim. Additionally, Section 113(g)(2) provides that the Court shall enter a declaratory judgement as to any contribution sought under § 113.

Congress adopted a remediation model in CERCLA that was a revised version of an existing national hazardous substance response plan, which is referred to as the National Contingency Plan ("NCP").  42 U.S.C. § 9605.  The NCP establishes the organizational structure and procedures necessary to respond to oil spills and the release of hazardous substances.  *Id.*; 40 CFR § 300.1.  This includes a description of the "methods for discovering and investigating facilities at which hazardous substances have been disposed or otherwise come to be located."  42 U.S.C. § 9605(a)(1).  The NCP's purpose is to ensure a national, standardized set of practices for investigating sites with potential releases of hazardous substances, provide methods and criteria for removal and remediation of those substances, and to specify "procedures, techniques, materials, equipment, and methods to be employed in identifying, removing, or remedying releases of hazardous substances…."  *Id.* § 9605(a)(10). CERCLA requires adherence to the NCP "to the fullest extent possible" in any response to the release of hazardous substances.  *Id.*

CERCLA requires that any costs sought under the Act be certified as compliant with the requirements of the NCP to be recoverable.  42 U.S.C. § 9607(a)(4)(B); Dkt 292-3, Simonton Dep. at 119:19–120:6 (May 6, 2021).  CERCLA response costs are recoverable by any person who incurs them so long as the costs are consistent with the NCP.  42 U.S.C. § 9607(a)(4)(B) (describing recoverable costs as "necessary costs of response incurred by any other person consistent with the [NCP]"); § 9613(j) ("[T]he court shall award (A) only the

response costs or damages that are not inconsistent with the [NCP], and (B) such other relief as is consistent with the [NCP].").  While CERCLA does not require absolute compliance with the NCP for private parties, it does require substantial compliance with the regulations and that the result be a "CERCLA-quality cleanup."  40 CFR § 300.700(a).

### A.  UCC Has Provided Sufficient Evidence to Establish Its CERCLA § 113(f) Claim

As an initial matter, the assertion that "UCC is implicitly admitting that it is responsible for the release of Hazardous Substances by pleading a § 113(f) Counterclaim against Courtland Company" is patently false. The cases reference in the Counterclaims Motion acknowledge that a party may bring a § 113(f) counterclaim *prior to* the establishment of common liability. *See Atl. Research Corp.*, 551 U.S. at 138-139 (clarifying that CERCLA § 113(f) "authorizes a PRP to seek contribution 'during or following' a suit under § 106 or § 107(a)… Thus, § 113(f)(1) permits suit *before or after* the establishment of common liability."); *id* at 140 ("[A] defendant PRP in such a § 107(a) suit could blunt any inequitable distribution of costs by filing a § 113(f) counterclaim.").   Plaintiff correctly asserts that UCC's right to contribution under § 113(f)(1) is only established where there is "an inequitable distribution of common liability among liable parties." *Id.* at 139. However, the implication of this rule is that Plaintiff would only be obligated to pay contribution to UCC *if* UCC were held liable for any CERCLA response costs on Plaintiff's property. If UCC is not found liable for CERCLA response costs on Plaintiff's property (as UCC contends in its summary judgment motion, it is not responsible for any such costs), then UCC would not be entitled to recover CERCLA response costs from Courtland because UCC was not responsible for paying any such response costs to begin with.

While UCC continues to dispute it is responsible to Courtland for its alleged response

costs, UCC has certainly produced sufficient evidence to show that Courtland has at least contributed to the contamination of its own property and should therefore contribute to any necessary response costs UCC incurs related to Courtland's contamination. *See* Dkt 290-15, MacPherson Jan. 2021 Report at 14, 19-21, *see also* Ex. D- Raynes Dep.  at 18:21-30:15 (Outlining various points where water contaminated by operations on the Courtland property is either absorbed into the ground ***on Courtland's property*** or discharged into the adjacent ditches and creeks.), see also Ex. E- Truslow Dep., at 99:6-13 (Confirming that Courtland never required its lessors to certify that its materials on cite were not contaminated.). Even Plaintiff's own expert does not dispute that Courtland has contaminated its own property. *See* Dkt 292-3, Simonton Dep. at 287:9-288:16 (May 6, 2021) (testifying that he does not dispute the December 2020 data taken by UCC and admitting it is possible Courtland is contaminating its own groundwater).

