UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

THE COURTLAND COMPANY,

     Plaintiff,

v.                         Civil Action No. 2:18-cv-01230
                            Civil Action No. 2:19-cv-00894

UNION CARBIDE CORPORATION,

     Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

     Pending is Defendant Union Carbide Corporation's ("UCC") Daubert Motion to Exclude Opinions and Testimony of Plaintiff The Courtland Company's ("Courtland") Expert Witness, D. Scott Simonton, Ph.D. (ECF 300; ECF 295[1]), filed October 8, 2021, to which Courtland responded in opposition (ECF 378) on March 28, 2022.[2]

---

[1] Unless otherwise indicated, all remaining docket citations herein will reference the docket in Civil Action No. 2:19-cv-00894 ("Courtland II").

[2] On October 27, 2021, the court approved the parties' stipulation to extend the response brief deadline to March 28, 2022.  <u>See</u> ECF 307.

I.

A. <u>Background</u>

These actions stem from Courtland's allegations that UCC's properties -- the Tech Park, Filmont Landfill, and Massey Railyard -- have caused the release of hazardous contaminants that have migrated onto Courtland's property and the surrounding environment.  As a result, Courtland has brought the following claims in both of these two actions: (1) recovery of response costs and declaratory relief under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9607(a), 9613(g); (2) citizen suit relief for violations of § 702(a)(1)(A) of the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. § 6972(a)(1)(A), and the West Virginia Hazardous Waste Management Act; (3) citizen suit relief for judicial abatement of an imminent and substantial endangerment under § 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B); (4) judicial abatement of a public

nuisance[3]; (5) relief from a private nuisance; (6) negligence; (7) gross negligence; and (8) strict liability.[4]

In support of these claims, Courtland primarily relies upon the findings and opinions of its expert, Dr. D. Scott Simonton, arising from the groundwater, soil, and surface water samplings collected by him in August 2017, November 2019, September 2020, and June 2021.[5] Dr. Simonton will opine at trial respecting the alleged presence and cause of contamination on the Courtland property that is the subject of this litigation. In the subject motion, UCC asserts Dr. Simonton's opinions are unsupported by reliable principles and methodology as required by the Federal Rules of Evidence and Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and its progeny.

---

[3] Civil Action Number 2:19-cv-00894, referred to as "Courtland II," also asserts a claim for judicial abatement of a public nuisance per se.

[4] Courtland's claims for negligence per se were dismissed on August 26, 2020, in Courtland II and September 29, 2020, in Courtland I. See ECF Nos. 75, 135.

[5] Specifically, Dr. Simonton collected (1) three groundwater samples from the southeast portion of the Courtland property regarding the Tech Park in August 2017; (2) three soil samples from an upland area between the South Boundary Creek and the UCC property line in the vicinity of the Filmont Landfill on November 16, 2019; (3) two surface water samples and one solid sample during a kayak trip along Ward Branch, Davis Creek, and the South Boundary Creek on September 11 and 12, 2020; and (4) several groundwater samples from his installation of temporary monitoring wells on the Courtland property in June 2021.

B.   <u>Summary of Dr. Simonton's Qualifications</u>

Dr. Simonton possesses over thirty (30) years of professional experience in state environmental and public health protection regulatory agencies, private counseling, and academia.   <u>See</u> ECF 378-1.   His qualifications include:

1.   Serving as a Regional Program Manager with the Idaho Division of Environmental Quality ("IDEQ"), including involvement with the assessment and remediation of dozens of sites;

2.   Assisting in developing a Risk Based Corrective Action Program for Idaho, a program putatively similar to the West Virginia Voluntary Remediation Program ("VRP"), including development of site assessment requirements;

3.   Serving as a project engineer/manager in regional and national consulting firms involved in dozens of site assessment and risk assessment projects;

4.   Serving in the first group of Licensed Remediation Specialists in West Virginia;

5.   Contracting with the West Virginia Department of Environmental Protection ("WVDEP") as an independent technical consultant, reviewing site assessments and risk assessments submitted as part of the VRP;

6.   Consulting with the WVDEP as an independent technical consultant, reviewing site assessments to ensure compliance with applicable standards and guidance;

7.   Serving as a consultant, field engineer, project engineer/manager, regulator, and/or technical reviewer to hundreds of site assessments under many different state and federal regulatory programs; and

       8.    Serving as a professor who for over twenty years has
taught graduate-level courses specific to site
assessment under various state and federal programs.

