UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

THE COURTLAND COMPANY,

       Plaintiff,

v.                          Civil Action No. 2:19-cv-00894
                            Civil Action No. 2:21-cv-00487

UNION CARBIDE CORPORATION,

       Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

Beginning on February 13, 2024, and through February 15, 2024, the court conducted a three-day bench trial on the appropriate remedies for plaintiff's claims asserted against the defendant and the defendant's counterclaims asserted against the plaintiff in the above-styled actions.

The court makes the following findings of fact by a preponderance of the evidence, and its conclusions of law.

As will be discussed below, the court made all findings of fact with regard to liability in its Phase I order, which remain applicable as the court addresses the remedial issues posed in this Phase II order. <u>See</u> <u>Courtland Co., Inc. v. Union Carbide Corp.</u>, No. 2:18-CV-01230 (Courtland I), et al., <u>2023 WL 6331069</u> (S.D.W. Va. Sept. 28, 2023) (hereinafter, "Phase

I Order").[1]  Further, unless explicitly otherwise indicated, the court's Phase I conclusions of law shall "continue to govern" in Phase II.  TFWS, Inc. v. Franchot, 572 F.3d 186, 191 (4th Cir. 2009); see Castro v. United States, 540 U.S. 375, 124 S. Ct. 786, 157 L. Ed. 2d 778 (2003) (holding the "law of the case doctrine" simply "expresses common judicial practice; it does not limit the court's power.") (internal quotations omitted).

The Phase II issues relate to the remedial measures that are to be imposed with respect to the liability found in Courtland II for violations of Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(A), and under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9607(a), 9613(g), and 9613(f), and in Courtland IV for violations of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1311(a), 1342(p).

## I.    RCRA

In Phase I, the court concluded that Union Carbide Corporation ("UCC") was in violation of RCRA, Subtitle D,

───────────────────────

[1] The Phase I Order is also available at ECF No. 567 in Civil Action No. 2:19-cv-00894 (Courtland II) and at ECF No. 393 in Civil Action No. 2:21-cv-00487 (Courtland IV).  Herein, the court will cite to the Phase I Order as it appears on the dockets. It is noted that Courtland I and Courtland III have been dismissed.

because the "Filmont facility continues to introduce arsenic into the groundwater as a result of the continued leaking/leaching of the solid waste contained therein, which is contaminating an underground drinking water source beyond the solid waste boundary as those terms are defined and is thus an 'open dump' in violation of 42 U.S.C. § 6945(a) (§ 4005(a)) and 40 C.F.R. § 257.3-4(a)."[2] Phase I Order, at 277.

A. <u>Courtland's Attempt to Invoke WVSWMA Regarding Open Dump</u>

The court also concluded that "Courtland has failed to establish, by a preponderance of the evidence, any ongoing violations of RCRA Subtitle C (regulating hazardous waste) that would subject UCC to liability under § 7002(a)(1)(A) or the [West Virginia Hazardous Waste Management Act, W. Va. Code § 22-18-1, <u>et seq.</u>]." Phase I Order, at 245. Further, the court found that "because Courtland's evidence fails to establish that the conditions at and emanating from Filmont and/or Massey may

_____

[2] Despite this conclusion, the court also concluded there was no imminent and substantial endangerment to human health or the environment arising from the contaminated groundwater for various reasons set forth in pages 160-183 and 290-294 of the court's Phase I Order, including the fact that "a large portion of the South Charleston area encompassing Filmont, Massey, Courtland and all surrounding properties in the general vicinity thereof, lie within what has been dubbed a 'Restricted Use Area' via local ordinance." Phase I Order, at 165. "This ordinance prohibits the potable use of groundwater for consumption without treatment to meet applicable state standards." <u>Id</u>.

3

present an imminent and substantial endangerment, Courtland's section 7002(a)(1)(B) claim must fail." Id. at 295.

Courtland also made several state law claims, including that Filmont is an "open dump" in violation of the West Virginia Solid Waste Management Act, W. Va. Code § 22-15-1, et seq. ("WVSWMA"). However, the court found that, under the WVSWMA's specific and active-verb definition of that term, Filmont was not a WVSWMA "open dump" inasmuch as UCC was no longer actively placing material in the Filmont landfill. See Phase I Order, at 315.

Nonetheless, throughout Phase II, Courtland has sought to revive its state law claims under the WVSWMA, arguing that — notwithstanding the court's conclusions in Phase I — Filmont is, indeed, an "open dump" under the WVSWMA. See Pl. Prop. Concl. of Law & Findings of Fact 12-15, ECF No. 647 (Courtland II), 331 (Courtland IV); Prop. Integrated Statement of Issues, at 18, ECF No. 616 (Courtland II), 299 (Courtland IV). Inasmuch as such a conclusion would significantly alter the court's findings as to liability in Phase I and impact the necessary remedies in Phase II, the court will directly address Courtland's argument.

The WVSWMA defined an "open dump" as "any solid waste disposal which does not have a permit under this article, or is in violation of state law, or where solid waste is disposed in a

4

manner that does not protect the environment." W. Va. Code §
22-15-2. The term "solid waste disposal" is statutorily defined
as follows:

> the practice of disposing of solid waste
> including placing, depositing, dumping,
> throwing, or causing any solid waste to be
> placed, deposited, dumped, or thrown.

Id. "Notably, unlike RCRA's statutory definition, the
WVSWMA does not define the term 'disposal' but instead defines
the phrase 'solid waste disposal.'" Phase I Order, at 304
(Compare 42 U.S.C. § 6903(3), with W. Va. Code § 22-15-2). Of
particular moment, the court found that the WVSWMA's definition
of "'solid waste disposal' is tailored to active conduct, given
that it does not, like RCRA, encompass subsequent occurrences
arising" from a "disposal." Id.; see 42 U.S.C. § 6903(3)
(defining "disposal" as encompassing "the discharge, deposit,
injecting, dumping, spilling, leaking, or placing of any solid
waste . . . into or on any land or water so that such solid
waste . . . or any constituent thereof may enter the environment
or be. . . discharged into any waters, including ground
waters."). The parties have not challenged the court's
interpretation of the active-conduct limitation of the WVSWMA's
definition of "solid waste disposal."

Turning to the WVSWMA's definition of "open dump,"
Courtland contends that the third prong of the statute's

definition means that there is an "open dump" any place "where solid waste is disposed in a manner that does not protect the environment."[3]  See Tr. Trans. 31:13-18; Pl. Prop. Concl. of Law & Findings of Fact 12-15, ECF No. 647 (Courtland II), 331 (Courtland IV); Prop. Integrated Statement of Issues, at 18, ECF No. 616 (Courtland II), 299 (Courtland IV).  That interpretation of the statute, however, is incorrect.

"[A] 'cardinal rule of statutory construction is that significance and effect must, if possible, be given to every section, clause, word or part of the statute.'"  Syl. Pt. 1, Young v. Apogee Coal Co., LLC, 753 S.E.2d 52 (W. Va. 2013) (citing Syl. Pt. 3, Meadows v. Wal-Mart Stores, Inc., 530 S.E.2d 676 (W. Va. 1999)).  Further, statutes must be read as a whole, as "statutory interpretation 'is a holistic endeavor ... and, at a minimum, must account for a statute's full text, language as well as punctuation, structure and subject matter.'"  Id. (quoting W. Va. Health Care Cost Review Auth. v. Boone Mem'l Hosp., 472 S.E.2d 411, 423 (W. Va. 1996) (quoting United States

---

[3] Of note, the court dismissed the argument that this prong of the definition, in connection with the regulations promulgated thereunder, requires a finding that Filmont is a WVSWMA "open dump."  See Phase I Order, 312-315.  Insofar as Courtland offers a new linguistic argument with respect to that phrase, the court considers — and finds unpersuasive — its argument.

_Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc._, 508 U.S.
439, 455 (1993))) (emphasis in original).

Here, Courtland's interpretation of the "open dumping"
definition would require the court to read its final prong in
isolation, which would contravene the rules of statutory
interpretation.

Instead, the statutory definition must be read as a
whole.  It defines an "open dump" by narrowing the types of a
"solid waste disposal" that qualify as an "open dump" to three
descriptors of a solid waste disposal listed in a series and
separated by a comma.  Accordingly, each descriptor must be read
as a modifier of the term "solid waste disposal" – they should
not be read, as Courtland contends, on their own.

The WVSWMA must be interpreted such that each
modifying clause in the series modifies "solid waste disposal,"
the original subject.  Framed differently, it must be
interpreted as if written as follows: "Open dump" means (1) any
solid waste disposal which does not have a permit under this
article, or (2) any solid waste disposal which is in violation
of state law, or (3) any solid waste disposal where solid waste
is disposed in a manner that does not protect the environment.
This interpretation gives meaning to the "full text, language as
well as punctuation, [and] structure" of the statute, ensuring

7

that each "or" triggers an alternative and specifically defined modifier of the term "solid waste disposal," which is necessary inasmuch as the second clause of the definition would not make sense unless it (and thus also the third clause) was intended to so modify "solid waste disposal," the initial element of the definition.

Accordingly, the court's original conclusion from the Phase I Order remains: in order for something to be considered an "open dump" under the WVSWMA, it must first involve "solid waste disposal" in a manner which fits one of the three described categories, and "solid waste disposal" is limited to "the active and direct placement of solid waste by an individual or entity" and does not include "passive migration, such as leakage, over time." Phase I Order, at 309. Thus, the Phase I Order's conclusion that Filmont is not an "open dump" under the WVSWMA remains undisturbed, and, as the court found in Phase I, Courtland's claims premised on Filmont being an "open dump" under the WVSWMA must fail.

### B.  Remedy Under Subtitle D

In Phase I, the court found that "UCC is in violation of the second prong of Courtland's section 7002(a)(1)(A) [42 U.S.C. § 6972(a)(1)(A)] claim inasmuch as UCC has violated RCRA's Subtitle D groundwater open dumping criterion set forth

8

in 40 C.F.R. § 257.3-4(a) but not the flood plain criterion set forth in 40 C.F.R. § 257.3-1(a)."  Phase I Order, at 279-80. UCC is in violation of RCRA Subtitle D, 42 U.S.C. § 6945, inasmuch as "the Filmont facility continues to introduce arsenic into the groundwater as a result of the continued leaking/leaching of the solid waste contained therein, which is contaminating an underground drinking water source beyond the solid waste boundary as those terms are defined and is thus an 'open dump' in violation of 42 U.S.C. § 6945(a) (§ 4005(a)) and 40 C.F.R. § 257.3-4(a)."  Phase I Order, at 277.

Subtitle D of RCRA regulates the handling of nonhazardous solid waste, and it does so in a more lenient fashion than that by which Subtitle C regulates hazardous wastes.  Phase I Order, at 246 (citing Ashoff v. City of Ukiah, 130 F.3d 409, 410 (9th Cir. 1997)).  "As clarified by the USEPA [United States Environmental Protection Agency ("EPA")], it was Congress's intent to limit the federal government's role in regulating solid waste facilities."  Id.  Indeed, the EPA has acknowledged that, under RCRA, "[solid waste] facility permitting is a state responsibility. EPA's role includes establishing technical design and operating criteria for facilities, determining the adequacy of state permitting programs, and enforcing compliance with [RCRA's] federal revised

criteria only after determining that the state program is inadequate."  Id. (quoting 47 Fed. Reg. 57026, 51029 (Oct. 23, 1998)).

Congress directed the EPA to promulgate regulations containing the minimum criteria with which all solid waste landfills must comply in order to assist states in the development of their own solid waste management plans.  Id. at 247.  States must do so to "qualif[y] to receive federal financial and technical assistance."  Cameron v. Peach Cnty., GA, No. 5:02-cv-41-1(CAR), 2004 WL 5520003, at *19 (M.D. Ga. June 28, 2004); see also AES Puerto Rico, L.P., 133 F. Supp. 3d at 422 (noting that "[p]ursuant to Subtitle D, federal financial and technical assistance are available for states that choose to develop solid waste management plans in accordance with federal guidelines.").  "West Virginia's Solid Waste Management Act, enacted in 1983, was adopted to satisfy the minimum requirements of Subtitle D and has been approved by the USEPA."  Phase I Order, at 248 (citing 61 Fed. Reg. 9451 (March 8, 1996); 65 Fed. Reg. 36792 (June 12, 2000)).