Courtland's assertion that "UCC has put forth no evidence demonstrating that Courtland Company is liable for any response costs under CERCLA" only demonstrates that Courtland is just as comfortable with misstating the evidence in this case as they are with mischaracterizing the applicable law to this Court. *See* Dkt. 360 at 4-5 a*nd* Dkt 290-15, January 2021 MacPherson Report at 14, 19-21 (Discussing the December 2020 soil samples taken by UCC and cross referencing contaminants in Courtland's soil with contaminants found in Courtland's 2017 groundwater testing. The results of this study indicate that ***Courtland's soil*** is the source of contamination found in ***Courtland's groundwater***); *see also,* Ex. D- Dep. No. 2 at 18:21-30:15; *see also,* Ex. B- MacPherson Dep. at 84:5-91:18 (Explaining that soil is sampled first, before groundwater, in order to locate soil contamination that may be a ***source*** of impacts on groundwater.) Therefore, it would be improper for this

Court to grant Courtland Summary Judgement of UCC's § 113(f) counterclaim on the flimsy claim that response costs for soil contamination are somehow not recoverable.

### B.  UCC Is Entitled To Necessary Response Costs That It Has Already Incurred Or Will Incur Under CERCLA § 113(g)(2)

CERCLA explicitly permits a private party "to be reimbursed for ***all or some*** of the costs [it has] already incurred in response to contamination" at the time the lawsuit was filed. *See Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 91 (2nd Cir. 2000)(Citing CERCLA § 113(g)(2), which authorized suit for recovery of response costs under CERCLA § 107 "at any time ***after*** such costs have been incurred") (emphasis added). Furthermore, in cases where remediation has not been fully completed, CERCLA § 113(g)(2) empowers the Court to enter a declaratory judgement delineating each party's proportionate responsibility for future response costs. *See* CERCLA § 113(g)(2); *see also Gussack Realty Co. v. Xerox Corp.,* 224 F.3d 85, 51 (2nd Cir. 2000) ("Proper remedy for future response costs is not present lump sum payment of anticipated expenses, but instead declaratory judgment award dividing future response costs among responsible parties."). The fact that an action is brought under CERCLA § 113, rather than CERCLA § 107 "does not preclude [a] plaintiff from recovering one hundred percent of [its] clean-up costs." *See Foster v. United States,* 130 F. Supp. 2d 68, 78 (DC D.C. 2001) (*citing PMC, Inc. v. Sherwin-Williams Co.,* 151 F.3d 610, 616 (7th Cir. 1998), which upheld the trial court's ruling holding the former landowner responsible for one hundred percent of response costs under CERCLA § 113.).

A four-part test must be met to establish a defendant's liability under CERCLA: (1) the site in question must be a "facility." (2) the defendant must be a "responsible person" as defined in CERCLA § 107; (3) there must have been a release of hazardous substances at the facility; and (4) such release must have caused the plaintiff to incur response costs consistent

with the national contingency plan. *See* CERCLA § 107(a). Once a court has determined that a party is liable, it then proceeds to allocating response costs under § 113(f)(1) using equitable factors. UCC has established each of the above requirements with regards to the Courtland Company property.

CERCLA defines a "facility" as "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located. *See* CERCLA § 107 (9)(B). Courtland, with its exposed scrap metal and concrete, is such a facility. Courtland is also a responsible party, as it has actual control over the facility (as owner) and possess the authority to clean up its site and prevent lessors from dumping contaminated materials on its site. The evidence shows numerous releases have occurred at Courtland's property, which contaminated Courtland's soil, groundwater, and downstream waterways. *See* Ex. D- Raynes  at 18:21-30:15 (Outlining various points where water contaminated by operations on the Courtland property is either absorbed into the ground ***on Courtland's property*** or discharged into the adjacent ditches and creeks.); *see also* Dkt 290-15, January 2021 MacPherson Report at 14; *see also* Ex. C- De haven analysis of on-site contaminant sources on the Courtland property, South Charleston, WV at 7 ("Courtland's facility is more likely to be impaired through unacceptable risks in soil/waste, which are entirely the fault of Courtland's poor site management practices.").