See id.

C.  **Alleged Flaws in Dr. Simonton's Opinions**

UCC's criticisms of Dr. Simonton focus on his sampling
documentation and his deposition testimony.  Respecting both,
UCC identifies what it contends are the irreducible minimums by
which Dr. Simonton must have conducted his investigative work,
namely, adherence to and compliance with the National Oil and
Hazardous Substances Pollution Contingency Plan ("NCP").  UCC
avers the NCP governs any opinions rendered herein and is used
nationwide for responding to oil spills and the releases of
hazardous substances.[6]  See ECF 298 at 13 (citing 42 U.S.C. §
9605; 40 C.F.R. § 300.1).

---

[6] While Dr. Simonton's responses are more fully detailed
later in Section II.B of this opinion, his disagreement on the
instant point set forth in his sworn declaration is worth
noting:

> This is quite simply not true and in fact only a small
> fraction of "environmental contamination cases"
> require compliance with the NCP.  The vast majority of
> environmental projects (and cases) in the US are not
> done under the auspices of nor would they be in
> compliance with the NCP.

ECF 378-1 ¶ 45.

### 1.   Dr. Simonton's Sampling Documentation

Regarding the expert-based documentation prepared by Dr. Simonton in this litigation, UCC first contends that the August 2017 sampling respecting the UCC Tech Park, the expert report he prepared regarding the same, and the lab report produced lacks any detailed discussion of the methodology used for the sampling event.

Second, UCC asserts the November 2019 soil collection conducted by Dr. Simonton between the South Boundary Creek and UCC property line near the Filmont Landfill consists of "little information regarding the objectives . . . [and] no information about the particulars of sample collection."[7] Id. at 5. Specifically, UCC notes Dr. Simonton's work is devoid of (1) field logs, (2) formal plans for collection and analysis, (3) data quality objectives, or (4) independent laboratory validation resulting from analysis of the three soil samples.

---

[7] UCC concedes, however, that Dr. Simonton has supplied mapping and annotated photographs of the areas where he collected a majority of the soil samples.  UCC has also been supplied a June 23, 2020, letter from Dr. Simonton to Courtland's counsel, which provides a summation of three visits Dr. Simonton made to the Filmont Landfill area, noting he inspected Courtland's property on November 16, 2019, adjacent to the "newly revealed dump" and took three near-surface soil samples.  ECF 298 at 5.

Third, UCC challenges the September 11 and 12, 2020, kayak travel by Dr. Simonton in the waterways near the subject properties.  Dr. Simonton states in one of his expert reports that the trips were "to observe and confirm the presence of contaminants coming from . . . Filmont."  ECF 393-1 ¶ 13.  Dr. Simonton collected two surface water samples and one solid sample somewhere along the east bank of Ward Branch.  UCC contends these field samplings are deficient as they only consist of "brief summaries of the work . . . , a set of simple marked-up maps [Dr. Simonton] prepared after his field work, and photographs he took during his excursion."  ECF 298 at 6. Similar to the November 2019 collection, UCC also notes the lack of, inter alia, field logs, work plans for collection methods, and the lack of surveyed coordinates of the sample locations or photographs of the actual samples.

Fourth, UCC notes that in early June 2021, Dr. Simonton installed four temporary monitoring wells at the Courtland Property, later collecting groundwater samples from three of them.  Although UCC admits that a sampling and analysis plan was prepared, it contends the same is vague.  Additionally, UCC notes that, inter alia, (1) few quality control samples were produced, (2) few field notes were provided, and (3) "many samples appeared to be packaged improperly, leading to samples

arriving at the laboratory for testing above the mandatory maximum shipping temperature." Id. at 7. UCC further contends, inter alia, no laboratory quality objectives or independent validation of the sampling analyses have been produced, and there is no indication that the prepared plan meets the standard criteria for a Quality Assurance Project Plan ("QAPP"), which is described infra.