The court must now decide in Phase II what remedy, if any, is warranted under RCRA § 7002(a) (42 U.S.C. § 6972(a)). In any action brought under RCRA § 7002(a), "[t]he district court shall have jurisdiction . . . to enforce the permit,

standard, regulation, condition, requirement, prohibition, or order, referred to in paragraph (1)(A),[4] to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B),[5] to order such person to take such other action as may be necessary, or both."[6]  42 U.S.C. § 6972(a).

The court notes that "in issuing any final order in any action brought pursuant to [RCRA § 7002(a) or § 7006], [the court] may award costs of litigation (including reasonable attorney and expert witness fees) to the prevailing or substantially prevailing party, whenever the court determines

───────────────────

[4] "[P]aragraph (1)(A)" permits a civil action "against any person . . . who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to [RCRA]."  42 U.S.C. § 6972(a)(1)(A).

[5] "[P]aragraph (1)(B)" authorizes a civil action "against any person . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."  Id. § 6972(a)(1)(B).

[6] The statute also provides that the district court shall have the jurisdiction to issue civil penalties against any party found to have violated RCRA Subtitle C.  See id.  Inasmuch as the court in Phase I found that Courtland did not establish that UCC violated Subtitle C, civil penalties are unavailable here.

such an award is appropriate." § 6972(e).  The court ruled
during trial that such fees would be addressed and adjudicated
by motion following the conclusion of Phase II.  <u>See</u> Tr. Trans.
5:9-14.

Accordingly, the court must determine what, if any,
prospective injunctive relief to order.  RCRA § 7002(a) gives
the court <u>jurisdiction</u> to issue injunctive relief, vesting in
the court the discretion to do so, but it does not <u>require</u> that
the court issue such relief.  <u>See</u> <u>LAJIM, LLC vs. GE</u>, 917 F.3D
933, 944 (7th Cir. 2019) ("[T]he district court correctly held
that it has discretion to award injunctive relief under the RCRA
and is not required to order relief after a finding of
liability."); <u>Gache v. Town of Harrison, N.Y.</u>, 813 F. Supp.
1037, 1044 (S.D.N.Y. 1993) ("A violation of RCRA does not mean
that a permanent injunction necessarily follows. 'In applying
the general equitable standards for the issuance of injunctions
in the area of environmental statutes, the Supreme Court has
explicitly rejected the notion that an injunction follows as a
matter of course upon a finding of a statutory violation.'")
(quoting <u>Town of Huntington v. Marsh</u>, 884 F.2d 648, 651 (2d Cir.
1989), <u>cert. denied</u>, 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d
473 (1990)); <u>Hanford Challenge, United Ass'n of Plumbers &
Steamfitters Loc. Union 598 v. Moniz</u>, No. 4:15-CV-5086-TOR, 2016

WL 11795779, *11 (E.D. Wash. Nov. 15, 2016) ("A violation of the RCRA does not automatically equate to a presumption of irreparable harm, nor require the Court to grant an injunction."); <u>Substation K, Inc. v. Kansas City Power & Light Co.</u>, No. 4:19-CV-00031-SRB, 2019 WL 2411439, *4 (W.D. Mo. June 7, 2019) ("Under a plain reading" of RCRA's citizen suit provision, a person can "seek a mandatory injunction, i.e., one that orders a responsible party to 'take action' by attending to the cleanup and proper disposal of toxic waste, or a prohibitory injunction, i.e., one that 'restrains' a responsible party from further violating RCRA.")  (quoting <u>Meghrig v. KFC Western, Inc.</u>, 516 U.S. 479, 484 (1996)).

In the course of that determination, the court must consider both the objective of the relevant statute and the traditional equitable principles which apply to injunctive relief.  <u>See</u> <u>Lajim, LLC</u>, 917 F.3d at 944 ("[C]ommenting directly on RCRA, we have reasoned that '[o]rdinarily, a court is obligated to conduct an equitable balancing of harms before awarding injunctive relief, even under an environmental statute which specifically authorizes such relief'") (quoting <u>United States v. Bethlehem Steel Corp.</u>, 38 F.3d 862, 867 (7th Cir. 1994)).

13

The purpose of RCRA is "to reduce generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment,'" and Courtland's request for an injunction must be examined in that context.  Meghrig v. KFC Western, Inc., 516 U.S. 479, 483, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996) (quoting 42 U.S.C. § 6902(b)); Hodgins v. Carlisle Engineered Prod., Inc., No. 1:02-CV-01454, 2006 WL 721762, *2 (N.D. Ohio Mar. 20, 2006) (quoting the same).  The Supreme Court's decision in Amoco Production Company v. Village of Gambell, Alaska, 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987), is guiding.  There, the Court held that courts, in determining the propriety of injunctive relief under environmental statutes, must focus "on the underlying substantive policy the process was designed to effect."  480 U.S. at 544; see also Weinberger v. Romero-Barcelo, 456 U.S. 305, 318 (1982) (discussing injunctive relief under the CWA and the Court's focus on "order[ing] relief that will achieve compliance" while retaining "their traditional equitable discretion").

Additionally, to establish the need for a permanent injunction, Courtland must show that (1) it or the public has suffered an irreparable injury; (2) remedies available at law,

such as monetary damages, are inadequate to compensate for the
injury; (3) the remedy is warranted in equity upon consideration
of the balance of hardships between plaintiff and defendant; and
(4) the permanent injunction being sought would not harm public
interest.   See, e.g., Monsanto Co. v. Geerston Seed Farms, 561
U.S. 139, 156-57 (2010); Weinberger v. Romero-Barcelo, 456 U.S.
305, 311–313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982); Amoco
Production Co. v. Gambell, 480 U.S. 531, 542, 107 S.Ct. 1396, 94
L.Ed.2d 542 (1987); see also Prop. Integrated Statement of
Issues, at 18, ECF No. 616 (Courtland II), 299 (Courtland IV)
(Courtland acknowledging that the court must apply the foregoing
four-factor test in issuing the injunction).[7]  Indeed, "[a]n
injunction should issue only where the intervention of a court
in equity is essential in order effectually to protect property
rights against injuries otherwise irremediable."  Weinberger,
456 U.S. at 312.

--------

[7] The court notes that, at trial, plaintiff took a different
tact, arguing that "because in Section 7002 of RCRA, Congress
expressly authorized the issuance of an injunction to enforce
any requirement, mandate, or order that has become affected
pursuant to RCRA," the "traditional standing showing of
irreparable injury and no adequate remedy of law do not apply to
statutory injunctions."  Tr. Trans. 278:16-279:1.  Inasmuch as
the court herein concludes that such considerations do, indeed,
apply, the court rejects Courtland's contention otherwise at
trial.

i.      Irreparable Injury

The first equitable factor the court must consider is whether Courtland has established that it or the public has suffered an irreparable injury.  In Phase I, the court made several findings as to whether Courtland established that Courtland had suffered an injury and whether the contamination emanating from Filmont may present an imminent and substantial endangerment to human health or the environment under RCRA.

The court concluded that Courtland had failed on both fronts.  Specifically, the court concluded that "'any reasonable probability of adverse effects on heath or the environment' arising from the contaminated groundwater containing arsenic in exceedance of its MCL at Filmont and beyond its solid waste boundary are neither imminent nor substantial."  Phase I Order, at 294; see also Hanford Challenge, 2016 WL 11795779, at *5 ("A violation of the RCRA does not automatically equate to a presumption of irreparable harm").  Indeed, in reaching this conclusion, the court emphasized the following:

> (1) there are no known public or private groundwater wells within a mile radius of Filmont or elsewhere; (2) even assuming there were groundwater wells in Jefferson Park, being the only known residential area near Filmont located further west of MW-13 on the west side of Davis Creek, there is no evidence showing the contaminated groundwater containing arsenic could or would reach that area given that groundwater does not continue to flow in a westerly direction once it

16

reaches the west side of Davis Creek but instead flows
in a northeast direction back towards the creek; (3) a
large portion of the South Charleston area
encompassing Filmont, Massey, Courtland, and all
surrounding properties in the general vicinity thereof
are subject to the local ordinance prohibiting the use
of groundwater without treatment to meet applicable
state standards; and (4) it is undisputed that no one
on the Courtland Property, Filmont, or Massey is
utilizing or planning to utilize the groundwater for
any purpose whatsoever.

All of the above findings effectively eliminate any
potential exposure pathway to the arsenic contaminated
groundwater existing beneath the surface, on-site or
off, by which any receptor could come into contact,
whether through ingestion or otherwise, which, in
turn, eliminates any "adverse impact" arising
therefrom as being either "imminent or substantial."

Phase I Order, at 292; see also id. at 160-183.

The court also specifically rejected the possible
contention "that because Filmont has been found to be an open
dump under RCRA [Subtitle D], it automatically renders the same
an imminent and substantial endangerment to health or the
environment."   Id. at 290; see also id. at 290-294.  Further,
in dismissing Courtland's public nuisance claim, the court
concluded that "Courtland has not established any harm to the
general public in need of abatement as a result of any of the
contamination emanating from Filmont and Massey," nor had
Courtland "demonstrate[d] a serious injury to its property
affecting its value and substance."  Id. at 315-16.  Likewise,
while analyzing the CWA claims in this matter, the court

17

concluded that Courtland failed to establish harm to itself or the public from any unpermitted discharges into Davis Creek from the Northern Boundary Ditch inasmuch as it failed to establish that Davis Creek reversed flow affecting Courtland.  Id. at 390.

In denying Courtland's private nuisance claim, the court additionally found that Courtland failed to establish "any interference with the private use and enjoyment of its property, let alone an interference that is substantial and unreasonable." Id. at 317-318. The court based much of its conclusions in this respect on the fact that Courtland's Vice President, Mr. Truslow, testified that Courtland's use of the property and revenues produced to Courtland from its current lessee and royalties based on the property "ha[d] been unaffected by the entirety of this litigation."  Phase I Order at 317-18.  In Phase II, Truslow again confirmed that little if any activity occurs on the northwestern portion of Courtland where the court concluded contaminated groundwater existed, saying that "[a]ll of our activity would be to the south . . . back towards the railroad tracks."  Tr. Trans. 77:7-78:13.  Further, Truslow confirmed that the only activity "that was ever done" in the area of the Southern Boundary Ditch is that "the City of South Charleston asked for an easement for a forced sewer main."  Id. 78:6-13.  Courtland did not offer evidence to challenge these conclusions, choosing instead to argue that the court need not

18

analyze whether Courtland suffered an irreparable injury, <u>see</u> Tr. Trans. 278:16-279:1 (Callaghan), a position the court has herein rejected, and Courtland has since retracted as explained above.

Accordingly, the court concludes that Courtland has failed to establish an irreparable injury to itself or the public in Phase II, and this factor weighs against injunctive relief.  This finding, alone, ensures that Courtland cannot satisfy the "four-factor test" which a plaintiff must satisfy before a court can grant a permanent injunction.  <u>Monsanto</u>, 561 U.S. at 156.

      ii.    Inadequacy of Remedies at Law

To establish the necessity of injunctive relief, Courtland must also establish the inadequacy of remedies at law, such as monetary damages, to compensate for an irreparable injury identified in the first prong.  <u>See Monsanto</u>, 561 U.S. at 156-57.

In Phase I, the court found that Courtland established that UCC was and is violating RCRA Subtitle D inasmuch as "the Filmont facility continues to introduce arsenic into the groundwater as a result of the continued leaking/leaching of the solid waste contained therein, which is contaminating an

underground drinking water source beyond the solid waste
boundary as those terms are defined" in the statute.  Phase I
Order, at 276.  However, as found in Phase I and affirmed above,
Courtland failed to establish any actual irreparable injury
suffered due to that contamination.  Because this second prong
is contingent on the existence of such an injury, the court
concludes that Courtland has failed to establish any such injury
for which remedies at law would be inadequate compensation.