Such discharges from Courtland's property have caused UCC to expend substantial amounts of money on both investigating the origins of contamination on Courtland and UCC's property, as well as establishing and carrying out an NCP compliant remediation plan. *See generally*, Dkt. 290-39, July 20, 2021 Supplemental Expert Report of Charles H. MacPherson. Jr. *and* Dkt. 290-41 *and* Dkt. 290-43, Invoices.

### C. UCC Has Supported Its Negligence Claims

"Under West Virginia law, a plaintiff alleging negligence or gross negligence is required to prove that he or she sustained an injury caused by the defendant's allegedly negligent conduct." *See Rhodes v. E.I. du Pont de Nemours & Co,* 636 F.3d 88, 94 (4th Cir. 2011). "Generally, such injury must already have occurred, although a plaintiff sometimes may recover for future effects of a present injury that are reasonably certain to occur." *Id.* Whether Courtland owed UCC a duty of care is a legal question for this Court to decide. *See Aikens v. Debow,* 541 S.E.2d 576, 578 (W. Va. 2000).

This Court has already acknowledged, in the context of Courtland's purported negligence claim against UCC, that neighboring land owners owe each other a duty of care "to prevent harm resulting from the hazardous waste stored on [the land owner's] property." *See* Dkt. 75 at 45. There are numerous state and federal laws which impose a duty on a land owner to prevent hazardous substances on the land owner's property from spreading and harming neighboring properties and the environment. *Id. See e.g.,* CERCLA, CWA, etc. Therefore, Courtland irrefutably had a duty to prevent contaminates from leaving its property and infiltrating both the nearby waterways and downstream properties, including UCC's.

Courtland has breached its duty to take precautions against contaminating its own property and UCC's property. Courtland permits its current lessee, Raynes, to maintain exposed piles of debris, including, but not limited to, dirt, millings (ground up asphalt), concrete, asphalt chunks, barriers and rebar or steel materials. *See supra; see also* Dkt 292-18, Ex. 4 to C. of Raynes Dep. (map depicting location of materials on property); Ex. G-Declaration of Brian Wellington-Wellington Report at 9-10 (Photographs of piles of debris, concrete, and metal rebar that are maintained directly on the ground of Courtland's property);

Dkt. 290-19 at 2, 5 (Photos); Ex. D-Raynes dep. at 21:9-18 (Confirming that metal is piled on the ground on Courtland's property until it is properly sorted into metal dumpsters.). A 1,000-gallon diesel tank is also located on the property and hydraulic oil and motor oil are stored in 5-gallon buckets throughout the site, and heavy equipment is stored on the site including, a screener, crusher, bulldozer, and excavators. Dkt. 290-19 at 2,5; Dkt 292-15, Raynes Dep. at 59:13–21, 67:12–70:3 (Oct. 11, 2019). Courtland does not require its lessors,  to characterize their materials before staging them on the property. *See* Ex. E- Truslow Dep.  at 99:6-13. The lessors were never required to provide Courtland with a report indicating that their materials were not contaminated. *Id.*

UCC has proven that the soils on Courtland are contaminated in its preliminary investigation.  Dkt. 290-15 at 14, 19-21.  When rain soaks through these piles of exposed materials, the contaminated water either absorbs ***directly into the ground*** (where it would ultimately reach groundwater at a location upgradient of the Filmont and Massey properties), runs into retention ponds where it is absorbed ***directly into the ground***, or is discharged into the South Boundary Drainage Ditch or Davis Creek. *See* Ex. D-Raynes Depo. at 27:7-29:13 (Confirming instances of discharge from at least one retention pond on the Courtland property, near piles of concrete and topsoil, into the South Boundary Drainage Ditch) *and id.* at 29:22-30:19 (Confirming discharges from an additional retention pond, near topsoil piles on Courtland's property, into Davis Creek.).  Courtland's negligence in allowing these piles of materials to be maintained in open, exposed conditions, without so much as a verification from its lessors that these materials are non-hazardous or not contaminated has contributed not only to the contamination of Courtland's property, but also the condition of nearby waterways. As a result of Courtland's negligence, UCC has incurred substantial expenses in

investigating and remediating the sources of contamination on both UCC property and Courtland's property. *See* Dkt. 290:39-290:41.