Fifth, UCC notes that Dr. Simonton's July 2021 expert report discusses the installation of the monitoring wells and resulting samples taken from the same, along with a Sampling and Analysis Plan designed to interpret the groundwater flow paths from Filmont to the Courtland Property and track with greater precision the contaminants migrating therefrom. But UCC likewise highlights that Dr. Simonton states in his report, "This limited investigation does not and was not meant to determine the nature and extent of contamination at and emanating from the Filmont open dump. An NCP-compliant Remedial Investigation remains necessary." Id. at 9 (citation[8] omitted).

_____

[8] The court notes that UCC cites to ECF 292-20 as Dr. Simonton's July 2021 expert report, but such citation is to the Sampling and Analysis Plan, not the report from which UCC quotes.

## 2.  Dr. Simonton's Deposition Testimony

As to Dr. Simonton's deposition testimony, UCC notes that Dr. Simonton testified that he (1) did not create a sampling plan for the August 2017 samples,[9] (2) did not create a QAPP or work plan for taking any soil or surface water samples, (3) did not take any field notes or collect any field blanks[10] in connection with his environmental sampling, and (4) deviated from one sampling plan[11] and also assumed the groundwater flowed from the UCC Property to the Courtland Property, with no other possible flows being considered.

---

[9] The court notes that UCC cites to Dr. Simonton's deposition testimony on this point as ECF 292-3 at 126:16-127:8, however, both pages 126 and 127 are missing from the attached deposition transcript.  These pages are likewise missing from the portions of this same deposition attached at ECF 393-3.

[10] The court notes that UCC cites to pages 422:21-423:5 of Dr. Simonton's May 7, 2021, deposition wherein he allegedly admits that he did not collect any field blanks; however, a review of the deposition at those references reveals no reference to field blanks.  See ECF 393-2.

[11] The court notes that UCC cites to Dr. Simonton's deposition testimony on this point as ECF 292-35 at 44:18-20; however, page 44 is missing from the attached portion of the deposition transcript.

### 3.  Requirements of the NCP

The NCP "sets forth detailed guidelines with which . . . parties must comply in order to collect the costs of a clean up of hazardous waste" under CERCLA.  Weyerhaeuser Corp. v. Koppers Co., Inc., 771 F. Supp. 1406, 1414 (D.Md. 1991) (citing 42 U.S.C. § 9607(a)(4)(B) (noting a party may only recoup "necessary costs of response" that are "consistent with the national contingency plan.")).  Indeed, one of the purposes of the NCP is to "establish procedures and standards for responding to releases of hazardous substances, pollutants, and contaminants[.]" 42 U.S.C. § 9605(a)(7).

As applicable to Courtland's CERCLA claims in the instant litigation, "[a] private party response action will be considered 'consistent with the NCP' if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements in paragraphs (5) and (6) of this section, and results in a CERCLA-quality cleanup."  40 C.F.R. 300.700(c)(3)(i).  Paragraph (5) sets forth multiple regulations "potentially applicable to private party response actions," including, inter alia, "Section 300.420 (on remedial site evaluation)."  40 C.F.R. § 300.700(c)(5)(viii).

Section 300.420 of the NCP, entitled Remedial site evaluation, "describe[s] the methods, procedures, and criteria" to be "use[d] to collect data, as required, and evaluate releases of hazardous substances, pollutants, or contaminants." 40 C.F.R. § 300.420(a).  Such evaluation "may consist of two steps: a remedial preliminary assessment ("PA") and a remedial site inspection ("SI").  Id.  "A remedial PA shall consist of a review of existing information about a release such as information on the pathways of exposure, exposure targets, and source and nature of release[,] . . . shall also include an off-site reconnaissance as appropriate[,]" and "may include an on-site reconnaissance where appropriate."  40 C.F.R. § 300.420(b)(2).  When performing a remedial PA a "PA report" shall be prepared, "which shall include (i) [a] description of the release; (ii) [a] description of the probable nature of the release; and (iii) [a] recommendation on whether further action is warranted . . .  and whether an SI or removal action or both should be undertaken."  40 C.F.R. § 300.420(b)(4)(i)-(iii).