### iii.    Additional Considerations

        The court notes that a conclusion that injunctive
relief is not necessary nor proper to remedy the RCRA Subtitle D
violation found in Phase I may appear concerning or incongruous
with a violation of federal environmental law.  But those
concerns are assuaged in three ways inasmuch as UCC has entered
into a Voluntary Remediation Program ("VRP") with the West
Virginia Department of Environmental Protection ("WVDEP"): the
VRP can be expected to result in an NCP-compliant clean up that
seeks to prevent offsite migration of contaminants, UCC faces
state disciplinary action if it exits the VRP, and permitting
the VRP to run its course is consistent with RCRA's goal of
enforcing RCRA compliance in conjunction with state programs
that have been approved by the EPA.

a.    The VRP, Generally

The VRP is a program authorized by West Virginia
statute and was established to, among other purposes,
"facilitate voluntary remediation activities and brownfield
revitalization" of contaminated properties resulting from past
activities.  W. Va. Code 22-22-1(d)(1).  Pursuant to statutory
authority, the WVDEP established the Voluntary Remediation and
Redevelopment Rule, which "establishes the eligibility,
procedures, standards, and legal documents required for
voluntary remediation activities and brownfield revitalization."
W. Va. Code St. R. § 60-3-1.

Under RCRA, "[a]ny [s]tate which seeks to administer
and enforce a hazardous waste program pursuant to this
subchapter may develop and, after notice and opportunity for
public hearing, submit to the Administrator an application, in
such form as he shall require, for authorization of such
program."  42 U.S.C. § 6926(b).  To that end, the West Virginia
Department of Environmental Protection designed the VRP to align
with federal requirements, including RCRA, and eventually
obtained approval from the EPA to use the VRP's cleanup
standards at corrective action sites inasmuch as the EPA
concluded that the VRP "meets all of the statutory and
regulatory requirements established by RCRA."  <u>West Virginia:</u>

**Final Authorization of State Hazardous Waste Management Program Revisions**, 78 Fed. Reg. 70225 (Nov. 25, 2013); <u>see</u> W. Va. Code St. R. § 60-3-1 (establishing the purpose of the VRP); Def. Ex. 128 (West Virginia Voluntary Remediation Agreement for Investigation and Remediation Activities) (requiring compliance with, <u>inter alia</u>, RCRA and CERCLA). David Long, an Environmental Resources Analyst with the WVDEP, testified that the VRP is designed specifically to accord with federal environmental regulations, including RCRA. <u>See</u> 687:9-23 (Long).

> Long described the VRP process as follows:

> There's an application and a fee associated with the application. The application must be completed. And then a project manager is assigned and the project manager reviews the application and makes sure all the information is there and then it's approved to come into the program.

> . . .

> Once it's in the program, the first thing that we do is negotiate a Voluntary Remediation Agreement with the applicant. And the agreement, among other things, spells out the reports that are to be work plans and reports that are to be submitted to the DEP.

Tr. Trans. 667:2-14 (Long). Then, "once work plans are submitted," WVDEP "review[s] [them]" and "provide[s] feedback." <u>Id.</u> 667:15-17 (Long). Then, "after the agreement, [WVDEP does] a site visit with the [license remediation specialist ("LRS")].

22

We do a site visit with the license remediation specialist
that's employed by the applicant.  And we go to the site and try
to determine what the sources of contamination are at the site.
Once we've done that, we do a public notice also." Id. 667:21-
668:2 (Long).  Once the public notice is issued, the property
owner and WVDEP develop a site assessment work plan, id. 668:14-
18, and the property owner develops a remedial action work plan
and submits it to the WVDEP, id. 650:25-651:2, and the parties
then iterate until the WVDEP approves the remedial action work
plan.

        Once approved, the property owner then implements the
agreed upon remedy, and a remedy report is created.  Tr. Trans.
542:1-543:15 (Carpenter).  As part of the remedy report, there
must also be a "residual risk assessment to ensure the remedy is
appropriate and worked."  Id. 651:6-7.  "Then after the residual
risk assessment, there is a final report. That final report sums
up everything done in the program . . . because sometimes these
programs go on for three or four or five years, the final
report, and then a summary of everything that happened in the
VRP."  Id. 651:6-14 (Carpenter).  The final report also presents
a "Land Use Covenant, as required by the rule," which is
"reviewed by the [WVDEP] along with the final report."  Tr.
Trans. 543:1-15.  "Once [WVDEP] review[s], approve[s] and

23

agree[s] on the final report, then [the property owner is] allowed to take that land use covenant to the county courthouse and file it with the county courthouse where it runs the deed in perpetuity. [The property owner] receive[s] a court-stamped version of that back. And that court-stamped version of the land use covenant gets attached to the letter that [the property owner] send[s] to the DEP requesting a Certificate of Completion. And if the DEP agrees, they issue [the property owner] a Certificate of Completion, stating that [it] fulfilled all obligations of the VRP program and all other laws and rules that [it is] required to comply with, as required under the Voluntary Remediation Program." Id. (Carpenter).

David Carpenter, UCC's Licensed Remediation Specialist, also made clear that the VRP includes two periods for public comment. The first is a 30-day public comment period when the application is submitted, and the second occurs when the remedial standard has been determined and is required to be published. Tr. Trans. 652:5-13 (Carpenter). For both periods, WVDEP is responsible for publishing the public notice, and a hearing is required if there are comments from the public. Id. 652:19-653:8 (Carpenter). A hearing may also be held if risk levels exceed certain levels. Tr. Trans. 675:4-13 (Long).

iv.    UCC and the VRP.

UCC applied to enter its Filmont/Massey site into the VRP in February 2021, but that application was initially rejected because the site was subject to a unilateral enforcement order due to seeps from the landfill going into a northern tributary of Ward Branch and on to Davis Creek. Tr. Tran. 671:9-23, 673:19-21 (Long). After negotiation between the WVDEP and UCC, the unilateral order was converted into a consent order, and WVDEP accepted Filmont/Massey into the VRP on July 9, 2021. Tr. Tran. 673:12-16 (Long); see Def. Ex. 290 (Consent Order No. 9994 issued by DEP). UCC and WVDEP entered into a Voluntary Remediation Agreement ("VRA") on October 13, 2021, which governs UCC's participation in the VRP. See Def. Ex. 128. The VRA mandates that "all work" under the VRA "shall be performed in compliance with all applicable federal, state, and local laws," specifically requiring compliance with RCRA. See id. at 5.

As part of the VRP, UCC has conducted extensive sampling and testing, including 56 soil samples, 20 groundwater samples, 18 surface water samples, 17 sediment samples, 8 soil gas samples, and 5 ambient air samples, as well as twice yearly groundwater sampling. See Tr. Trans. 458:1-6, 486 (Carpenter). UCC has tested its samples for a variety of possible

25

constituents, including "[v]olatile organic compounds, semi-volatile organic compounds, polycyclic aromatic hydrocarbons, herbicides, pesticides, dioxins, furans, PCBs, inorganics," and it was guided by "historical knowledge" of the industrial activity which occurred on that land.  Id. 490:10-491:8 (Carpenter).

UCC has also conducted additional borings to investigate historical stream channels and potential seeps. (Tr. Tran. 569:2-574:15 (Carpenter).  These borings were not part of the original site assessment work plan – though UCC had invited the WVDEP to observe borings – and were conducted to gather additional information about the site.  Tr. Tran. 578:25-579:9. In addition to the boring logs, UCC's remediation specialists also installed thirteen monitoring wells.  Tr. Trans. 526:14-21 (Carpenter).

Carpenter testified that after collecting the data, he has completed and submitted with the WVDEP a site assessment work plan.  See Tr. Trans. 5331:12.  In addition, UCC's remediation specialists prepared and, as of trial were still in the process of finalizing, a preliminary report on the impact of the site on human health and the environment to "help guide the next phase of [their] investigation."  Id. (Carpenter).

David Carpenter estimated that the remedial design would be created by the end of 2024, construction to implement the remedy would begin in 2026, and the remedy would be implemented by the end of 2026. Tr. Tran. 650:9-22. However, David Long from WVDEP estimated it would take 4-5 years to complete the entire VRP process. Tr. Tran. 699:11-12. Long testified that more groundwater monitoring wells likely need to be installed to fully characterize the contamination at the site, and estimated that it would take about 6 months to develop a plan for this additional work, carry it out, and submit the results. Tr. Tran. 697:8-699:4.

Long also testified that, even after the VRP is completed, there would likely still be "waste in the groundwater at the Filmont/Massey facility" but that there would not be any offsite migration and that "[t]here would be monitoring associated with that so that we know the contaminants are degrading." Tr. Trans. 680:2-681:20. He made clear that the VRP process would not automatically turn the Filmont/Massey site into a sanitary landfill, as that term is used in RCRA. Id.

v.    Simonton's Critiques of the VRP

Dr. Simonton had several critiques of the VRP, all of
which come down to the fact that "there are differences" between
the VRP and NCP-compliance requirements.  See Tr. Trans. 126:22-
127:12 (Simonton).  Most significantly, Simonton states that
"the differences are going to be the level of detail and the
remedial investigation itself, what is how far and how deep []
you go," also "the analysis of appropriate standards" is much
broader under the NCP than the VRP, and the VRP requires much
less public comment and involvement than the NCP.  Id.

The first two major critiques are weakened in that the
EPA has explicitly approved the VRP as consistent with RCRA's
aims, and inasmuch as RCRA, as will be discussed below, does not
mandate direct compliance with the NCP.  Simonton's critique of
public comment is limited inasmuch as one period of public
comment has already passed, and Courtland failed to make any
public comment related to UCC's participation in the VRP.  See
Tr. Trans. 694:25-695:5 (Long).  Simonton did not rebut Mr.
Long's testimony that the VRP would result in a manner that
prevents any existing contaminants from migrating offsite.
Indeed, when asked if he had any specific critiques of the work
done or the result of the VRP, UCC's counsel and Simonton had
the following exchange:

Q. Up to now, right, you've reviewed all the reports to date, right?

A. I believe so.

Q. Is there any other criticism that you have of the work done -- or the lack of sampling or work done in the process so far to tell the Court that they shouldn't accept if the Court picks up now where -- where we've gotten to?

A. I've never suggested that the Court disregard the data that's been gathered.

Q. Yeah. That's what I'm saying is, is do you have any criticism that it has failed in some way, right, so that at this point in the process -- forget what's to come -- this point in the process, what should have been done hadn't been done?

A. If we're just talking about site assessment -- well, site assessment, remedial investigation, it's a continued process. There's things -- I have criticisms, but this is a continued process. So -- so, no, I wouldn't -- but, again, this is specific only to the [remedial investigation].

Q. In the end of the day it may satisfy Dr. Simonton and it may not be satisfy Dr. Simonton, right?

A. Well, what –

Q. The remedy. The ultimate outcome.

A. The remedy? Sure.

Q. You don't know right now?

A. I don't know.

Tr. Trans. 249:9-250:6 (Simonton).

### vi.      The VRP and RCRA

Though the court notes that Courtland argues that UCC has improperly entered the VRP inasmuch as they did so while this litigation was pending, it is clear that Courtland's main concern with the VRP is their position that it will not result in a remedial clean up of the quality required by RCRA, as well as by CERCLA and the National Contingency Plan ("NCP").  As discussed in the Phase I Order, the NCP, see 40 C.F.R. § 300. "is a set of regulations that 'establish procedures and standards for responding to releases of hazardous substances, pollutants, and contaminants[.]'"  Phase I Order, at 191 (quoting 42 U.S.C. § 9607(a)(4)(B)); see also 40 C.F.R. § 300.3(b).

Regarding RCRA, there is no specific injunction that the court must issue.  Rather, as discussed above, the court "ha[s] jurisdiction" to "order [UCC] to take such action as may be necessary" to achieve compliance with the statute.  42 U.S.C. § 6972(a).