### D. Courtland Has Provided No Substantive Argument That UCC Is Not Entitled To Declaratory Judgement Or Equitable Relief In Its Favor

Courtland's sole support that UCC is not entitled to Declaratory Judgement or Equitable Relief is based on Courtland's false assertion that UCC has failed to provide any evidence indicating that Courtland is at fault for releasing Hazardous Substances in violation of CERCLA. For the reasons outlined above, this assertion is plainly false. As Courtland fails to provide any other argument in support of request for Summary Judgement on UCC's Declaratory Judgment counterclaim, Courtland's request should be denied.

### E. UCC Seeks Response Costs, Not Attorney's Fees

Plaintiff is correct in its statement that attorney's fees are typically not recoverable under CERCLA. *See generally, Key Tronic Corp. v. United States,* 511 U.S. 809 (1994) (Superseded in part by CERCLA § 127(j) in 1999, which allows the recovery of attorneys' fees in specific CERCLA cases not at issue here.). Plaintiff seeks dismissal of an alleged UCC counterclaim for attorney's fees, in fact UCC has not sought attorney's fees but rather response costs.

Regardless of whether it prevails at trial, the damages sought by UCC's counterclaims are explicitly clear – "UCC incurred costs of $169,391.58 for the investigation and analysis of soils and source materials on the Courtland property." *See* Dkt. 304, Am. Ans. ¶16.  UCC specifically lays out that the costs incurred by UCC are CERCLA NCP compliant costs which relate directly to the extent of contamination on the Courtland property, the potential to impact to human health and the environment, possible scope of response or remediation, and who is responsible. Am. Ans. ¶17: *See generally*, Dkt. 290-39, July 20, 2021 Supplemental Expert

Report of Charles H. MacPherson. These include "removal costs," to monitor, assess, and evaluate the release or threat of release of hazardous substances at the Courtland Property and to prevent or lesson damage to public health or welfare or to the environment. Am. Ans. ¶30: *See generally*, Dkt. 290-39.

UCC's Response Costs were incurred to investigate the nature, source, and extent of the contamination, identify potentially responsible parties ("PRPs"), comment on the proposed remedy and propose alternative remedial measures that more effectively address the contamination. Am. Ans. ¶31: *See generally*, Dkt. 290-39. These response costs were necessary given Courtland's refusal to investigate its soil for potential sources of contamination ***prior to or throughout*** this litigation. *See* Ex. B- MacPherson Dep. at 87:7-92.2. The damages sought for UCC's remaining state law counterclaims are those damages incurred to investigate the scope and source of any contamination and determine the proper remediation action. Am. Ans. ¶¶43, 48. UCC's expert witness Charles MacPherson has certified the response costs as NCP compliant. *See generally*, Dkt. 290-39, July 20, 2021 Supplemental Expert Report of Charles H. MacPherson. The actual evidence to prove the specific amount of costs sought is all invoices for environmental investigation, analysis, and the work of non-legal professionals in securing access to conduct the contaminate source investigation. *See* Dkt. 290-28 and 290-41. UCC explicitly has not and will not seek attorney's fees as its damages.[4]

Courtland focuses on a lone phrase of the prayer for relief (Item F), ignoring the actual allegations of the Counterclaims and the remaining prayers for relief which focus exclusively

---

[4] To the extent MacPherson's invoices carry the notation legal services, it is an indication that he is working with legal counsel rather than independently and has nothing to do with what the costs are. *See generally*, Ex. H- March 15, 2022 Deposition of Charles Macpherson at 100:6-153:9; *see id specifically* at 128:18-133:15.

on costs incurred in relation to the investigation of the contamination on Courtland's property. Even taking this cherry-picked contention at face value, the Court can strike Item F of the prayer for relief without impacting the counterclaims. Thus, Courtland's fantastical argument to bar recovery of attorney's fees is irrelevant and untethered from the reality of what is sought in UCC's counterclaims.