In the event that an SI is determined to be necessary, the NCP pertinently provides:

> (2) The remedial SI shall build upon the information collected in the remedial PA.  The remedial SI shall involve, as appropriate, both on- and off-site field investigatory efforts, and sampling.

(3) If the remedial SI indicates that removal action may be appropriate, the lead agency shall initiate removal site evaluation pursuant to § 300.410.

(4) Prior to conducting field sampling as part of site inspections, the lead agency shall develop sampling and analysis plans that shall provide a process for obtaining data of sufficient quality and quantity to satisfy data needs.  The sampling and analysis plans shall consist of two parts:

(i) The field sampling plan, which describes the number, type and location of samples, and the type of analyses, and

(ii) The quality assurance project plan (QAPP) which describes policy, organization, and functional activities, and the data quality objectives and measures necessary to achieve adequate data for use in site evaluation and hazard ranking system activities.

(5) Upon completion of a remedial SI, the lead agency shall prepare a report that includes the following:

(i) A description/history/nature of waste handling;

(ii) A description of known contaminants;

(iii) A description of pathways of migration of contaminants;

(iv) An identification and description of human and environmental targets;

(v) A recommendation on whether future action is warranted.

42 C.F.R. § 300.420(c)(2)-(5).

UCC notes that all of Courtland's claims hinge upon the alleged releases of hazardous substances from UCC that then migrated to the Courtland Property.  UCC emphasizes the

requirements set forth in 42 C.F.R. § 300.420(c)(4)(i)-(ii), regarding the "two parts to the field sampling and analysis plans required by the NCP:" (1) the field sampling plan, and (2) the QAPP.  ECF 298 at 13.  UCC asserts that "Due to the broad nature of the <u>Daubert</u> analysis . . . this court can and should consider the requirements of the NCP to evaluate Dr. Simonton's opinions and testimony."  <u>Id.</u> at 14.

In summary, based upon the discussion in Section I.C.1 and I.C.2 <u>supra</u>, UCC contends, (1) there is no evidence, except minimally so in the 2021 samples, that Dr. Simonton collected or analyzed the surface water, solid, or soil samples using a work plan or QAPP,[12] (2) Dr. Simonton did not develop data quality objectives, "which define the level of certainty data must meet to be accepted as representative of the site and usable for decision making[,]" (3) there is no evidence Dr. Simonton's

---

[12] UCC contends that a "proper QAPP" under the NCP it claims governs here:

> includes a description of project goals; identification of the type, quantity and quality of data to be collected; specifics of field and laboratory methods (cited as standard operating procedures [SOPs] or as separate, detailed work plans); specifications for acceptance quality control criteria for sample collection and laboratory analyses; and a workflow process for quality assurance through data verification and validation.

ECF 298 at 15.

13

sampling data was "critically evaluated using a proper formal
data verification or data validation process, as required by"
the United States Environmental Protection Agency ("USEPA"), (4)
no evidence shows Dr. Simonton collected most of the samples
pursuant to a systematic field sampling plan, "meaning Dr.
Simonton has failed to specify the methods of sample collection
and handling used and the documentation maintained for the
sampling," and (5) Dr. Simonton failed to collect appropriate
field quality control samples required to verify the accuracy of
the resulting levels for the major and trace metals reportedly
contained in his collected samples.  Id. at 17-18 ("Validation
determines and qualifies the accuracy and quality of the data
and without validation, the resulting data cannot be considered
reliable").