As to CERCLA and the NCP, the court notes that such considerations are not directly relevant to the question of the adequacy of the VRP inasmuch as they are targeted at determining whether a party can recover "response costs" under CERLCA.   "A private party response action will be considered 'consistent

with the NCP' if the action, when evaluated as a whole, is in
substantial compliance with the applicable requirements in [40
C.F.R. § 300.700(c)(5)-(6)], and results in a CERCLA-quality
cleanup."  40 C.F.R. § 300.700(c)(3)(i).  "In turn, §
300.700(c)(5)-(6) sets forth an array of requirements
"potentially applicable to private party response actions"
regarding, <u>inter alia</u>, worker health and safety; documentation
and cost recovery; permit requirements; reports of releases to
the National Response Center ("NRC"); removal site evaluation
and actions; remedial site evaluation; selection of a remedy;
and providing an opportunity for public comment concerning the
selection of a response action."  Phase I Order, at 195 (citing
40 C.F.R. § 300.700(c)(5)-(6)).  A "CERCLA-quality" cleanup is
achieved "if the response action protects human health and the
environment through the utilization of permanent solutions and
alternative treatment or resource recovery technologies to the
maximum extent possible."  <u>Young v. United States</u>, 394 F.3d
858, 864 (10th Cir. 2005).  Importantly, "[a]n 'immaterial or
insubstantial' deviation, however, will not result in a cleanup
that is 'not consistent' with the NCP."  <u>ITT Indus., Inc. v.
Borgwarner, Inc.</u>, 700 F. Supp. 2d 848, 880 (W.D. Mich. 2010).

　　　　In light of the foregoing, the court declines to find
that the VRP is a wholly insufficient remedy for the RCRA

violation identified in the Phase I Order.  Firstly, it is clear that the VRP substantially complies with a CERCLA quality cleanup inasmuch as it is designed to protect human health and the environment, implement permanent solutions, and provides for some – albeit limited – public participation.

Certainly, it is not without its imperfections.  Long testified that waste may remain in groundwater, and it has yet to resolve the seep of leachate from Filmont which was the subject of the original unilateral enforcement order.  But it does aim to prevent offsite migration and to prevent such seeps.

Inasmuch as Simonton's critiques of the VRP were generalized and unspecific, and to the extent the EPA approved the VRP explicitly to accord with RCRA, and because Courtland did not engage in the public comment period that has already occurred despite arguing that more such periods are necessary, the court declines to find that, as applied in this case, the VRP is an insufficient method of remedying the RCRA Subtitle D violation identified in Phase I.

### a.    State Disciplinary Action

If, at any point before completion, UCC ends its participation in the VRP, it would become subject to a unilateral enforcement order by the WVDEP.  When UCC first filed

its application with the WVDEP to enter Filmont and Massey into
the VRP, it was denied "[b]ecause [UCC] w[as] the subject of a
unilateral order under" state law.  Tr. Trans. 671:6-19 (Long).
The underlying basis for the unilateral order "were seeps from
the landfill going into Davis Creek and going into [Ward
Branch]".  Id. 673:17-21 (Long).  A unilateral enforcement order
is "a written final order issued by a federal or state agency
charged with enforcing environmental law, which compels the
fulfillment of an obligation imposed by law, rule against a
person without their voluntary consent."  W. Va. Code § 22-22-2.

That unilateral order was converted to a consent order
by the WVDEP, which conversion permitted Filmont and Massey to
enter into the VRP.  Id. 673:12-16.  If UCC "decides to not
participate in [the VRP]," the unilateral enforcement order
would go back into effect.  Id. 677:17-19.

### b.   Consistency with RCRA

Permitting UCC to continue and complete the VRP while
working with the WVDEP is consistent with the remedial goals and
structure of RCRA.  "RCRA is not principally designed to
effectuate the cleanup of toxic waste sites or to compensate
those who have attended to the remediation of environmental
hazards."  Meghrig, 516 U.S. at 483.  "RCRA's primary purpose,
rather, is to reduce the generation of hazardous waste and to

33

ensure the proper treatment, storage, and disposal of that waste" to "minimize the present and future threat to human health and the environment." Id. (quotation marks omitted). To that end, Congress sought to "provid[e] technical and financial assistance to State and local governments . . . for the development of solid waste management plans" and empowered the EPA to authorize state programs in accordance therewith. 42 U.S.C. §§ 6902(a), 6926(b).

Pursuant to RCRA, as earlier noted, "West Virginia [] applied to EPA for final authorization of revisions to its hazardous waste program under [RCRA]," including the VRP, and EPA determined that West Virginia's application "meets all of the statutory and regulatory requirements established by RCRA," granting the state "final authorization to operate its hazardous waste program." West Virginia: Final Authorization of State Hazardous Waste Management Program Revisions, 78 Fed. Reg. 70229 (Nov. 25, 2013). EPA's approval "allow[s] the use of the cleanup standards of the VRP at RCRA corrective action sites." Id. at 702230.

The approval additionally relies upon a Memorandum of Agreement ("MOA") between the EPA and the WVDEP to "achieve cleanups that are protective of human health and welfare and the

environment through the appropriate use of the State voluntary remediation program."[8]  Def. Ex. 388 (MOA).

Courts have consistently found that where a RCRA defendant is already participating in a mandatory state remedial program, that has been approved by the EPA, to remedy a potential or actual RCRA violation, it is not necessary to issue an injunction under RCRA.  See <u>Schmucker v. Johnson Controls, Inc.</u>, No. 3:14-CV-1593 JD, 2019 WL 718553, *2 (N.D. Ind. Feb. 19, 2019) (finding that the defendant's participation in Indiana's VRP "does not relieve [defendant] of its RCRA obligations; participating in that program <u>is</u> [defendant's] RCRA obligation") (emphasis in original); <u>LAJIM, LLC v. Gen. Elec. Co.</u>, 917 F.3d 933, 948-49 (7th Cir. 2019) (upholding district court's denial of injunctive relief under RCRA where plaintiffs "have not provided the evidence necessary for this Court to second guess [defendant]'s Remedial Action Plan and order relief

-----

[8] The court notes that the MOA's applicability is limited to "contaminated or potentially contaminated properties (brownfields) that are 'eligible response sites,' as defined by CERCLA §101(41)," and that the parties have agreed that Filmont is not a brownfield site.  Def. Ex. 388 (MOA); <u>see</u> Tr. Trans. 24:3-8 (Donovan), 240:18-22 (Masterson stipulating that Filmont is not a brownfield).  Nonetheless, the court takes it into consideration inasmuch as it helps articulate the purpose and scope of the VRP, which the EPA took into consideration in approving the VRP under RCRA.

in addition to what the [relevant state agency has already required") (internal quotations omitted); McCormick v. Halliburton Co., No. CIV-11-1272-M, 2012 WL 1119493, *2 (W.D. Okla. Apr. 3, 2012) (finding the relevant state department has primary jurisdiction over plaintiff's RCRA claims because though "RCRA clearly contemplates federal judicial intervention," the court's "involvement would likely cause further delay of the investigation of the Site and would result in substantial duplication of the efforts of the" state agency because the defendant was, pursuant to a mandatory consent order, "currently investigating/characterizing and remediating the Site and surrounding areas that may have been impacted under [state] oversight."); Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co., 704 F.3d 413, 431 (5th Cir. 2013) (finding a plaintiff was not entitled to injunctive relief against a defendant where the Executive Branch was "charged with the responsibility to oversee the cleanup," and where there was no reason to make a determination that the cleanup scheme was deficient or ineffective).

        The Third Circuit's case of Trinity Indus., Inc. v. Chicago Bridge & Iron Co., 735 F.3d 131 (3d Cir. 2013), is also guiding.  Pennsylvania had initiated enforcement proceedings against Trinity after an investigation regarding the alleged

release of hazardous substances at a facility that it owned. Id. at 133. Those proceedings resulted in "Trinity's entering into an agreement whereby it pleaded nolo contendere to five misdemeanor counts of unlawful conduct." Id. Trinity and the Pennsylvania Department of Environmental Protection entered into a consent order under state law "whereby Trinity agreed to fund and conduct "Response Actions" according to a schedule approved by DEP." Id. By the time the case was in the Third Circuit, Trinity claimed to have undertaken 'preliminary investigative work in anticipation of cleanup,' but 'ha[d] yet to perform shovel-in-the-ground remediation.'" Id. (citing Trinity Br. 55).

After it signed the consent order, Trinity sued defendant Chicago Bridge & Iron Co. ("CB&I"), a prior owner of the site, under RCRA, CERCLA, and state law, claiming CB&I was partially responsible for the contamination and seeking contribution for its share of remediation costs under CERCLA and seeking a mandatory injunction under RCRA requiring CB&I's participation in the cleanup. The district court denied Trinity's injunctive relief under RCRA, holding that the "Consent Order rendered any injunctive relief futile." Id. at 139.

The Third Circuit affirmed the district court's denial of injunctive relief under RCRA. Id. at 139-40. In doing so,

the court cited Meghrig's logic that RCRA's primary purpose is
"to reduce the generation of hazardous waste and to ensure the
proper treatment, storage, and disposal of that waste" to
"minimize the present and future threat to human health and the
environment." Id. at 140.  The court then concluded that,
inasmuch as Trinity has failed to establish that compelling
CB&I's participation will aid in the minimization of such
threats, the Consent Order appears effective and injunctive
relief is not "necessary" under RCRA.  Id.  The district court's
denial of an injunction under RCRA was deemed proper.  See id.

Certainly, there are some significant differences
between the facts of Trinity and this matter.  For example,
there, the relevant consent order was binding and in effect
prior to the commencement of the suit whereas, here, the VRP is
voluntary, was not in effect when Courtland sued, and was
entered into during litigation.  However, the voluntary nature
of the VRP is abated by the fact that, were UCC to back out, it
would immediately become subject to a WVDEP unilateral
enforcement order and face state enforcement, which would
include enforcement of federal laws, including RCRA.  Though
UCC was not in the VRP when Courtland II was initiated in 2019,
by the time the Phase II trial occurred, it had been in the VRP
for approximately two years and four months, from October 13,

2021, to February 13, 2024.  <u>See</u> Phase I Def. Ex. 128

(Voluntary Remediation Agreement) (dated Oct. 13, 2021).  During

Phase II, the court heard significant testimony about its

purpose, process, and intended effect at trial and found that it

is intended to and will comply with RCRA.  <u>See</u>, <u>e.g.</u>, Tr. Trans.

113:17-115:5 (Simonton) (testifying that the VRP shares the same

components as the NCP and is "headed in the right direction"

regarding its remedial investigation); Tr. Trans. 537:20-543:17

(Carpenter) (providing an overview of the VRP process); Tr.

Trans. 666:23-668:23 (Long) (providing high-level overview of

the steps of the VRP and noting that RCRA and CERCLA both

"apply" to the VRP); <u>see</u> <u>also</u> 47 Fed. Reg. 57026, 51029 (Oct.

23, 1998).

        In sum, the court concludes that because UCC has

entered into the WVDEP's Voluntary Remediation Program, being a

program which has been approved by the EPA to accord with both

RCRA and CERCLA and the purpose of which is, among others, to

prevent offsite migration of contaminants, and because UCC's

failure to complete the VRP would prompt state environmental

enforcement actions under a state statutory and regulatory

scheme that includes the requirements of RCRA, a scheme which

has also been approved by the EPA, the proper remedy for the

RCRA Subtitle D violation found in Phase I is to permit UCC to complete the VRP without additional injunctive requirements.

## II.  CERCLA

There are three overarching CERCLA remedy questions to be resolved.  First, the court must adjudicate UCC's challenges to the response costs of $27,142.50 Courtland incurred and determine whether UCC is entitled to any contribution with respect thereto from Courtland.  Second, the court must determine whether and to what extent UCC can recover its alleged response costs of $199,942.52.  And third, the court must determine liability for future response costs incurred by Courtland.