### F.   CERCLA § 113(f) and 113(g) Claims do not Require Public Participation.

A party is *not* required to have already completed the public participation stage of their CERCLA response in order to recover under CERCLA § 113(f) or 113(g). Plaintiff's assertion that UCC's claim for remediation costs should be denied based on the fact that UCC has not *yet* satisfied the "public participation" requirement of the NCP simply illuminates their ignorance of the CERCLA process.  *See* Dkt. 290-15 MacPherson Rpt. at 29-33 and Ex. F-EPA Timeline Flowchart (Outlining the stages of CERCLA process and NCP compliance. The public participation requirement is not invoked until *after* the contamination on site has been fully investigated.  It can take several years to get to this point and neither UCC nor Courtland has reached this stage yet.).  In fact, it is inconsequential that the site remediation has not already been fully delineated or carried out, as CERCLA § 113(g)(2) *explicitly authorizes* the Court to enter a declaratory judgement detailing each party's respective responsibilities for remediation costs going forward. *See e.g., Foster v. United States,* 130 F. Supp. 2d 68,78 (D.C. DC, 2001) (Holding that defendant is liable for one hundred percent of the future necessary response costs plaintiff will incur, consistent with the National Contingency Plan, notwithstanding the fact that such plan had not yet been established). For these reasons, Plaintiff's fixation on the fact that UCC is too early in its CERCLA response to invoke the public's participation is immaterial. *See also* Dkt. 290-39, at 10.

**UNION CARBIDE CORPORATION**

**By Counsel:**

*/s/Patricia M. Bello*
R. Scott Masterson (WV Bar #10730)
Matthew A. Nelson (WV Bar #9421)
Patricia M. Bello (WV Bar #11500)
707 Virginia Street East, Suite 1400
Charleston, West Virginia 25301
(304) 553-0166
Scott.masterson@lewisbrisbois.com
Matt.nelson@lewisbrisbois.com
Patricia.bello@lewisbrisbois.com

and

Martin A. Shelton (*Pro Hac Vice*)
LEWIS BRISBOIS BISGAARD & SMITH LLP
600 Peachtree Street NE, Suite 4700
Atlanta, GA 30308
(404) 476-2009
Martin.Shelton@lewisbrios.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

THE COURTLAND COMPANY, INC,          )
                                     )
      Plaintiff,                   )
                                     )          Civil Action Number:
v.                                   )          2:19-cv-00894
                                     )
UNION CARBIDE CORPORATION,           )          Hon. John T. Copenhaver, Jr.
                                     )
      Defendant.                   )
_____      )

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 28th day of March, 2022 this Certificate of Service was electronically filed with the Clerk of the Court using the CM/DKT. system, which will send a Notice of Electronic Filing to, and constitutes service on counsel of record, and "Memorandum in Opposition to Plaintiff The Courtland Company's ("Courtland") Motion for Summary Judgment on Union Carbide Corporation's Counterclaims ("Counterclaims Motion Case No. 2:19-cv-00894 ("2019 Case") Dkt. 359 & 360" was served on counsel of record as follows:

                Via United States Mail and Email:

                Michael O. Callaghan, Esq.
                NEELY & CALLAGHAN
                1337 Virginia St., E., Suite 200
                Charleston, WV  25301
                mcallaghan@neelycallaghan.com

Via Email only:

Michael C. Donovan, Esq.
Law Offices of Michael C. Donovan
530 Showers Drive, Ste 7
Mail Code #305
Mountain View, CA  94040-1457
mcd@legal-recoveries.com

John R. Till, Esq.
Kirk M. Tracy, Esq.
Paladin Law Group LLP
1176 Boulevard Way
Walnut Creek, CA  94595
jtill@paladinlaw.com
ktracy@paladinlaw.com

Thomas A. Smith, Esq.
Senak Keegan Gleason & Smith
Suite 750
566 West Adams
Chicago, IL  60661
tsmith@skgsmlaw.com

Date:      March 28, 2022

/s/Patricia M. Bello
Patricia M. Bello (WV Bar #11500)
LEWIS BRISBOIS BISGAARD & SMITH
LLP
707 Virginia Street East, Suite 1400
Charleston, West Virginia 25301
(304) 553-0166 (T)/(304)932-0265 (F)
Patricia.bello@lewisbrisbois.com

23