    UCC additionally notes the absence of field notes,
which would indicate the most basic of purity precautions such
as "certified-clean glassware for sample collection, what tools
were used for sample collection, or whether or how sampling
equipment was decontaminated between sampling events."  Id. at
17.  UCC avers that Dr. Simonton contaminated at least one set
of samples with bug spray he wore during collection, allegedly

verified by bug spray existing in the samples.[13]  UCC contends

Dr. Simonton's failure to record quality control precautions

leads directly to the inference that inadvertent contamination

or cross-contamination could have occurred.

Based on the foregoing, UCC asserts that inasmuch as

"Dr. Simonton's sampling was not conducted pursuant to a QAPP,

Dr. Simonton did not develop data quality objectives, and the

---

[13] Again, Dr. Simonton's responses are more fully detailed
later in Section II.B of this opinion.  Nonetheless, the court
notes that Dr. Simonton assertively rejects such contention in
his declaration:

> Simply put, this statement is completely false and
> based on something Mr. MacPherson made up. There is
> quite literally nothing to support UCC Counsel[']s
> statement. While . . . opining on insect repellent Mr.
> MacPherson provided no evidence to support his claims.
> He offers no opinion on what in the analytical results
> could have possibly come from insect repellent either
> in his report or at his deposition on March 15, 2022.
> As Mr. MacPherson admits that he does not know the
> difference between insect repellent and insecticide
> and it appears that he conflated these product
> categories when he listed in his deposition (but not
> in his report). At his March 15, 2022 deposition, Mr.
> MacPherson stated that the 3 or 4 chemicals that his
> "research" suggested may be in some insecticides (not
> repellents) and thus he concludes that the samples
> were contaminated. Ignoring all of the other sampling
> conducted by UCC at the Tech Park, Massey Railyard,
> and Filmont Facilities which also detected those
> chemicals.

> . . . .

ECF 378-1 ¶ 66.

sampling lacked field sampling plans, field sampling documentation, and field quality control samples, the samplings are not accurate, representative, or reliable reported data." Id. at 19.  UCC thus requests that the court "exclude evidence of groundwater, surface water, and soil sampling conducted by [Dr. Simonton], and exclude any documents or testimony relying upon or referencing his groundwater, surface water, and soil sampling data" under Rule 702 and Daubert.  Id.

## II.

### A.  Governing Standard

Federal Rule of Evidence 702 provides that a qualified expert's testimony is admissible if it will assist the trier of fact and is (1) "based upon sufficient facts or data," (2) "the product of reliable principles and methods," and (3) "the principles and methods [have been applied] reliably to the facts of the case."  Fed. R. Evid. 702(b)-(d); see United States v. McLean, 715 F.3d 129, 144 (4th Cir. 2013).  "Admissibility of such testimony is governed by a two-part test: the evidence is admitted if 'it rests on a reliable foundation and is relevant.'"  Coleman v. Union Carbide Corp., No. 2:11-0366, 2013 WL 5491855, *17 (S.D.W. Va. Sept. 30, 2013) (quoting Daubert v. Merrell Dow Pharm., 509 U.S. 579, 597 (1993)).  Five non-

exhaustive factors are germane to the relevance and reliability inquiry set forth in Daubert:

> (1) whether the particular scientific theory "can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; (4) the "existence and maintenance of standards controlling the technique's operation"; and (5) whether the technique has achieved "general acceptance" in the relevant scientific or expert community.

United States v. Crisp, 324 F.3d 261, 266 (4th Cir. 2003) (quoting Daubert, 509 U.S. at 593–94)).

"The court need not, however, consider all of the factors in lockstep fashion." Coleman, 2013 WL 5461855, at *17. "Neither Rule 702 nor case law establish a mechanistic test for determining the reliability of an expert's proffered testimony." Id. Instead, "'the test of reliability is flexible' and 'the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.'" United States v. Wilson, 484 F.3d 267, 274 (4th Cir. 2007) (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141-42 (1999)).