### A.  UCC's § 113(f) Contribution Claim as to Courtland's Costs

UCC brought a counterclaim against Courtland for contribution under CERCLA § 113(f).  See UCC's Answer, Affirmative Defenses, and Counterclaim, at 43 ECF No. 304 (2:19-cv-894). CERCLA § 113(f)(1) enables "[a]ny person to seek contribution from any other person who is liable or potentially liable under [CERCLA § 107(a)], during or following any civil action under [CERCLA § 106 or § 107(a)]."  42 U.S.C. § 9613(f)(1).  "A party making a claim under CERCLA § 113(f) bears the burden of proving: 1) that the defendant is a responsible

party under § 107(a) of CERCLA; and 2) the defendant's equitable share of costs." Ashley II of Charleston, LLC v. PCS Nitrogen, Inc., 791 F. Supp. 2d 431, 490 (D.S.C. 2011), aff'd, 714 F.3d 161 (4th Cir. 2013) (citing Minyard Enterprises, Inc. v. Se. Chem. & Solvent Co., 184 F.3d 373, 385 (4th Cir. 1999)).

"In resolving such claims, the court may allocate response costs among liable parties using such equitable factors as the court determines appropriate." Id.  The court "has considerable discretion as to what and how many equitable factors it will consider in allocating Response Costs among the responsible parties," Minyard, 184 F.3d at 385, and may use any equitable factor the court deems appropriate.  See Carolina Pines I, LLC v. City of Abbeville Pub. Works, 2018 U.S. Dist. LEXIS 240104, at *29 (D.S.C. Nov. 14, 2018) (citing Dent v. Beazer Materials & Servs., Inc., 993 F. Supp. 923, 950 (D.S.C. 1995) (noting the court ""is not limited to any specific equitable factors in deciding how to apportion liability")); see also Kerr—McGee Chem. Corp. v. Lefton Iron & Metal Co., 14 F.3d 321, 326 (7th Cir. 1994) ("CERCLA not only entrusts the district court to make the ultimate equitable allocation of costs, but it also grants the court the authority to decide which equitable factors will inform its decision in a given case.").  The resolution of a § 113(f) contribution claim is a "fact-intensive

inquiry [that] is particularly suited to case-by-case analysis." Carolina Pines I, 201 U.S. Dist. LEXIS 240104, at *29 (quoting NCR Corp. v. George A. Whiting Paper Co., 768 F.3d 682, 695 (7th Cir. 2014)).

Prior courts have been guided by six equitable factors known as the "Gore factors," which were derived from the legislative history of CERCLA" and bear relevance to many cases thereunder. Ashley II of Charleston, 791 F. Supp. 2d at 490; see Dent, 993 F. Supp. at 950; see also United States v. R.W. Meyer, Inc., 932 F.2d 568 (6th Cir. 1991) (Guy, J., concurring) (noting that the Gore factors were present in Representative Gore's legislative proposal and that "Congress implicitly retained the essence of the Gore Factors and intended to reject only mandatory legislative standards," supporting the "proposition that Congress intended the court to have flexibility in determining apportionment") (citing 126 Cong. Rec. 26,779, 26,781 (1980)); H.R. Rep. No. 253 (III), 99th Cong., 1st Sess. 19 (1985), reprinted in 1986 U.S. Code Cong. & Admin. News 2835, 3042.). The Gore factors will be addressed below.

"Other courts have also considered: 1) the economic benefit to each party associated with releases of hazardous wastes, and 2) each party's ability to pay its share of the

cost." Id. (citing Weyerhaeuser Co. v. Koppers Co., 771 F. Supp. 1420, 1427 (D. Md. 1991); United States v. Davis, 31 F.Supp.2d 45, 63 (D.R.I.1998)). Additionally, in Phase I of this matter, the court explicitly invited UCC to offer evidence as to excessiveness of Courtland's response costs.

UCC's threshold burden to sustain its CERCLA § 113(f) claim for contribution as to Courtland's response costs incurred during its June and July 2021 sampling of its property next to its northern border with UCC's Filmont is that it must show that Courtland is a responsible party under CERCLA § 107(a).

In the Phase I Order, the court concluded that Courtland established that it was entitled to recover $27,142.50 in response costs against UCC pursuant to CERCLA § 107(a)(1)(B). See Phase I Order, at 404. The court also concluded:

> [T]here is no question that hazardous substances have come to be located in the groundwater on the Courtland Property -- of which Courtland is the owner and operator -- as evidenced by the results of Dr. Simonton's June and July 2021 groundwater sampling thereon. It is also evident that both historic uses of and ongoing industrial operations at the Courtland Property are contributing sources to its groundwater contamination as explained in detail in Section III.G. at pages 111-136 [in the Phase I Order].
>
> Simply stated, UCC and Courtland are both contributing to the same harm at issue in this action: the contamination of groundwater on the Courtland Property. Thus, to hold UCC 100%

> liable for the costs Courtland expended on its
> 2021 groundwater investigation, which
> revealed the presence of multiple hazardous
> substances in the groundwater on the northern
> portion of the property, would produce an
> inequitable result given the court's finding
> that Courtland is also a contributing source.

Phase I Order, at 219-20.   Inasmuch as Courtland is an "owner" of its property on which Dr. Simonton found contamination in the groundwater, and the court has already concluded that it is a party responsible for the contamination for which it obtained § 107(a) liability against UCC, UCC has satisfied its initial burden of establishing that Courtland is a responsible party therefor under § 107(a).

UCC seeks to establish three main equitable bases for the court to allocate certain of Courtland's response costs back to Courtland.   The court turns to whether UCC has carried its burden of establishing an "equitable share of costs" of the $27,142.50 between UCC and Courtland and will initially consider the three bases urged by UCC.   Ashley II of Charleston, LLC, 791 F. Supp. 2d at 490.

First, UCC contends that the costs incurred by Courtland were excessive.   UCC's expert, Mr. MacPherson, offered testimony that boiled down to the argument that Dr. Simonton's fees, charged at his $350 per hour rate, were excessive because he performed field work himself instead of delegating such tasks

to people at a lower hourly rate.  See Tr. Trans. 290:7-291:6
(MacPherson: Feb. 13, 2024) (discussing Phase I Pl. Ex. 500, ECF
No. 258-13 in 2:21-cv-487).  Specifically, for example,
MacPherson testified that one "would typically use $80 to $85
for an hour for well installation and development. Something
similar to that, up to $120 for site oversight."   Id. at
291:10-16.

        Mr. MacPherson presented his firm's invoices totaling
$199,942.52 incurred by UCC for its alleged CERCLA response
costs, which UCC also seeks to recover from Courtland via
contribution, as an example of non-excessive billing.   See Tr.
Trans. 291:17-25 (MacPherson).  And so, turning to those
invoices, MacPherson is correct in that those doing UCC's
sampling charged much lower rates – ranging from $85 to $128 an
hour – than Dr. Simonton's $350 an hour.   See Phase I Def. Ex.
51, ECF No. 260-12, at 3 (PageID #10429).  Yet, MacPherson's
agency also invoiced costs for travel and oversight for such
field work at costs between $200 and $310 per hour.   Id. at 9
(PageID 10434).  In view of the combined cost of $285 at the low
end to $438 at the high end (for which the court lacks
sufficient evidence to specify further) – which UCC also seeks
to recover via contribution – the court declines to find that
Simonton's blanket rate of $350 per hour for his fieldwork is

excessive.   The court also declines to find Simonton's rate
excessive when overseeing fieldwork, Tr. Trans. 290:7-15
(Simonton), inasmuch at UCC's experts also charged for
overseeing fieldwork at rates not dissimilar to Simonton's rate.

Similarly, MacPherson testified that Simonton's $350
per hour rate for "report development" (the development of
planning) is excessive inasmuch as he believed a more
"typical[]" rate would be about $150 an hour.  Tr. Test. 291:12-
16 (MacPherson: Feb. 13, 2024).  In the same vein as above, the
court declines to find Simonton's rate excessive because UCC
itself seeks to recover MacPherson's rate of $310 per hour for
block bills which included, inter alia, "[d]rafting of initial
sampling plan" and reviewing past reports and data.  See Phase I
Def. Ex. 51, ECF No. 260-12, at 5-12.

In brief summation of those three contentions by UCC,
the court declines to equitably allocate UCC's § 107(a)
liability to Courtland on the grounds that Courtland's costs
were excessive.

Second, UCC offered testimony from MacPherson seeking
to argue that Simonton's work was subpar and thus the costs for
that work should be allocated such that Courtland pays 95% of
those costs.  See Tr. Trans. 303:9-304:24 (MacPherson) (arguing
that Courtland's quality assurance measures were substandard,

and that Courtland did not follow proper sampling procedure).
UCC, however, does not offer any testimony, evidence, or
authority to suggest why the cost of Simonton's allegedly subpar
work — which work in this context the court has already found
credible and relied upon despite UCC's challenges thereto in
Phase I — should be allocated so heavily to Courtland.  Inasmuch
as the court has already found Simonton's work to have been NCP
compliant (and explicitly foreclosed a challenge to such costs
on NCP compliance grounds, see Phase I Order, at 213), the court
declines to equitably allocate associated costs on the grounds
that UCC's expert believes such work to be subpar.

Third, UCC elicited testimony from Courtland's
corporate representative, John Truslow, that Courtland has not
expended any cost or resources on actually cleaning up its
property, on which it identified the hazardous substances that
form the basis for this action.  See Tr. Trans. 83:20-86:17
(Truslow, cross examination).  UCC also elicited testimony from
Simonton that, other than reports he prepared for Phase II, he
has not taken "any other sampling" or developed "any type of
site conceptual plan [or] groundwater elevation mapping," Tr.
Trans. 154:10-20 (Simonton), which UCC argues indicates that
Courtland has not engaged in any cleanup on its property,
despite the data collected during Simonton's 2021 sampling, see

UCC Prop. Conl. Law, at 37.  The policy of CERCLA, however, does not require that a party incur clean-up fees prior to filing suit or trial inasmuch as § 113 clearly contemplates future clean-up costs, requiring in § 107 actions that a court "enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."  § 113(g)(2). Accordingly, the court declines to find that Courtland's investigatory costs be largely allocated to Courtland simply because it has not yet acted upon the findings thereof.

Nonetheless, the court turns to and rates, parenthetically below, the factors first mentioned as bearing upon the allocation of Courtland's $27,142.50 response costs, beginning with the Gore factors.  The factors are (1) "the ability of the parties to demonstrate that their contribution to a discharge, release, or disposal of a hazardous waste can be distinguished" from another party's contribution (neither party established an ability to do so by the preponderance of the evidence); (2) "the amount of hazardous waste involved" (though the court identified three hazardous substances, none were established to pose a risk to human health or the environment, see Phase I Order, at 183-84); (3) "the toxicity of the hazardous waste above" (same as previous); (4) "the degree of

48

involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste, especially waste driving the remediation" (UCC appears to be the primary cause, but Courtland is also a contributing source); (5) "the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste" (none); and (6) "the degree of cooperation by the parties with Federal, State, or local officials to prevent harm to the public health or the environment" (none with respect to this issue). Ashley II of Charleston, 791 F. Supp. 2d at 490 (analyzing the Gore factors). In all, the Gore factors generally counsel an even equitable allocation of Courtland's investigatory costs.

As to the other equitable factors that have been addressed, courts have considered the economic benefit to each party associated with the releases of hazardous wastes (UCC benefited from noncompliance by saving costs) and each party's ability to pay its share of the cost (no evidence offered but obvious that UCC has the ability and so, too, does Courtland with respect to the monetary levels contemplated in this case).

The court finds that, because it concluded in Phase I based on a preponderance of the evidence that it was more likely than not that both Courtland and UCC contributed to the

49

hazardous substance contamination at issue herein, and neither party offered convincing evidence in Phase II in support of how Courtland's response costs should be equitably allocated, the appropriate equitable allocation of CERCLA costs in this matter is generally an even split with a tilt in favor of Courtland.