"The gatekeeping role exercised by the district court is a critical one." Coleman, 2013 WL 5461855, at *18. Indeed, given that "expert witnesses have the potential to be both powerful and quite misleading[,]" the court must "ensure that

17

any and all scientific testimony . . . is not only relevant, but reliable." PBM Prods., LLC v. Mead Johnson & Co., 639 F.3d 111, 123 (4th Cir. 2011); Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001) (citing Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999) and Daubert, 509 U.S. at 588, 595). "As observed in Westberry, '[t]he inquiry to be undertaken by the district court is 'a flexible one' focusing on the 'principles and methodology' employed by the expert, not on the conclusions reached.'" Coleman, 2013 WL 5461855, at *18 (quoting Westberry, 178 F.3d at 261 (quoting Daubert, 509 U.S. at 594–95)).

The court is not required to "determine that the proffered expert testimony is irrefutable or certainly correct" -- "[a]s with all other admissible evidence, expert testimony is subject to testing by '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" United States v. Moreland, 437 F.3d 424, 431 (4th Cir. 2006) (quoting Daubert, 509 U.S. at 596) (alteration in original); see also Maryland Cas. Co. v. Therm-O-Disc., Inc., 137 F.3d 780, 783 (4th Cir. 1998) (noting that "[a]ll Daubert demands is that the trial judge make a 'preliminary assessment' of whether the proffered testimony is both reliable ... and helpful").

B.  <u>Discussion</u>

        The analysis herein is simplified by categorizing UCC's array of criticisms into more general challenges.  First, UCC challenges Dr. Simonton's purported failure to follow NCP standards or generally assure sampling and data integrity.  In his sworn declaration attached to Courtland's response to the subject motion, Dr. Simonton, however, observes as follows respecting the multiple alleged deviations from NCP standards:

> [T]here are MANY sampling protocols outside of the NCP that are in fact scientifically valid. For this motion, it should ONLY be about data reliability – NCP compliance is ONLY relevant in regard to response costs, NOT in relation to data on which to base an opinion and is irrelevant to this <u>Daubert</u> motion.
>
>         . . . .
>
> UCC can't seem to determine which standard is applicable, as one of their experts (Uhler) says VRP [West Virginia Voluntary Remediation Program] standards are applicable, and the other (MacPherson) says CERCLA/NCP standards are applicable. But even there, MacPherson gets it wrong, in that the standards he applies are for a CERCLA Remedial Site Assessment, which any field work we conducted was not, and was not meant to be. In fact, in my reports and in my deposition I have repeatedly said that nothing we have done was meant to be a Remedial Site Assessment, which is meant to determine the nature and extent of contamination.
>
>         . . . .
>
> UCC wishes to not only apply a standard to Courtland that isn't applicable, but one they don't apply to themselves. In fact, NONE of the data generated by UCC in relation to Filmont or the Rail Yard or Courtland is "NCP compliant" – none of the data submitted to

19

WVDEP as a part of the VRP application is NCP
compliant, and in fact does not even meet the standard
of the VRP, yet that data was accepted by WVDEP as the
sampling methodology – neither NCP or VRP compliant –
is still a valid determination of environmental
conditions and was certainly enough for both UCC and
WVDEP to base opinions. In fact, my sampling was done
either in a manner nearly identical to what UCC has
always done at Filmont and Massey, or very similar.

.   .   .   .

The fact is that there are many levels of and types of
environmental sampling and sampling protocols – while
UCC Counsel insists there are maybe 2 standards
(counsel and UCC experts confusingly refer to NCP and
VRP standards as applicable and which are simply not
the same), their client and UCC consultants most
certainly recognize that other methodologies and
protocols are valid as they have themselves been
practicing sampling protocols that do not meet the
standards of either the VRP or the NCP.

.   .   .   .

I have approached this project (in all 4 cases) very
much in compliance with the NCP standards for a
Preliminary Assessment (PA) as described in Section
420 of the NCP, except for developing an HRS [Hazard
Ranking System] score for addition to the National
Priorities List, which is not applicable here as that
is a USEPA function and as of yet this site has not
been considered as an NPL or Superfund site.

.   .   .   .