With respect to Courtland's CERLCA § 107(a)(1)(B) costs of $27,142.50 from Simonton's June and July of 2021 sampling, the court additionally considers that the sampling occurred "on the northern portion of the Courtland Property, lying between the Southern Boundary Ditch and the property line with Filmont but near the property line," which is a different portion of the Courtland property than where much of Courtland's historical and current operations occur.  Phase I Order, at 112; id. 110-135 (discussing Courtland's activities and possible contamination in its southern portion).  In sum, it appears to the court that UCC must bear the brunt of the costs associated with such sampling and finds that the appropriate allocation for Courtland's June and July 2021 sampling costs be 75% on UCC and 25% on Courtland.  The court thus concludes that UCC is entitled

to contribution from Courtland for $6,785.63 under CERCLA § 113(f).[9]

    B.   <u>UCC's § 113(f) Contribution Claim as to UCC's Costs</u>

        UCC additionally seeks an equitable allocation of its own response costs under CERCLA § 113(f).  Specifically, UCC seeks an equitable allocation of the $199,942.52 that it

---------------

[9] To the extent Courtland maintains UCC is not entitled to contribution under CERCLA § 113(f) inasmuch as the court has not found that UCC and Courtland share common liability for a common harm, the same is without merit. In the Phase I Order, the court explicitly found that "UCC and Courtland are both contributing to the same harm at issue in this action: the contamination of groundwater on the Courtland Property." Phase I Order, at 219. The court explained in detail in that Order the basis for that conclusion, which it declines to repeat herein. <u>See</u> Phase I Order at 111-136, 216-220.

        To the extent Courtland suggests the court should have undertaken an analysis of whether such harm was divisible, such assertion is likewise without merit inasmuch as at no point during the litigation did UCC raise a divisibility or apportionment defense under CERCLA § 107.  <u>See</u>, <u>e.g.</u>, <u>Burlington Northern and Santa Fe Ry. Co. v. U.S.</u>, 556 U.S. 559, 616 n.9 (2009)(internal citations and quotations omitted)(explaining "[a]pportionment . . . looks to whether defendants may avoid joint and several liability by establishing a fixed amount of damage for which they are liable, while contribution actions allow jointly and severally liable [potentially responsible parties] to recover from each other on the basis of equitable considerations."); <u>New York v. Solvent Chemical Co., Inc.</u>, 453 F. App'x 42, 46 (2d Cir. 2011) (explaining that "[d]ivisibility (or apportionment) is inapplicable to contribution claims under section 113(f); it is a common law doctrine that may be used to blunt the harshness of joint-and-several liability under section 107(a)."). Instead, UCC brought a counterclaim for contribution, or equitable allocation, under CERCLA § 113(f).

"expended . . . on costs associated with its soil investigation on the southeastern area of the Courtland Property, which MacPherson avers was both reasonable and necessary in order to determine if Courtland could be a source of the contamination detected thereon." Phase I Order, at 31-32. The court reserved for Phase II "a decision as to whether UCC will be permitted to recover from Courtland any of the $199,942.52 UCC expended on its December 2020 soil investigation of the Courtland Property." Id. at 220 n.82.

"Section 113(f)(1) authorizes a contribution action to [potentially responsible parties] with common liability stemming from an action instituted under . . . § 107(a)," while "§ 107(a) permits cost recovery (as distinct from contribution) by a private party that has itself incurred cleanup costs." U.S. v. Atlantic Research Corp., 551 U.S. 128, 139 (2007). Thus, "a [potentially responsible party] that pays money to satisfy . . . a court judgment may pursue § 113(f)(1) contribution." Id. Importantly, however, "by reimbursing response costs paid by other parties, the [potentially responsible party] has not incurred its own costs of response and therefore cannot recover under § 107(a)." Id. "As a result, though eligible to seek contribution under § 113(f)(1), the [potentially responsible party] cannot simultaneously seek to recover the same expenses

under § 107(a)." Id. In other words, in contribution actions, a responsible party, in this case UCC, cannot seek to recover its own response costs but instead can only seek to recover a portion of the response costs it has been found liable for under CERCLA § 107(a) from other parties bearing some responsibility for those same costs on equitable grounds.

Here, the only response costs UCC has been found liable for under CERCLA § 107(a) is with respect to the $27,142.50 Courtland expended on its June and July 2021 groundwater sampling investigation on the Courtland property. The $27,142.50 worth of response costs are thus the only costs eligible for an equitable allocation under CERCLA § 113(f) given the court's finding that Courtland bears some responsibility for the same. Conversely, the $199,942.52 in costs UCC expended on its December 2020 soil investigation on the Courtland property were incurred on its own accord and were not the subject of Courtland's CERCLA § 107(a) claim. Simply put, UCC was not found liable under CERCLA § 107(a) for the $199,942.52 worth of costs associated with its December 2020 soil investigation. Such costs are thus not eligible for an equitable allocation under CERCLA § 113(f).

Accordingly, the court concludes that UCC bears sole responsibility for the $199,942.52 it expended on its December 2020 soil investigation on the Courtland property.

C.    <u>Declaratory Judgment Claims under CERCLA § 113(g)(2)</u>

In Courtland II, Courtland, as part of its § 107(a) claim for response costs, maintains a cause of action seeking declaratory relief as to future response costs under CERCLA § 113(g)(2).  In the same action, UCC maintains a counterclaim for declaratory relief as to future response costs under CERCLA § 113(g)(2).

In Phase I, as to Courtland's claim for declaratory relief, the court concluded:

> Pursuant to section 113(g)(2) of CERCLA, "[i]n any such action described in this subsection, the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."  42 U.S.C. § 9613(g)(2).  "As this statutory language makes clear, under § 113(g)(2), '[t]he entry of declaratory judgment as to liability is mandatory.'" <u>Dent v. Beazer Materials and Services, Inc.</u>, 156 F.3d 523, 531 (4th Cir. 1998) (quoting <u>Kelley v. E.I. DuPont de Nemours & Co.</u>, 17 F.3d 836, 844 (6th Cir. 1994)).

> The award of declaratory judgment pertains only to the fact of liability, not the amount, and thus "the speculative nature of . . . future costs is no bar to a present day declaration of liability." <u>United States</u>

54

> v. Fairchild Indus., Inc., 766 F. Supp. 405,
> 415 (D. Md. 1991).    Indeed, "[p]ermitting
> prompt declaratory judgments encourages
> prompt remedial action."    Dent, 156 F.3d at
> 532.
>
> Inasmuch as UCC is liable under CERCLA 107(a)
> for at least some of the groundwater
> contamination detected on the northern portion
> of the Courtland Property, declaratory
> judgment against UCC for any future
> remediation costs Courtland may choose to
> incur in efforts to remediate the same is
> proper.    This imposition of future liability
> does not prevent UCC from challenging any
> actual future costs incurred by Courtland as
> unnecessary, inconsistent with the NCP, or
> unreasonable.    Nor does it preclude UCC from
> seeking an equitable allocation of such costs
> from Courtland.

Phase I Order, at 214-15; see also Phase I Order, at

403 ("Courtland is likewise entitled to declaratory judgment

under CERCLA § 113(g)(2) against UCC for any future remediation

costs Courtland may choose to incur in efforts to remediate the

Courtland Property, which will be subject to an equitable

allocation between the parties").

    As to UCC's claim for declaratory relief, the court,

finding that declaratory relief under CERCLA § 113(g)(2) "is

permissible in connection with a [§ 113(f)] contribution claim,"

Phase I Order, at 221 (collecting cases), concluded:

> Just as it would be inequitable to hold UCC
> liable for the entirety of the response costs
> that Courtland has already incurred, it would
> likewise be inequitable to hold UCC 100%
> liable for any future response costs Courtland

55

may choose to incur in efforts to remediate
its groundwater contamination when Courtland
itself is a contributing source.

Accordingly, in the event that Courtland
chooses to incur further response costs
associated with remediating the groundwater
contamination at the Courtland Property, UCC
will be entitled to an equitable allocation of
such costs.

Phase I Order, at 221-22; see also Phase I Order, at

404 ("UCC is entitled to declaratory judgment under CERCLA §

113(g)(2) declaring that UCC is entitled to contribution

respecting any future response costs Courtland chooses to incur

in efforts to remediate the Courtland Property; thus, any such

costs will be subject to an equitable allocation between the

parties").

Seeing no reason to disturb these conclusions, the

court incorporates them herein.  The court concludes that

Courtland is entitled to declaratory judgment under CERCLA §

113(g)(2) that UCC is liable to it for future response costs

incurred in an effort to remediate the groundwater contamination

detected on the northern portion of the Courtland Property,

which costs may nonetheless be challenged by UCC in future

actions as unnecessary, unreasonable, or inconsistent with the

NCP and subject to an equitable allocation between the parties.

### III. <u>CLEAN WATER ACT</u>

The court found in Phase I that "UCC violated the Clean Water Act inasmuch as UCC discharged stormwater associated with industrial activity by a shallow drainage channel running along the [Filmont] facility's fence line north of Courtland and then across Courtland into the Southern Boundary Ditch as well as by the two Massey Railyard culverts into the Southern Boundary Ditch, and on to Davis Creek, without a permit."  Phase I Order at 402; <u>see</u> 33 U.S.C. § 1311(a); 33 U.S.C. § 1342(p). Accordingly, the court must determine the appropriate relief.

In citizen suits brought under the CWA, the court has jurisdiction to issue an injunction against a violator to enforce an "effluent standard or limitation" of the CWA and to "apply any appropriate civil penalties under" 33 U.S.C. § 1319(d).  33 U.S.C. § 1365(a).

### A.    <u>Injunctive Relief</u>

As to the proper injunctive relief, the court found UCC to be in violation of the CWA inasmuch as its discharges were not permitted in accordance with 33 U.S.C. § 1342.  <u>See</u> Phase I Order at 402.  "[A] pollutant may be discharged into United States waters upon receipt of a permit under the National Pollutant Discharge Elimination System ("NPDES")."  <u>Ohio Valley</u>

Env't Coalition, Inc. v. Shepard Boone Coal Co., No. 2:15-CV-01488, 2017 WL 662119 (S.D.W. Va. Jan. 30, 2017) (citing § 1342).   The NPDES permits the EPA or an authorized state agency to "issue a permit allowing for the discharge of a pollutant if the discharge complies with certain CWA provisions." Id.  Under § 1365 of the CWA, the court has jurisdiction to require UCC to comply with the § 1342 permitting scheme in order to "effectuate the stated goals of the Clean Water Act 'to maintain the chemical, physical, and biological integrity of the Nation's waters,' 33 U.S.C. § 1251 (1983)."  United States v. Cumberland Farms of Connecticut, Inc., 826 F.2d 1151, 1164 (1st Cir. 1987).

UCC has represented that it is in the process of obtaining an NPDES permit so that its discharges will not be unpermitted.  See Tr. Trans. 563:5-21 (Carpenter: Feb. 16, 2024).  During trial, when asked whether obtaining such permits for Filmont and Massey would be completed within "roughly" six months of the trial date, Mr. Carpenter testified that he expected it to be "faster than that."  Tr. Trans. 179:10-12 (Carpenter: February 13, 2024).  After trial, UCC filed a notice to the court that it "submitted an application for a[n NPDES] Industrial Permit for Massey Railyard on June 26, 2024."  Defendant's Notice of Submission of NPDES Permit Application, ECF No. 356 in Courtland IV (filed July 3, 2024).  Therein, UCC also represents, with respect to the Filmont shallow drainage

channel, that a "separate Application for a NPDES Permit for Filmont Landfill has been substantially completed and is awaiting another required sample for submission."  Id.

The parties substantially agree that if UCC were to obtain the necessary discharge permits under the CWA, UCC would no longer be in violation thereof.  See Tr. Trans. 38:25-39:5 Proposed Integrated Statement of Issues at 38, ECF No. 299 in Courtland IV (Courtland asking the court to "enjoin UCC to obtain the necessary stormwater discharge permits"); Defendant's Motion for Adoption of Litigation Plan for Phase II of Trial at 5, ECF No. 284 in Courtland IV.  Courtland specifically seeks a permanent injunction requiring UCC to (1) cease its unpermitted stormwater discharges from Filmont and Massey, and (2) obtain the necessary NPDES permits for such discharges.  See Courtland's Proposed Findings of Fact and Conclusions of Law at 20, ECF No. 331 in Courtland IV.