The NCP compliant PA conducted by me – based on UCC
data, reports of UCC experts, and depositions of UCC
personnel, contractors and experts, as well as other
information gathered and site recons clearly shows the
need for further investigation, which has been the
purpose of my work and is the focus of my opinions. In
fact in my 1st deposition I clearly state that
sampling was done as part of a site recon (pg 443).
Any sampling done was only to confirm what UCC data
showed.

.   .   .   .

> WVDEP and UCC used a subset of the same data I used in
> reaching my opinions and came to the same conclusions.
> I find it stunningly hypocritical that UCC reviewed
> the same information I did, reached the same
> conclusion regarding the need for further
> investigation that I did, but their methodology was
> acceptable when mine was not – we did the same thing.
>
> . . . .
>
> Again, and as described above, I have used the same
> methodology that UCC has employed since the early
> 2000s on the Filmont and Massey sites, used the same
> data, and came to the same conclusions.

ECF 378-1 ¶¶ 21, 23, 35, 37, 38, 40, 44.

It is noteworthy that UCC has not cited any authority requiring the use of NCP protocols and standards in this setting, nor is the court aware of any such authority. While a deeper analysis respecting the purported costs of the investigatory efforts employed by Courtland in relation to the NCP will undoubtedly become pertinent in determining whether the response costs it seeks under CERCLA are necessary and consistent with the NCP and thus recoverable, the court is hard pressed to conclude that the NCP dictates the exclusive methods by which individuals are to conduct scientifically valid and reliable field sampling absent any authority establishing the same.

The second, general challenge offered by UCC is that Dr. Simonton has drawn vastly outsized or unwarranted conclusions based solely upon the limited sampling data that he alone procured, to which Dr. Simonton responds as follows:

> Any sampling I have done was to merely confirm what UCC data had already shown and on which I based my opinions. Any statement by anyone associated with UCC that I have relied on limited data or that I have "formed much of my opinion" by my limited sampling is not only false, but blatantly, knowingly and dishonestly so.

Id. ¶ 19.

Finally, the third theme permeating UCC's challenge is that little information is provided by Dr. Simonton respecting his testing locations and methods. Dr. Simonton, however, observes:

> I attended a meeting with then UCC Remediation Leader Jerome Cibrik and UCC Counsel Shannon Callahan on October 12, 2017 and discussed exactly what work had been done at Courtland relative to UCC. Additionally, Mr. Cibrik was provided GPS sampling locations, photos of the borings and field work, and the analytical results. UCC Counsel has been provided with the email between me and Mr. Cibrik relative to this. So while details of this field work may not be in my original Rule 26 report, UCC has most certainly been provided the details they claim are missing, for example in the NOE/NOV. This information was also provided in some detail in my first deposition (Vol 1, beginning page 135). This is one of many cases in this memorandum where UCC holds me to a much higher standard for data usability than they hold themselves.

Id. ¶ 25.

Two considerations are readily apparent.  First, Dr. Simonton is exquisitely aware of the NCP requirements.  Second, he has authoritatively set forth under oath why those requirements are inapplicable to the inquiry at hand.  He also convincingly demonstrates that some of the work performed by UCC and some of the opinions it has contracted for do not meet NCP or similar rigors.  He has thus demonstrated at this pretrial juncture that his approach is based on sufficient facts and data employing reliable principles and methods.  Consequently, his work judged during this preliminary assessment readily traverses the reliability and helpfulness gates.

To reiterate what the Supreme Court and our court of appeals have consistently noted, the Daubert analysis is "a flexible one."  Dr. Simonton's opinions may ultimately be discarded or accepted.  But the showing here made demonstrates that determination will reach the trier of fact, subject of course to vigorous cross examination, the presentation of contrary evidence by UCC, and the instructional process.

III.


Accordingly, based on the foregoing discussion, it is ORDERED that UCC's motion to exclude Dr. Simonton's opinions and testimony (ECF Nos. 300, 295) be, and hereby is, DENIED.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER: April 29, 2022


John T. Copenhaver, Jr.
Senior United States District Judge