The CWA "does not require a district court to enjoin all violations of the CWA's permit requirements." Forest Serv. Emps. for Env't Ethics v. United States Forest Serv., 674 F. Supp. 3d 959, 967 (D. Mont. 2023) (citing Weinberger v. Romero-Barcelo, 456 U.S. 305, 320 (1982)).  Indeed, as recognized by the Supreme Court, the "grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do

so under any and all circumstances, and a federal judge . . . is
not mechanically obligated to grant an injunction for every
violation of the law." Romero-Barcelo, 456 U.S. at 313; see
also id. at 320 (concluding the district court did not err in
declining to issue a permanent injunction and instead ordering
the Navy to apply for an NPDES permit inasmuch as "[t]he
District Court did not face a situation in which a permit would
very likely not issue, and the requirements of the statute could
therefore not be vindicated if discharges were permitted to
continue."); Forest Serv. Emps., 674 F. Supp. 3d at 967
(concluding "the objective of the CWA is likely to be achieved
here in due course without need for a permanent injunction in
the interim" inasmuch as defendant had begun the process of
obtaining the requisite NPDES permit.); Stone v. High Mountain
Co., LLC, 627 F. Supp. 3d 1211, (D. Colo. 2022), rev'd and
remanded on other grounds, 89 F.4th 1246 (10th Cir. 2024)
(declining to issue a permanent injunction respecting
defendant's CWA violations inasmuch as plaintiffs had failed to
show irreparable harm and "an injunction requiring [defendant]
to obtain an NPDES permit would constitute an impermissibly
vague obey-the-law injunction . . . .").

      As mentioned above, UCC established at trial and
reiterated thereafter that it is in the process of obtaining the

necessary NPDES permits for the stormwater discharges identified by the court emanating from Filmont and Massey.  The estimated timeframe for obtaining these permits is within the next six (6) months and there is no evidence to suggest the permits will not be obtained.  Further, for many of the same reasons articulated above, Courtland has again failed to make the requisite showing for a permanent injunction inasmuch as the record is devoid of any evidence that it or the public will suffer irreparable harm unless a permanent injunction should issue.  While the court recognizes that stormwater associated with industrial activity constitutes a pollutant under the CWA, at no point during the entirety of the litigation did Courtland sample the stormwater being discharged from the Filmont drainage channel or the two Massey culverts.  Nor did Courtland ever sample the Southern Boundary Ditch.  Without any such evidence, there is no basis for the court to find any irreparable harm to Courtland, the public, the environment, or otherwise that would warrant issuance of a permanent injunction.

Accordingly, the court finds issuance of a permanent injunction unnecessary under the circumstances in light of UCC's evident commitment to obtaining the necessary permits and concludes Courtland has failed to meet its burden in establishing the necessity of a permanent injunction.  However,

the court orders UCC to secure the necessary NPDES permits to
remedy the unpermitted stormwater discharges identified herein
in violation of the CWA within six (6) months of the date of
this memorandum opinion and order.  UCC shall likewise submit
status reports to the court every two months from entry of this
order until the permits have been obtained.

### B.    Civil Penalties

As to civil penalties, the CWA commands that "[a]ny
person who violates section 1311 . . . shall be subject to a
civil penalty not to exceed $25,000 per day for each violation."
33 U.S.C. § 1319(d).  As of December 27, 2023, for violations of
the CWA that occurred after November 2, 2015, where penalties
are assessed on or after December 27, 2023, the $25,000
statutory civil penalty has been adjusted upward to $66,712 to
account for inflation.  See 40 C.F.R. § 19.4, Table 1.[10]  The

_____

[10] In their Proposed Findings of Fact and Conclusions of Law,
citing Table 1 of 40 C.F.R. § 19.4, the parties assert the
maximum penalty when adjusted for inflation is $64,618, as
opposed to $66,712.  The $64,618 amount, however, arises from a
previous version of the regulation that was effective from
January 6, 2023, to December 26, 2023.  See 40 C.F.R. § 19.4,
Table 1 (Jan. 6, 2023) (providing the maximum civil penalty
under 33 U.S.C. § 1319(d) for violations of the CWA that
"occurred after November 2, 2015, where penalties are assessed
on or after January 6, 2023" is $64,618).  Effective December
27, 2023, the regulation was amended and now provides that the
applicable maximum civil penalty is $66,712 for violations of
the CWA that "occurred after November 2, 2015, where penalties

Fourth Circuit has held that the statutory language of section 1319(d) mandates a civil penalty: "This language leaves little doubt that, under the circumstances of this case, a penalty in some form is mandated." Stoddard v. W. Carolina Reg'l Sewer Auth., 784 F.2d 1200, 1208 (4th Cir. 1986); see Foster v. United States Env't Prot. Agency, No. CV 2:14-16744, 2019 WL 4148067 (S.D.W. Va. Aug. 29, 2019); see also Atl. States Legal Found., Inc. v. Tyson Foods, Inc., 897 F.2d 1128, 1142 (11th Cir. 1990) ("This language makes clear that once a violation has been established, some form of penalty is required."). "Courts are afforded broad discretion in setting the penalty amount." Foster, 2019 WL 4148067, at *2; see United States v. Smithfield Foods, Inc., 191 F.3d 516, 526–27 (4th Cir. 1999) ("Because of the difficulty of determining an appropriate penalty in a complex case such as this one, we give deference to the 'highly discretionary calculations that take into account multiple factors [that] are necessary in order to set civil penalties

---

are assessed on or after December 27, 2023." See 40 C.F.R. § 19.4, Table 1 (Dec. 27, 2023).  Under the current version of the regulation, the $64,618 amount is now applicable to "violations that occurred after November 2, 2015, where penalties were assessed on or after January 6, 2023, but before December 27, 2023." Id.(emphasis added).  While the court found UCC liable for CWA violations on September 28, 2023, it is assessing the civil penalty for those violations herein.  The $66,712 amount is thus the applicable maximum "per day for each violation" penalty.

under the Clean Water Act.'") (quoting <u>Tull v. United States</u>, 481 U.S. 412, 427 (1987)); <u>Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York</u>, 451 F.3d 77, 87 (2d Cir. 2006) ("District courts have broad discretion in calculating civil penalties under the CWA.")).

UCC does not dispute that a civil penalty is an appropriate form of remedy, but the parties disagree as to the number of violations subject to penalty and the impact, if any, of the statute of limitations on the court's determination of the number of violations.

To ascertain the appropriate civil penalty, courts begin with one of two anchor points: either "with the violator's estimated economic benefit from noncompliance (known as the 'bottom-up' method) or with the statutory maximum allowable penalty (known as the 'top-down' method)." <u>Foster</u>, 2019 WL 4148067, at *3 (quoting <u>Catskill Mountains</u>, 451 F.3d at 87); <u>see Smithfield Foods, Inc.</u>,191 F.3d at 528, n.7 ("the CWA does not require the use of either [the bottom-up or the top-down] method, however, courts have applied both.") (collecting cases of application of both methods). Using that anchor point, courts adjust the value provided by either method (upward if using bottom-up, downward if using top-down) by applying the six factors set forth by the CWA: "[(1)]the seriousness of the

violation or violations, [(2)]the economic benefit (if any) resulting from the violation, [(3)]any history of such violations, [(4)] any good-faith efforts to comply with the applicable requirements, [(5)] the economic impact of the penalty on the violator, and [(6)] such other matters as justice may require." 33 U.S.C. § 1319.

Here, Courtland did not set forth sufficient evidence for the court to determine the economic benefit UCC received from its noncompliance with the CWA at Filmont and Massey, which would be necessary input for the bottom-up method. Accordingly, the court finds that it is most appropriate to apply the top-down method, and the court must first determine the statutory maximum allowable penalty.

Again, the parties differ as to the number of violations warranting imposition of a civil penalty. Courtland appears to take the position that the court may assess a civil penalty for each day UCC failed to obtain a stormwater permit, irrespective of whether Courtland presented evidence demonstrating an unpermitted stormwater discharge occurred on those dates. Specifically, Courtland asserts "UCC is liable for violations for each and every day from February 4, 1991, to the present" for unpermitted stormwater discharges to the Southern Boundary Ditch from Filmont and from each of the two Massey

culverts, "totaling three violations per day" throughout that
thirty-three-year period.  See Plaintiff's Proposed Findings of
Fact and Conclusions of Law at 19.

Conversely, UCC contends the court may only assess a
civil penalty for the unpermitted stormwater discharges
Courtland proved occurred during the liability phase of trial --
-- those being the stormwater discharges Dr. Simonton observed
on a single day in 2022 from the Filmont drainage channel and
the Massey culverts.  In other words, UCC contends it did not
violate the CWA every day it did not have a permit, but only
violated the CWA "for discharging stormwater without a permit."
See Defendant's Final Proposed Findings of Fact and Conclusions
of Law for Phase II of Trial ¶ 295 (emphasis in original).
Simply put, UCC asserts "[i]f stormwater was never discharged
from Filmont [or Massey], then it is irrelevant whether [it] had
a CWA permit."  Id.

The court agrees with UCC's position that any civil
penalty imposed must be based on the actual, unpermitted
stormwater discharges Courtland established during the liability
phase of trial, as opposed to every day UCC failed to obtain a
CWA permit.  See Alaska Cmty. Action on Toxics v. Aurora Energy
Servs., LLC, No. 3:09-cv-00255-TMB, 2011 WL 13069517, at *11 (D.
Alaska Jan. 10, 2011) (concluding "that any civil penalties

imposed under § 1319(d) should be calculated only with respect to days involving actual discharges of pollutants."); <u>see also</u> <u>Kleinman v. City of Austin</u>, 310 F. Supp. 3d 770, 782 (W.D. Tex. 2018) (explaining that "[t]he maximum penalty is calculated according to the number of days on which <u>a violation</u> <u>occurred</u>.")(emphasis added)).  This is so inasmuch as UCC's "lack of a permit is not, in and of itself, a violation" of the CWA "absent a discharge of a pollutant," in this case, stormwater associated with industrial activity.  <u>Id</u>. Indeed, if the court were to adopt Courtland's position, it would essentially be imposing a penalty for every day from February 1991 to the present, regardless of whether a pollutant (i.e., stormwater associated with industrial activity) was discharged from the Filmont drainage channel or the Massey culverts.  A simple observation illustrates why Courtland's position is flawed: in order to establish a discharge of stormwater, rainfall is doubtless necessary, and it is evident that it did not rain every day from 1991 to the present.

     In order to properly identify the number of days from 1991 to the present where an unpermitted discharge of stormwater occurred from the locations previously identified, Courtland would have had to present expert testimony or some other evidence during the liability phase of trial establishing (1)

the amount of rainfall necessary to trigger a stormwater discharge from the Filmont drainage channel and the Massey culverts, and (2) rainfall data demonstrating the days from 1991 to the present when that amount of rainfall occurred. Courtland presented no such evidence at any point during the liability phase.[11]  Instead, it only elicited testimony from Dr. Simonton

---

[11] Presumably recognizing its failure to elicit such expert testimony from Dr. Simonton and produce any relevant rainfall data during the liability phase of trial, Courtland attempted to do so in Phase II, which became the subject of two Motions in Limine filed by UCC seeking to preclude such evidence and testimony as outside Phase II's scope, which was limited to an assessment of damages for the violations of CERCLA, RCRA, and the CWA found in Phase I.  See ECF Nos. 614, 615.

On the morning of Phase II of trial, the court granted UCC's two Motions in Limine insofar as they sought exclusion of the the National Oceanic and Atmospheric Administration's ("NOAA") rainfall data from July 1996 – November 2023 and Dr. Simonton's opinions respecting the NOAA records and the amount of rainfall necessary to trigger stormwater discharges from the Massey culverts and Filmont drainage channel as set forth in paragraphs 5-9 of his December 27, 2023, declaration.  See Tr. Trans. 5:15-6:13, 6:14-7:16; ECF 615-3 (Simonton Dec. 27, 2023, Declaration); see also the court's Order entered this same date with respect to the parties' pretrial motions.

Although the bench ruling was not elaborated on, the court excluded this evidence and testimony based on the sole fact that the same could have -- and should have -- been presented during the liability phase of trial given that it was during that phase Courtland was tasked with proving UCC's liability with respect to any and all violations of the CWA. Indeed, the publicly available NOAA rainfall data dating back to July 1996 through the close of trial on August 3, 2022, was obviously in existence and thus available to Courtland during Phase I.  To permit Courtland to introduce such evidence and testimony during Phase II would have resulted in giving

who testified he observed stormwater discharges occurring from the Filmont drainage channel and the Massey culverts on a single day in 2022.

While it is evident to the court that unpermitted stormwater discharges have likely been occurring from the Filmont drainage channel and the Massey culverts for some time given that it has undoubtedly rained sufficiently to produce stormwater discharges on many occasions since 1991, the court is limited by the evidence presented to imposing a civil penalty for those three unpermitted stormwater discharges Courtland established during the liability phase of trial.  To do otherwise would result in the imposition of penalties for days on which no unpermitted stormwater discharges -- and thus no CWA violation -- occurred.

In sum, inasmuch as the court has found UCC liable for a total of three CWA violations, -- the unpermitted stormwater discharges emanating from the Filmont drainage channel and the two Massey culverts observed by Dr. Simonton on a single day in

_____

Courtland a second opportunity to litigate issues of liability that had already been determined, resulting in prejudice to UCC. The court thus excluded the NOAA rainfall data and opinions from Dr. Simonton related thereto in paragraphs 5-9 of his December 27, 2023, declaration from Phase II of trial.

2022 -- utilizing the $66,712 maximum per day for each violation penalty mandated by 40 C.F.R. § 19.4, the court concludes the maximum civil penalty that can be imposed for such violations is $200,136.

### i.   Application of Mitigating Factors

Applying the top-down method, once the court has calculated the statutory maximum penalty, it must then determine if a reduction is appropriate by considering the six potentially mitigating factors mandated by section 1319(d). United States v. Smithfield Foods, Inc., 191 F.3d 516, 528 (4th Cir. 1999). As previously mentioned, such factors include: ""[(1)] the seriousness of the violation or violations, [(2)] the economic benefit (if any) resulting from the violation, [(3)] any history of such violations, [(4)] any good-faith efforts to comply with the applicable requirements, [(5)] the economic impact of the penalty on the violator, and [(6)] such other matters as justice may require." 33 U.S.C. § 1319(d).

First, the court considers the seriousness of the violation by analyzing the "frequency and severity of the violations, and the effect of the violations on the environment and the public," as well as the duration of noncompliance. Foster, 2019 WL 4148067, at *3; see also Hawaii's Thousand Friends v. City & Cnty. of Honolulu, 821 F. Supp. 1368, 1384 (D.

Haw. 1993).  Again, while the court recognizes that the three
unpermitted stormwater discharges observed by Dr. Simonton have
likely been occurring for some time, the court declines to
speculate as to the frequency of the same given the lack of
evidence presented on the matter.  Nonetheless, given that it is
undisputed UCC has never had a CWA permit for Filmont or Massey,
it is axiomatic that its history of noncompliance is
substantial.

        More importantly to this factor, however, is the
court's Phase I finding that Courtland failed to establish that
UCC's unpermitted stormwater discharges have caused any actual
or potential harm to human health or the environment.  See City
of Mt. Park, Ga v. Lakeside at Ansley, LLC, 2011 U.S. Dist.
LEXIS 162205, at *8 (N.D. Ga. 2011) (affording "great weight" to
the extent of harm to human health and the environment)).
Indeed, in Phase I, the court credited the Human Health Risk
Assessment and Ecological Risk Evaluation performed by UCC's
consultants which examined "whether the conditions at the site
were creating any on-site or off-site risks to human health or
the environment via all complete and existing exposure
pathways," and concluded that no such harm existed to human
health or the environment.  Phase I Order, at 177; see also id.
at 167-183.  And, again, while the court recognizes stormwater

associated with industrial activity is presumably a pollutant, at no point during the entirety of the litigation did Dr. Simonton sample the stormwater he observed being discharged from the shallow Filmont drainage channel or the two Massey culverts. Nor did he sample the Southern Boundary Ditch.  At the end of Phase I, the court was simply left with no evidence that would have permitted it to sustain a finding of harm or potential harm to human health or the environment arising from the unpermitted stormwater discharges.

As in Phase I, Courtland's expert Dr. Simonton has not provided any further evidence upon which the court should discredit its previous conclusions.  Accordingly, despite the presumably long duration of noncompliance, the lack of evidence of actual or potential harm to human health or the environment arising from the unpermitted stormwater discharges from Filmont and the Massey culverts into the Southern Boundary Ditch, then on to Davis Creek, tends to mitigate the "seriousness" factor.

Second, as to the economic benefit of the violation to the violator, Courtland failed to adduce any evidence which would permit the court to analyze this factor.  Though Courtland's attorney asserted that its "evidence will adduce that the [economic advantage to UCC from the violation] is in the low millions" and there are "compliance costs [UCC has]

escaped by not complying," Tr. Trans. 40:21-41:4, no such evidence was presented.  But the court notes that the converse also remains true -- UCC did not adduce any evidence to demonstrate the absence of any economic benefit obtained from not complying with the CWA with respect to the three identified unpermitted stormwater discharges.  Accordingly, the factor is neutral.

Third, the court considers the history of violations. As recognized above, it is evident UCC has a substantial history of noncompliance with the CWA that is somewhat mitigated by the fact that the record is devoid of any evidence that such noncompliance has produced any negative effect on human health or the environment.  This factor, when considered alongside the first, remains significant.

Fourth, the court considers any good faith efforts by UCC to comply with the applicable regulations by examining whether it "took any actions to decrease the number of violations or made efforts to mitigate the impact of [its] violations on the environment." United States v. Smithfield Foods, Inc., 972 F. Supp. 338, 349-50 (E.D. Va. 1997) (citing Atlantic States Legal Found., Inc. v. Universal Tool & Stamping Co., Inc., 786 F. Supp. 743, 752 (N.D.Ind.1992)).  Such actions or efforts include, but are not limited to, attempting to seek a

permit, engaging with the EPA to determine the necessity of a
permit, or working with experts to determine necessary steps to
achieve compliance with the CWA.  <u>Foster</u>, 2019 WL at *4.  The
record is devoid of any evidence that UCC engaged in efforts to
mitigate its CWA violations prior to this litigation.  While
UCC, on its own accord, hired consultants from 2005 through 2019
to monitor and sample groundwater, surface water, and soil at
and near Filmont and Massey (of which the WVDEP was aware),
there is no evidence these investigations had anything to do
with ensuring UCC was not violating the CWA by way of its
unpermitted stormwater discharges.

Nonetheless, since the court issued its Phase I
findings, UCC has undertaken significant efforts to remedy the
three stormwater discharges identified by the court.  Not only
has UCC begun the necessary steps to obtain NPDES permits for
both Filmont and Massey, it has also repaired erosion of the
Filmont berm in an effort to ensure that stormwater remains on
site and no longer flows through Courtland into the Southern
Boundary Ditch.  <u>See</u> Tr. Trans. 561:5-13, 563:5-567:7
(Carpenter).  While it is this litigation that appears to have
triggered UCC's current good faith efforts to comply with the
CWA, those efforts nevertheless would ordinarily tip the scales
slightly toward a reduced penalty.  However, given UCC's

74

substantial history of noncompliance with the CWA as highlighted below, those recent good faith efforts carry little, if any, mitigating weight.

Respecting the fifth factor, the court must consider the economic impact of the penalty on UCC.  "Where a violator cannot show that a penalty will have a ruinous effect, the economic impact factor . . . will not reduce the penalty." <u>City of Mt. Park, Ga v. Lakeside at Ansley, LLC</u>, 2011 U.S. Dist. LEXIS 162205, *11-12 (N.D. Ga. 2011).  The record is devoid of any evidence that imposition of a civil penalty, even at the maximum amount calculated above, would adversely affect the operations of UCC.  This factor thus fails to weigh in favor of reduction.

Lastly, in assessing the final penalty to be imposed, the court may consider other matters as justice may require.  To reiterate, while Courtland failed to adduce evidence establishing more than the three violations warranting imposition of a civil penalty, the substantial number of violations UCC would be facing had Courtland not failed in its evidentiary burden is not lost on the court.  The court accordingly declines to reduce the penalty to a total of the mere $3,000 UCC suggests is appropriate.  To reduce the penalty

to such an extent would fail to adequately penalize UCC for its evident history of noncompliance with the CWA.

In light of all of the foregoing, the court concludes that the maximum $200,136 civil penalty is appropriately imposed on UCC despite the lack of evidence demonstrating any harm or potential harm to human health or the environment arising from UCC's unpermitted stormwater discharges. Notwithstanding the few established violations, UCC's evident history of noncompliance with the CWA is an overriding factor that warrants imposition of a sizeable penalty for the three stormwater discharges shown.

### IV.   CONCLUSION AND SUMMARY

Based on the foregoing discussion, and the entirety of the evidentiary record, the court ORDERS as follows:

> 1. In Courtland II (2:19-cv-00894), Courtland has failed to establish the requirements for issuance of a permanent injunction with respect to UCC's RCRA Subtitle D violation identified in Phase I, and UCC's continued participation in and completion of the VRP is sufficient to remedy that violation without additional injunctive requirements;

2.  In Courtland II, while UCC is liable to Courtland under CERCLA § 107 for the $27,142.50 Courtland expended on its June and July 2021 groundwater sampling investigation on the Courtland property, UCC is entitled to contribution for a 25% portion of those costs from Courtland in the amount of $6,785.63 pursuant to CERCLA § 113(f), with UCC bearing responsibility for the remaining 75%;

3. In Courtland II, UCC is not entitled to contribution from Courtland under CERCLA § 113(f) for the $199,942.52 UCC expended on its December 2020 soil investigation on the Courtland property and thus bears sole responsibility for the same;

4. In Courtland II, Courtland is entitled to declaratory judgment under CERCLA § 113(g)(2) declaring that UCC is liable to it for future response costs it may choose to incur in efforts to remediate the groundwater contamination detected on the northern portion of the Courtland property, which will be subject to an equitable allocation between the parties as noted below in Paragraph 5;

5. In Courtland II, UCC is entitled to declaratory judgment under CERCLA § 113(g)(2) declaring that UCC is entitled to contribution respecting any future response costs Courtland may choose to incur in efforts to remediate the groundwater contamination detected on the northern portion of the Courtland property; thus, any such costs will be subject to an equitable allocation between the parties;

6. In Courtland IV (2:21-cv-00487), Courtland has failed to establish the necessity of a permanent injunction for UCC's CWA violations, but UCC shall obtain the necessary NPDES permits for the unpermitted stormwater discharges identified herein within six (6) months of entry of this Order;

7. In Courtland IV, UCC is directed to update the court every two months from the date of the entry of this Order until its NPDES permits have been obtained;

8. In Courtland IV, UCC shall pay a civil penalty in the amount of $200,136, to the United States Treasury for its CWA violations identified herein; and

9. Inasmuch as the court has adjudicated all

   outstanding claims in Courtland II and IV with

   respect to liability in its Phase I Order and with

   respect to damages on the merits herein, Courtland's

   Motions for Judgment as a Matter of Law in Courtland

   II (ECF No. 642, 645) and Courtland IV (ECF No. 326,

   329) are DENIED AS MOOT.

   The Clerk is directed to transmit copies of this order

to all counsel of record and any unrepresented parties.

ENTER: September 27, 2024

John T. Copenhaver, Jr.
Senior United States District Judge